IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MATTHEW HAVRILLA, CYNTHIA DAWSON, ALDEN HENRIKSEN, MELODY DESCHEPPER, CHRISTOPHER TILTON, and MARK HACKETT, individually and on behalf of all others similarly situated, <br><br><br> Plaintiffs, <br><br> *v.* <br><br> CENTENE CORPORATION; CENTENE MANAGEMENT COMPANY LLC; and CELTIC INSURANCE COMPANY, <br><br> Defendants. | |

**CLASS ACTION COMPLAINT**

# Table of Contents

Page

I.   Introduction ......................................................................................... 1

II.  Parties ................................................................................................... 9

    A.   Plaintiffs ....................................................................................... 9

        1.   Matthew Havrilla .................................................................. 9

        2.   Cynthia Dawson ................................................................. 11

        3.   Alden Henriksen ................................................................ 14

        4.   Melody DeSchepper ........................................................... 15

        5.   Christopher Tilton ............................................................. 15

        6.   Mark Hackett ..................................................................... 17

    B.   Defendants ................................................................................. 19

III. Jurisdiction and Venue .................................................................... 19

IV.  Factual Allegations .......................................................................... 20

    A.   Defendants are members of a RICO enterprise that defrauds primarily low-income consumers, in part by taking advantage of enterprise members' status as Medicaid managed-care organizations. ............................... 20

    B.   Ambetter plans don't comply with the ACA's requirements. ............................ 28

    C.   Ambetter plan documents misrepresent the benefits that members will receive. ................................................................. 30

    D.   Defendants have been defrauding consumers since 2013. .................................. 32

    E.   Defendants engaged in racketeering by violating the criminal federal mail- and wire-fraud statutes millions of times incident to their scheme to defraud. ................................................. 37

    F.   The Ambetter Enterprise's scheme to defraud could not have been executed without Defendant Centene Corp. and its subsidiaries using their separate legal incorporation to facilitate racketeering activity. ........................... 38

    G.   Centene Corp. and Centene Management obtain their subsidiaries by acquiring companies that previously offered legitimate health insurance services and then use the subsidiaries to further the Ambetter Enterprise. .......... 42

    H.   The Ambetter Enterprise defrauded not only consumers, but also the federal government. ............................................. 44

V.   Class Action Allegations.................................................................. 45

VI.  Claims for Relief ........................................................................... 49

    Claim 1: Violations of the Racketeer Influenced and  Corrupt Organizations Act, 18 U.S.C. § 1962(c)................................................49

    Claim 2: Unjust Enrichment ........................................................53

    Claim 3: Violations of the Arizona Consumer Fraud Act,  Ariz. Rev. Stat. §§ 44-1521 through 44-1534 ...............................................54

    Claim 4: Violations of the California Unfair Competition Law,  Cal. Bus. & Prof. Code §§ 17200 through 17594 ..................................55

    Claim 5: Violations of the Illinois Consumer Fraud and  Deceptive Business Practices Act, 815 ILCS 505/1 through 505/12..................57

    Claim 6: Violations of the Kentucky Consumer Protection Act,  Ky. Rev. Stat. Ann. §§ 367.110 through 367.990......................................58

    Claim 7: Violations of the Nebraska Consumer Protection Act,  Neb. Rev. Stat. §§ 59-1601 through 59-1623 ...............................................60

    Claim 8: Violations of the Nevada Trade Regulation and Practices Act,  Nev. Rev. Stat. §§ 41.600, 589.0903 through 598.0999..............................61

    Claim 9: Violations of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1 through 56:8-91..................................................62

    Claim 10: Violations of New Mexico Unfair Practices Act, N.M. Stat. §§ 57-12-1 through 57-12-22 ................................................64

    Claim 11: Violations of the New Mexico Unfair Insurance Practices Act,  N.M. Stat. §§ 59A-16-1 through 59A-16-30.......................................66

    Claim 12: Violations of the North Carolina Unfair and Deceptive  Practices Statute, N.C. Gen. Stat. §§ 75-1.1 through 75-35 ...............68

    Claim 13: Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. §§ 201-1 through 201-9.3 ......................69

    Claim 14: Violations of the Washington Consumer Protection Act,  Wash. Rev. Code §§ 19.86.010 through 19.86.920..............................70

VII. Prayer For Relief............................................................................ 72

VIII. Jury Demand .................................................................................. 73

Plaintiffs Matthew Havrilla, Cynthia Dawson, Alden Henriksen, Melody DeSchepper, Christopher Tilton, and Mark Hackett bring this action against Defendants Centene Corporation, Centene Management Company LLC, and Celtic Insurance Company, individually and on behalf of all others similarly situated, and allege the following based on personal knowledge, the investigation of counsel, and information and belief.

## I. INTRODUCTION

1. This case is about a multi-billion-dollar scheme to defraud consumers who purchase health-insurance plans sold by subsidiaries of Centene Corporation ("Centene Corp."), which, collectively, is the largest provider of health-insurance plans sold on the online exchanges established by the Affordable Care Act ("ACA"). The scheme—conceived by Defendants Centene Corp. and Centene Management Company LLC ("Centene Management"), and executed by those Defendants in conjunction with Defendant Celtic Insurance Company ("Celtic") and other Centene Corp. subsidiaries—is massive in scope. Defendants and numerous subsidiaries of Centene Corp. have since 2013 operated as an unlawful enterprise under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), selling fraudulent health-insurance policies under the brand name "Ambetter" to millions of consumers across 26 states. The millions of consumers—most of them low-income—who have purchased the Ambetter plans sold by Defendants and other members of the RICO enterprise have been overcharged by hundreds of millions of dollars a year because the plans don't deliver the benefits that are represented to consumers and fail to satisfy the minimum requirements imposed by the ACA and other federal and state laws and regulations. This class action seeks to recover the overcharges incurred by Plaintiffs and the millions of other similarly situated consumers who paid premiums for Ambetter plans, and to enjoin Defendants from further unlawful conduct.

2.     Centene Corp. is a giant in the health-insurance industry. The company's total revenue in 2021 was $126 billion, and it reported $850 million in profits for the first quarter of 2022. As of July 2022, the company's market cap is $52.43 billion.

3.     Through its numerous subsidiaries—including Defendants Centene Management and Celtic—the company is the largest provider of Medicaid managed-care health plans in the United States, with its subsidiaries managing Medicaid coverage for more than 15 million persons nationally.

4.     Centene Corp. also is the largest provider of health-insurance plans sold on the exchanges established by the Affordable Care Act. The company's many subsidiaries sell ACA plans under the brand name Ambetter.

5.     Ambetter plans are currently sold on exchanges in 26 states. Over 2 million persons currently pay for Ambetter brand plans.[1]

6.     Approximately 90% of the Ambetter plans sold through the exchanges are Silver plans.[2] Of the four "metal levels" of health plans offered on the exchanges, "Silver plans fall about in the middle: [the consumer] pay[s] moderate monthly premiums and moderate costs when [they] need care."[3]

7.     Significantly, Silver plans are the only ACA plans that qualify for cost-sharing reductions. In other words, for persons on a Silver plan who qualify for cost-sharing based on

---

[1] Robert King, *Centene to expand ACA exchange footprint by nearly 400 counties in 2021*, FIERCE HEALTHCARE (Sept. 11, 2020), https://www.fiercehealthcare.com/payer/centene-to-expand-aca-exchange-footprint-by-nearly-400-counties-2021.

[2] *Centene Corp at Credit Suisse Healthcare Conference – Final*, FD (FAIR DISCLOSURE) WIRE (Nov. 14, 2018) (statement of Edmund E. Kroll, SVP of Finance & IR for Centene Corporation) (LEXISNEXIS).

[3] *Silver Health Plan*, HEALTHCARE.GOV (last visited July 26, 2022), https://www.healthcare.gov/glossary/silver-health-plan/.

income, the federal government pays for part of the monthly premiums and the insured person has lower deductibles, lower co-payments or co-insurance, and lower out-of-pocket maximums.[4]

8.      For Plaintiffs, the government subsidy for the Ambetter plans they purchased ranges from 60% to 95%.

9.      Defendants' unlawful conduct is therefore injuring not only consumers but the government and taxpayers, and Defendants are well aware of this fact. As Ed Kroll, Centene's Senior VP of Finance & IR, said in 2019: "**90% of our almost 2 million lives are getting [government] subsidies**."[5]

10.     Centene Corp.'s website for Ambetter plans tells consumers that Ambetter "offers affordable Health Insurance Marketplace plans,"[6] provides "the benefits, tools, and coverage you need to take charge of your health,"[7] and "partner[s] with local providers, ensuring Ambetter members have access to the care they need."[8]

11.     In reality, the sale of Ambetter plans is an ever-expanding scheme to defraud primarily low-income consumers who purchase the plans on the ACA exchanges.[9]

---

[4] *See id.*; *Cost-sharing reductions*, HEALTHCARE.GOV (last visited July 26, 2022), https://www.healthcare.gov/lower-costs/save-on-out-of-pocket-costs/.

[5] *Centene Corp at Wells Fargo Healthcare Conference – Final*, FD (FAIR DISCLOSURE) WIRE (Sept. 4, 2019) (emphasis added) (LEXISNEXIS).

[6] *What is Ambetter?*, AMBETTER (last visited July 26, 2022), https://www.ambetterhealth.com/health-plans/what-is-ambetter.html.

[7] *Id.*

[8] *About Us*, AMBETTER (last visited July 26, 2022), https://www.ambetterhealth.com/about-us.html.

[9] *See, e.g.*, *Centene Corp at Wells Fargo Healthcare Conference*, *supra* note 5 ("[W]e've targeted the same people in all of these states, in all of these markets. They're basically working poor people, lower-income, subsidized people. So 90% of our almost 2 million lives are getting subsidies." (statement by Ed Kroll, Centene Corp.'s Senior Vice President of Finance & IR)) .

12.     Among other things, the provider networks for Ambetter plans that are presented to plan members and potential members are simply false and are often just copies of physician directories from other sources. Accordingly, plan members have difficulty finding an in-network provider and sometimes cannot find *any* provider who accepts Ambetter insurance. The harms caused by this practice include (among other things) time spent searching for an in-network physician, delays in treatment, inability to get treatment, traveling to see an in-network provider who is hundreds of miles away, and paying out-of-pocket for out-of-network providers because no in-network provider is available.

13.     In addition, Ambetter plans routinely refuse to pay for medical services and medications that the plan purportedly covers. Indeed, Centene Corp. and its subsidiaries have been sued numerous times by medical providers challenging this unlawful practice.[10] That Ambetter plans routinely fail to pay for covered services is well known by medical providers and leads to many providers refusing to accept Ambetter insurance, which further reduces the number of in-network providers.

14.     When an Ambetter plan refuses to pay for covered medical services or prescriptions, the plan member may be stuck with a bill for the medical service and will certainly have to pay for the prescription out-of-pocket. In some cases, the medical bill is sent to collections and the plan member is stuck between disputing the bill for years and paying for medical care that the Ambetter plan purportedly covered.

---

[10] *See, e.g.*, *Orthopaedic Care Specialists, P.L. v. Celtic Ins. Co.*, No. 9:20cv82358 (S.D. Fla. Dec. 18, 2020); *Reyna v. Celtic Ins. Co.*, No. 1:19cv23914 (S.D. Fla. Sept. 19, 2019); *Piney Woods ER III LLC v. Centene Corp.*, No. 2:19-cv-00261 (E.D. Tex. Aug. 2, 2019); *Boca Raton Hosp., Inc. v. Celtic Ins. Co.*, 9:19cv80650 (S.D. Fla. May 15, 2019); *S. Baptist Hosp. of Fla., Inc. v. Celtic Ins. Co.*, No. 3:17cv1214 (Oct. 30, 2017); *Mem'l Health Servs. v. Centene Corp.*, No. 21STCV28207 (Cal. Super. Ct., Los Angeles Cty. July 30, 2021); *Suncoast Surgical Assocs., P.A. v. Celtic Ins. Co.*, No. 21-CA-004919 (Fla. Cir. Ct. June 15, 2021).

15.     The bottom line is that the consumers who purchase Ambetter plans are being fraudulently overcharged by hundreds of millions of dollars a year because the plans don't deliver what they promise and fail to satisfy minimum requirements imposed by the ACA and state laws.

16.     The scope of the fraudulent scheme perpetrated by Defendants Centene Corp., Centene Management, and Celtic—and at least 26 other Centene Corp. subsidiaries—is staggering, involving millions upon millions of instances of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

17.     For the purpose of carrying out the fraudulent scheme, Defendants and numerous Centene Corp. subsidiaries have used or caused the use of the United States Mails, private and commercial interstate carriers, and interstate wire communications, and they did so millions of times as an essential part of the scheme—sending Ambetter plan documents and invoices to current or potential plan members, electronically filing Ambetter plan documents with the online health insurance exchanges of 26 states, receiving fraudulently procured premium payments electronically from plan members, sending emails to plan members and potential customers, and communicating about Ambetter plans through emails or over the phone.

18.     The millions of violations of the mail- and wire-fraud statutes by Defendants and various Centene Corp. subsidiaries constitute a pattern of racketeering activity under RICO, 18 U.S.C. § 1962(c).

19.     Defendants and Centene Corp. subsidiaries involved in this pattern of racketeering activity constitute a RICO enterprise ("the Ambetter Enterprise").

20. The Ambetter Enterprise's decision to operate through subsidiaries facilitates its unlawful activity, as each company performs a distinct and necessary role in the fraudulent scheme.

21. To understand how each subsidiary facilitates the unlawful activity of the Ambetter Enterprise, it's necessary to understand how the Enterprise takes advantage of "churn"—the fact that low-income persons are cycling in and out of Medicaid eligibility— and leverages the contracts that Centene Corp. subsidiaries have with states to provide managed-care plans to Medicaid beneficiaries.

22. Taking the state of Florida as an illustrative case, the scheme to defraud perpetrated by the Ambetter Enterprise operates as follows:

    a.  A person is a Medicaid beneficiary in Florida and is enrolled in a managed-care plan through Centene's subsidiary Sunshine State Health Plan, Inc. (which is referred to as "**Sunshine Health**").

    b.  The person gets a new job, their income increases, and they are no longer eligible for Medicaid. This is a feature of what members of the Ambetter Enterprise call "churn": low-income persons losing Medicaid eligibility and needing to buy private insurance, only to eventually regain Medicaid eligibility, thus "churning" between Medicaid coverage and private coverage.[11]

    c.  **Sunshine Health** is notified by Florida that the person is no longer eligible for Medicaid.

    d.  This information is conveyed to Celtic Insurance Company, which is the underwriter for the Ambetter plan sold on the ACA exchange in Florida.

---

[11] *See, e.g.*, *Centene Corp at Bank of America Merrill Lynch Health Care Conference – Final*, FAIR (FAIR DISCLOSURE) WIRE (May 14, 2015) ("[T]he individuals who lose eligibility in Medicaid[ ]—we coined the word; others are using it now—churn. People that lose eligibility go into Ambetter, regain eligibility, go back and forth." (statement of Michael Neidorff, Centene Corp.'s Chairman of the Board, President, and CEO)) (LEXISNEXIS).

e. Celtic sends materials to the person who just lost Medicaid coverage advertising its Ambetter plan, which in Florida is called Ambetter from **Sunshine Health**.

f. The words "from **Sunshine Health**" in the name of the Ambetter plan are intended by the Ambetter Enterprise to falsely convey to the person that the Ambetter plan will provide them with the same coverage they received through Medicaid.[12] In Florida, Centene even does business under the name "Ambetter from **Sunshine Health**," which further reinforces the idea that the Ambetter product is equivalent to the managed-care plan a person receives while on Medicaid.

g. The person purchases the Ambetter plan, only to discover that it does not provide the benefits represented in the marketing materials, plan policy documents, or the insurance contract itself.

23. Although not all Ambetter plans are purchased by former Medicaid beneficiaries, this churn-based strategy has been a focus of the Ambetter Enterprise since the ACA exchanges went online in late 2013.[13] Moreover, the Enterprise's churn-based strategy demonstrates how the Enterprise's decision to operate through subsidiaries facilitates its unlawful activity:

---

[12] *See, e.g.*, *Centene Corporation at Bank of America Merrill Lynch Health Care Conference – Final*, FD (FAIR DISCLOSURE) WIRE (May 15, 2015) (emphasis added) "([J]ust a note on the Ambetter—so that's the common brand across all nine states. But there is a reference point to the Medicaid health plan. Each of our states has a unique Medicaid health plan brand, Peach State Health in Georgia, Sunshine in Florida, Buckeye in Ohio, and et cetera. So the Ambetter brought to you by Buckeye Health Plan in Ohio, for example, to make that connection to the Medicaid player in the same state." (statement of Ed Kroll, Centene Corp.'s Senior Vice President of Finance and IR)) (LEXISNEXIS).

[13] *See, e.g.*, *Centene Corporation Analyst Meeting – Preliminary*, FD (FAIR DISCLOSURE) WIRE (Dec. 13, 2013) ("[O]ur value proposition is built around a focus on the subsidized market particularly the Medicaid churn population. We're leveraging a narrow network of our Medicaid providers who have experience serving this target market . . . ." (statement of Rone Baldwin, Centene Corp.'s Executive Vice President of the Insurance Group)) (LEXISNEXIS).

a. Defendants Centene Corp. and Centene Management designed the Ambetter plan and originated the scheme to defraud.

b. Defendant Centene Management coordinates between the various Centene Corp. subsidiaries to ensure that all of the members of the Enterprise work toward a common purpose and function as a continuing unit.

c. Each Centene Corp. subsidiary that has a contract to provide Medicaid plans in a state lends its name/brand to the Ambetter plan in that state so that persons who lose Medicaid coverage are more likely to purchase the Ambetter plan.

d. Each subsidiary that has a contract to provide Medicaid plans in a state receives notice from the state when a person on their plan is no longer eligible for Medicaid. The subsidiary then uses that information to target that person with promotional materials for the Ambetter plan. (The subsidiary either sells the Ambetter plan itself or provides the consumer's information to the subsidiary that does.)

e. The subsidiaries that provide Medicaid managed-care plans or Ambetter plans in each state have the necessary licenses to do so, without which the scheme could not work. These licenses are difficult to obtain: Centene Corp. has specifically acquired Defendant Celtic and other companies because they are licensed to sell health plans in certain states.

24.     As members of the Ambetter Enterprise, Defendants have been defrauding consumers since the ACA health-insurance exchanges went online in 2013.

25.     Defendants' unlawful conduct has not gone unnoticed. In 2017, Insurance Commissioner for the State of Washington levied a $500,000 fine against Coordinated Care Corporation—the Centene Corp. subsidiary that was selling the Ambetter plans in the state—based on the conclusion that the company had, among other things, "failed to provide an adequate network of providers, failed to monitor its network of providers, failed to report its inadequate network to the Insurance Commissioner, failed to timely file an alternative

access delivery request to ensure that consumers received access to healthcare providers, [and] failed to provide an adequate network of providers."[14]

26.     Unfortunately, such administrative action by states has not deterred Defendants and the other members of the Ambetter Enterprise from continuing their fraudulent scheme. A $500,000 fine is a slap on the wrist given the enormous profits that Defendants are reaping through their racketeering activity.

27.     Defendants have demonstrated that they will not cease their unlawful activity willingly.

28.     On behalf of themselves and all others similarly situated, Plaintiffs seek both damages for the overcharges obtained through Defendants' scheme to defraud and a permanent injunction putting an end to Defendants' fraudulent and unlawful conduct.

## II.     PARTIES

### A. Plaintiffs

#### 1. Matthew Havrilla

29.     Plaintiff Matthew Havrilla is a natural person and a citizen of the State of Arizona. He purchased an Ambetter policy covering himself and his wife for the 2021 calendar year.

30.     Before selecting the Ambetter plan, Mr. Havrilla reviewed all of the plans available on the ACA online marketplace, in particular the list of in-network providers for each plan.

---

[14] Consent Order No. 17-0477 Levying a Fine at ¶ 11, *In re Coordinated Care Corp.*, WAOIC No. 500635, NAIC No. 95831 (Dec. 15, 2017), *available at* https://www.insurance.wa.gov/sites/default/files/documents/Coordinated-Care-Final-Consent-Order-No-17-0477.pdf.

31.     Mr. Havrilla has severe arthritis, and one of the decisive factors in his choosing to purchase the Ambetter plan was that his rheumatologist was listed on the prescriber list and purportedly covered under the Ambetter policy.

32.     After purchasing Ambetter insurance, however, Ms. Havrilla learned that this was not the case. When he sought to make an appointment with his rheumatologist, the rheumatologist's office stated that they had not accepted Ambetter for over a year.

33.     When Mr. Havrilla discovered that his rheumatologist was not in-network, he contacted Ambetter to complain and was assigned a patient advocate to assist with locating an in-network rheumatologist. When he spoke with the advocate, Mr. Havrilla made clear that he wanted assurances that any list he received would consist of in-network rheumatologists—namely, rheumatologists who accepted Ambetter insurance.

34.     Mr. Havrilla understood from his conversation with the patient advocate that he would receive such a list fairly soon, but after waiting for a week and a half without receiving a list of in-network rheumatologists, he complained again.

35.     After the second complaint, he received a list of seven rheumatologists (but not from the assigned patient advocate). Of those seven rheumatologists, three did not accept Ambetter insurance, and another three were not in Tucson, despite the Ambetter plan's website listing them as having offices in Tucson.

36.     When Mr. Havrilla finally located and consulted with an in-network rheumatologist, the rheumatologist switched him to a medication that Mr. Havrilla made clear had not worked for him previously. The change in medication landed Mr. Havrilla in the hospital for a week.

37.     After being released from the hospital, Mr. Havrilla returned to his original rheumatologist and decided to just pay out of pocket.

38.     Mr. Havrilla had similar issues locating an in-network internist, dermatologist, and neurologist.

39.     Throughout 2021, Mr. Havrilla had to continue contacting Ambetter for referrals. But even with the referrals in hand, Mr. Havrilla had to contact the provider offices on the in-network list and ask whether they accepted Ambetter. At least 50% of the providers on Ambetter's in-network list did not accept Ambetter insurance.

40.     Mr. Havrilla spent between two and eight hours per month in 2021 on phone and email correspondence with his insurer attempting to get an accurate list of in-network providers.

41.     Mr. Havrilla paid a premium of approximately $400 per month for his Ambetter plan. He believes that the government subsidized a part of the cost of the plan, but he does not recall the amount of the government subsidy.

42.     Because of his frustration with Ambetter's fraudulent list of in-network providers, in January 2022 Mr. Havrilla switched to a different health-insurance plan sold on the ACA exchanges, this one offered by Bright HealthCare.

**2.  Cynthia Dawson**

43.     Plaintiff Cynthia Dawson is a natural person and a citizen of the State of Florida. She paid for an Ambetter policy from Sunshine Health from January 2018 through December 2020.

44.     Before purchasing the policy, Ms. Dawson checked to see whether Ambetter had a good list of in-network providers.

45.     Based on Ambetter's advertised list of in-network providers, Ms. Dawson believed that the plan had many in-network providers, but later learned that the provider list was a sham.

– 11 –

46.     During the two years that she was on the Ambetter plan, Ms. Dawson had

undue difficulties finding doctors that accepted her Ambetter insurance.

47.     When she began looking for an in-network primary-care physician in

early 2018, Ms. Dawson called eight doctors before finding one that accepted Ambetter

health insurance.

48.     Ms. Dawson was not calling random doctors' offices but rather doctors on the

Ambetter list of in-network providers—doctors that she had researched. Seven out of the

eight primary-care physicians on the in-network list did not accept Ambetter insurance.

49.      Similarly, in early 2018 Ms. Dawson began looking for a gynecologist.

50.     Ms. Dawson reviewed Ambetter's list of in-network gynecologists and made a

list of the ten doctors that she would be comfortable with based on their location and other

factors.

51.     Ms. Dawson ultimately called the offices of all ten doctors because nine of the

ten doctors—all on the Ambetter list of in-network providers—did not take Ambetter health

insurance.

52.     Ms. Dawson settled for the tenth gynecologist she called, even though the

doctor was her last choice.

53.     The biggest difficulty in finding an in-network provider occurred after

Ms. Dawson was hospitalized in September 2020 because of neurological issues and

associated symptoms. While in the hospital, Ms. Dawson received an MRI, which returned

abnormal results.

54.     The neurologist at the hospital asked that Ms. Dawson return for a follow-up

visit in one week, but after leaving the hospital Ms. Dawson discovered that the neurologist's

– 12 –

outpatient location was not included in Ambetter's network (the neurologist was in-network only while at the hospital).

55.     It took Ms. Dawson a week to locate an in-network neurologist in Tampa, Florida, a city of nearly 400,000 people.

56.     Ambetter's list of in-network neurologists in her area was long, but only three of the neurologists on the list were actually in-network.

57.     Of those three neurologists, one could not speak to her in person and another did not have an opening for another seven months. The third neurologist was able to see her, but not until late November—nearly two months after she was medically indicated for a follow-up appointment with a neurologist.

58.     When Ms. Dawson was finally able to access neurological care in late November 2021, the neurologist requested additional testing. Ambetter approved one test but denied the other. The neurologist and radiologist suggested to Ms. Dawson that she appeal the denial, but she knew that this would only cause further delays in her care.

59.     Ms. Dawson therefore decided to cancel her Ambetter policy and to switch her care to the Veterans Health Administration (the "VA"), which she was able to do because she had served in the military from 1988 to 1998.

60.     Ms. Dawson was able to get an appointment with a neurologist within *two weeks* of switching her healthcare over to the VA. She received the proper testing and was placed on prescription medication.

61.     Nonetheless, the results of Ms. Dawson's MRIs continue to be abnormal, and her doctors are monitoring her. Her symptoms include severe vertigo, headaches, vision disturbances, and nausea.

62. Ms. Dawson believes that she experienced adverse health effects because of the delays in treatment caused by the fraudulent Ambetter provider list. During the five months she was unable to receive proper treatment (between September 2020 and February 2021), her symptoms got worse and at times she missed days of work, had to return to the emergency room, and had to see her primary-care physician twice. She could treat herself only with over-the-counter medication because her primary-care physician needed information about her health that only a neurologist and further testing could reveal.

63. Right before she left the Ambetter plan, Ms. Dawson's monthly premium for the plan was about $290. Her Ambetter coverage was subsidized in part by the federal government. She believes that in 2020 that government subsidy was about $440 per month.

### 3. Alden Henriksen

64. Plaintiff Alden Henriksen is a natural person and a citizen of the State of Illinois. He signed up for an Ambetter of Illinois health-insurance plan in 2019.

65. Mr. Henriksen looked at the in-network doctors on the website for his Ambetter plan, and the site listed numerous doctors.

66. Mr. Henriksen needed to see a dermatologist, but when he started calling the dermatologists on Ambetter's list of in-network providers, almost none of them accepted Ambetter insurance.

67. Mr. Henriksen ultimately decided to call the general practitioner in his area that he had been assigned to by his Ambetter plan, but when he called the general practitioner, he learned that the doctor likewise did not take Ambetter insurance.

68. Initially, he paid a premium of $80 a month for his Ambetter insurance, but in the fall of 2020, his monthly premium increased to over $100, his deductible went up, and the co-insurance changed, as did the formulary of covered medications—all without notice.

69.     This prompted Henriksen to cancel his Ambetter plan, and he is currently on Medicaid.

### 4. Melody DeSchepper

70.     Plaintiff Melody DeSchepper is a natural person and a citizen of the State of Illinois. She signed up for an Ambetter health-insurance plan in January 2021.

71.     Ms. DeSchepper purchased the Ambetter policy because she had lost her job and needed insurance.

72.     While Ms. DeSchepper was on the Ambetter plan, she could not even see a primary care doctor. She called 29 providers that were on Ambetter's in-network provider list or were recommended by Ambetter's assistance line: none of them accepted Ambetter insurance.

73.     Because the Ambetter plan did not deliver the promised benefits, Ms. DeSchepper cancelled the plan in October 2021.

74.     Ms. DeSchepper paid a monthly premium of $200 for the Ambetter policy. She believes that Ambetter also received a governmental subsidy of around $1,000 per month for providing her the policy.

75.     Ms. DeSchepper is currently insured through Medicaid.

### 5. Christopher Tilton

76.     Plaintiff Christopher Tilton is a natural person and a citizen of the State of Nevada. He signed up for an Ambetter health insurance plan in May 2021.

77.     Before purchasing the Ambetter plan, Mr. Tilton was on an employer-sponsored plan. He decided to look at the plans on the ACA online marketplace because his employer was in the midst of changing its health insurance and his doctors would no longer be in-network.

78. Mr. Tilton obtained a broker through the ACA marketplace and reviewed plans. He chose the Ambetter plan after confirming that all of his medical providers—his primary-care physician, podiatrist, oncologist, orthopedic surgeon, and physical therapists—were listed as being in-network.

79. Ensuring that his current medical providers were in-network was especially important to Mr. Tilton, who in the prior two and a half years had suffered a broken femur, a blood clot, and multiple myeloma.

80. It was only after purchasing Ambetter insurance that Mr. Tilton learned that his physical therapist was not in Ambetter's network. He discovered this when he went to his therapy appointment and the receptionist told him that they no longer accepted Ambetter insurance. Mr. Tilton called Ambetter's support line and was told that the physical therapist had not been in-network since 2017, despite still being on Ambetter's list of in-network providers.

81. Mr. Tilton learned that his orthopedic surgeon—also listed as an Ambetter in-network provider—likewise had not accepted Ambetter insurance since 2017.

82. Shortly after purchasing the Ambetter plan, Mr. Tilton twisted his knee while exiting a pool as part of his physical therapy. In a short time, his health declined and he was using a walker.

83. This ultimately led to Mr. Tilton spending three or four weeks in a hospital, after which he was sent to a rehab facility.

84. After he was discharged from rehab, Mr. Tilton was supposed to receive physical and occupational therapy in his home. Ambetter didn't have any in-network providers that provided in-home therapy, so Mr. Tilton had to attend outpatient therapy outside of his home.

85.     During outpatient therapy, a fracture was detected in Mr. Tilton's leg. Mr. Tilton believes that the fracture may have been caused by the outpatient therapy.

86.     Because of the fracture, Mr. Tilton had a surgery on his leg and developed a staph infection as a result of the surgery.

87.     Because the Ambetter plan did not provide the promised benefits, Mr. Tilton cancelled the plan in December 2021.

88.     Mr. Tilton paid a monthly premium of about $335 for his Ambetter plan, and the federal government provided a monthly subsidy of approximately $1,070 per month to the plan provider.

### 6. Mark Hackett

89.     Plaintiff Mark Hackett is a natural person and a citizen of Texas. He had an Ambetter policy from January 2018 until early 2021, and again from May 2021 to the present. All of his Ambetter policies have been Silver-tier policies.

90.     During the times he had Ambetter policies, Mr. Hackett had difficulties finding a primary-care physician, a rheumatologist, a neurologist, and a nephrologist.

91.     Because the Ambetter plan requires Mr. Hackett to get a referral before making an appointment with a specialist, he sought out a primary-care physician. But all of the primary-care physicians on Ambetter's provider list were pediatricians, DOs (Doctors of Osteopathic Medicine), or physician's assistants—not MDs.

92.     Mr. Hackett has a serious health issue for which he needed to see a rheumatologist. He tried to locate one, but the rheumatologist that was listed on Ambetter's list of in-network providers told him that he had not taken Ambetter insurance for two years.

93.     When he finally located an in-network rheumatologist, Mr. Hackett was only seen by a physician's assistant who would not answer his questions or provide guidance about dealing with his condition.

94.     Mr. Hackett also needed to see a nephrologist, but quickly discovered that there was only one in-network nephrologist in the entire Austin metro area (where Mr. Hackett lives). The population of the Austin metro area is approximately 2.3 million people.

95.     There were a few nephrologists in San Antonio that were listed as being in-network, but seeing any of those doctors would have required that Mr. Hackett drive 300 miles round-trip.

96.     Mr. Hackett also has had undue difficulties finding an in-network neurologist.

97.     In November 2021, he scheduled an appointment with a neurologist to take place in February 2022. But when he called Ambetter to confirm that the neurologist was in-network, he was told that the neurologist was not in-network because Mr. Hackett had switched from an Ambetter EPO plan in 2021 to an Ambetter HMO plan for 2022.

98.     Mr. Hackett cancelled his neurologist appointment, despite waiting four months for the appointment, because he was at risk of having to pay for the appointment out of pocket.

99.     When Mr. Hackett started looking for in-network neurologists, he discovered that there were no nearby neurologists in the Ambetter network. He was able to find only providers with the title "psychiatry in neurology," and called some of those providers to confirm that they are not neurologists.

100.     Mr. Hackett paid a monthly premium of $100 for his Ambetter insurance in 2021. In 2022, his premium jumped to $300 per month.

101.    The governmental subsidy for his plan was about $900 per month in 2021 and jumped to $1,300 per month in 2022.

**B.  Defendants**

102.    Defendant Centene Corporation is a Delaware corporation with its principal place of business located at 7700 Forsyth Blvd., St. Louis, Missouri 63105.

103.    Defendant Centene Management Company LLC is a Wisconsin corporation with its principal place of business located at 7700 Forsyth Blvd., St. Louis, Missouri 63105.

104.    Defendant Celtic Insurance Company is a corporation organized under the laws of Arkansas, with its principal place of business located at 200 East Randolph Street, Suite 3600, Chicago, Illinois 60601.

### III.    JURISDICTION AND VENUE

105.    This action arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), 1964(c). Plaintiffs seek damages for their injuries, as well as for injuries suffered by Class Members, resulting from Defendants' unlawful conduct. Plaintiffs also seek an injunction to prohibit Defendants from continuing their unlawful conduct. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States. This Court also has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because: (i) the proposed Class consists of well over 100 persons; (ii) the parties are minimally diverse, as there are members of the proposed Class, including Plaintiffs, who are "citizen[s] of a State different from any Defendant"; and (iii) the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs.

106.    This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over all Defendants because nationwide service of process to all Defendants is authorized by 18 U.S.C. § 1965(b).

– 19 –

Defendant Celtic is headquartered in Chicago, Illinois, and is the Centene Corp. subsidiary that sells Ambetter plans to Illinois residents. In this way, Defendants' scheme to defraud targets the state of Illinois and its residents.

107.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the claims occurred in this District. Alternatively, venue is proper under 28 U.S.C. § 1391(b)(3) because this Court has personal jurisdiction over all Defendants under 18 U.S.C. § 1965(b), including Celtic Insurance Company, which has its principal place of business in Chicago, Illinois. Additionally, venue is proper in this District under 18 U.S.C. § 1965(a) because each Defendant "resides, is found, has an agent, or transacts [its] affairs" in this District. Defendant Centene Corporation transacts business in this District; Defendant Centene Management Company LLC transacts business and has a registered agent in this District; and Defendant Celtic Insurance Company transacts business, has an agent, and is found in this District, as its principal place of business is in Chicago, Illinois.

## IV.    FACTUAL ALLEGATIONS

### A. Defendants are members of a RICO enterprise that defrauds primarily low-income consumers, in part by taking advantage of enterprise members' status as Medicaid managed-care organizations.

108.    Centene Corp.'s position as the largest provider of both Medicaid managed-care plans and ACA plans is not an accident. The company's success in these areas is in significant part the result of a nearly decade-long scheme to defraud that would not have been possible without the existence of the Ambetter Enterprise, including subsidiaries that provide Medicaid managed-care plans in numerous states.

109.    To fully appreciate the scope of Defendants' scheme to defraud consumers, one must understand Medicaid managed care and the role that various members of the Ambetter Enterprise play as Medicaid managed-care organizations.

110.    Managed care is simply a form of insurance "that attempts to manage the quality and cost of medical services that individuals receive."[15] Perhaps the best-known example of managed care is an HMO (health maintenance organization).

111.    Managed care works by "limiting to varying degrees the number of providers from which a patient can choose, whether the patient has to use a primary care physician, and whether out-of-network care is covered under the plan. Some managed-care plans attempt to improve health quality, by emphasizing the prevention of disease."[16]

112.    In the context of Medicaid, managed care "provides for the delivery of Medicaid health benefits and additional services through contracted arrangements between state Medicaid agencies and managed-care organizations (MCOs) [such as Centene Corp. subsidiaries] that accept a set per member per month (capitation) payment for these services."[17] The theory is that, "[b]y contracting with various types of MCOs to deliver Medicaid program health care services to their beneficiaries, states can reduce Medicaid program costs and better manage utilization of health services."[18]

113.    States contract with private companies to offer managed-care insurance plans to Medicaid recipients. The companies that win these contracts are referred to as

---

[15] *What is managed care?*, HEALTHINSURANCE.ORG (last visited July 26, 2022), https://www.healthinsurance.org/glossary/managed-care/.

[16] *Id.*

[17] *Managed Care*, MEDICAID.GOV (last visited July 26, 2022), https://www.medicaid.gov/medicaid/managed-care/index.html.

[18] *Id.*

managed-care organizations. Theoretically, these private managed-care organizations have an incentive to both keep costs down and keep Medicaid beneficiaries healthy, because doing so results in higher profits.

114.    Not all Medicaid beneficiaries are enrolled in managed-care plans. But some version of these plans has existed since the 1960s, although the use of such plans initially required special waivers from the federal government. Accordingly, participation in Medicaid managed-care plans was minimal until the Balanced Budget Act of 1997 "granted states authority to enroll most Medicaid recipients in mandatory managed care plans by amending their state plans, rather than by obtaining special … waivers."[19] At that point, participation in Medicaid managed-care plans began rapidly increasing.

115.    Even after the Balanced Budget Act of 1997, however, most Medicaid beneficiaries still were not enrolled in a comprehensive managed-care plan—namely, a plan that provides all acute, primary and specialty medical services. Instead, the majority of Medicaid beneficiaries who participated in managed-care plans had limited-benefit plans that provided only a portion of their Medicaid services (e.g., dental care); the remainder of their Medicaid benefits were still administered directly by the state.

116.    The ACA both expanded Medicaid eligibility and drove an increase in the use of Medicaid comprehensive managed-care plans. For example, from 2014 to 2015 Medicaid enrollment in comprehensive managed-care plans increased by 17.5%—from 43.4 million to

---

[19] *Appendix C. Evolution of Managed Care Within Medicaid and Disability Services*, NATIONAL COUNCIL ON DISABILITY (last visited July 26, 2022), https://ncd.gov/publications/2013/20130315/20130513_AppendixC/.

50.9 million.[20] By 2018, 55.2 million Medicaid beneficiaries (roughly 70% of all beneficiaries) were enrolled in comprehensive managed-care plans.[21]

117.    Centene Corp.'s subsidiaries have contracts to operate Medicaid managed-care plans in at least 30 states.[22]

118.    Like the Ambetter plans, the Medicaid managed-care plans operated by Centene Corp.'s subsidiaries have been riddled with fraud. In June 2021, Centene Corp. settled a fraud suit brought by Ohio for $88.3 million and also settled potential fraud claims by Mississippi for $55 million; both settlements stemmed from Centene Corp.'s subsidiaries double-billing the states' Medicaid departments for medications.[23]

119.    Centene Corp. is set to pay an additional $1.1 billion to 20 states to settle similar claims that its subsidiaries defrauded Medicaid departments.[24]

120.    Centene Corp. subsidiaries' status as Medicaid managed-care organizations facilitates Defendants' scheme to defraud persons who purchase Ambetter plans.

121.    As of 2022, Ambetter plans are sold on the ACA exchanges in 26 states. In 25 of those 26 states, Centene Corp. subsidiaries have contracts to provide managed-care plans to Medicaid beneficiaries. And in 16 of the 26 states (<mark>highlighted</mark> in the table below),

---

[20] Mathematica Policy Research, *Medicaid Managed Care Enrollment and Program Characteristics, 2015*, CENTERS FOR MEDICARE & MEDICAID SERVICES, at 11 (Winter 2016).

[21] Mathematica Policy Research, *Medicaid Managed Care Enrollment and Program Characteristics, 2018*, CENTERS FOR MEDICARE & MEDICAID SERVICES, at 10 (Winter 2020).

[22] *Centene Issues Public Comment on Centers for Medicare & Medicare Services Proposed Rule*, TARGETED NEWS SERVICE (Mar. 31, 2020) (LEXISNEXIS).

[23] Marty Schladen, *Centene agrees to settle Medicaid claims with Ohio, Mississippi for $143 million*, OHIO CAPITAL JOURNAL (June 14, 2021), https://ohiocapitaljournal.com/2021/06/14/centene-agrees-to-settle-medicaid-claims-with-ohio-mississippi-for-143-million/.

[24] *Id.*

the Centene Corp. subsidiary that has the Medicaid contract is the same subsidiary that sells the Ambetter plan on the state's online exchange:

| State | Centene Corp. Subsidiary Operating as Medicaid Managed-Care Organization | Centene Corp. Subsidiary Selling Ambetter Plan in State Through Online ACA Exchanges | Name of Ambetter Plan Sold in the State |
|---|---|---|---|
| Arizona | Health Net of Arizona, Inc. d/b/a Arizona Complete Health[25] | Health Net of Arizona, Inc. d/b/a Arizona Complete Health | Ambetter from Arizona Complete Health |
| Arkansas | Arkansas Total Care, Inc. | Celtic Insurance Co. d/b/a Arkansas Health & Wellness | Ambetter from Arkansas Health and Wellness |
| California | Health Net Life Insurance Company | Health Net Life Insurance Company | Ambetter from Health Net |
| Florida | Sunshine State Health Plan, Inc. | Celtic Insurance Company d/b/a Ambetter from Sunshine Health | Ambetter from Sunshine Health |
| Georgia | Peach State Health Plan, Inc. | Peach State Health Plan, Inc. | Ambetter from Peach State Health Plan |
| Illinois | Meridian Health Plan of Illinois, Inc. (since July 2020)[26] | Celtic Insurance Company | Ambetter of Illinois |
| Indiana | Coordinated Care Corporation d/b/a/ | Celtic Insurance Company | Ambetter from MHS |

[25] Health Net of Arizona Inc. is a wholly owned subsidiary of Health Net LLC, which is a wholly owned subsidiary of Centene Corp.

[26] Meridian Health Plan of Illinois, Inc. is a subsidiary of WellCare Health Plans, Inc., which is a wholly owned subsidiary of Centene Corp.

IlliniCare Health Plan, Inc., a different Centene Corp. subsidiary, operated as a Medicaid managed-care organization until 2019, when it ceased being a subsidiary of Centene Corp.

| State | Centene Corp. Subsidiary Operating as Medicaid Managed-Care Organization | Centene Corp. Subsidiary Selling Ambetter Plan in State Through Online ACA Exchanges | Name of Ambetter Plan Sold in the State |
|---|---|---|---|
| | Managed Health Services ("MHS") | | |
| Kansas | Sunflower State Health Plan, Inc. d/b/a Sunflower Health Plan | Sunflower State Health Plan, Inc. | Ambetter from Sunflower Health Plan |
| Kentucky | WellCare of Kentucky, Inc. | WellCare of Kentucky, Inc. | Ambetter from WellCare of Kentucky |
| Louisiana | Louisiana Healthcare Connections, Inc. | Louisiana Healthcare Connections, Inc. | Ambetter from Louisiana Healthcare Connections |
| Michigan | Meridian Health Plan of Michigan, Inc.[27] | Meridian Health Plan of Michigan, Inc. | Ambetter from Meridian |
| Mississippi | Magnolia Health Plan, Inc. | Ambetter of Magnolia Inc. | Ambetter from Magnolia Health |
| Missouri | Home State Health Plan, Inc. | Celtic Insurance Company | Ambetter from Home State Health |
| Nebraska | Nebraska Total Care, Inc. | Nebraska Total Care, Inc. | Ambetter from Nebraska Total Care |
| Nevada | SilverSummit Healthplan, Inc. | SilverSummit Healthplan, Inc. | Ambetter from SilverSummit Healthplan |
| New Hampshire | Granite State Health Plan, Inc. d/b/a NH Healthy Families | Celtic Insurance Company | Ambetter from NH Healthy Families |

---

[27] Meridian Health Plan of Michigan, Inc. is a subsidiary of WellCare Health Plans, which is a wholly owned subsidiary of Centene Corp.

| State | Centene Corp. Subsidiary Operating as Medicaid Managed-Care Organization | Centene Corp. Subsidiary Selling Ambetter Plan in State Through Online ACA Exchanges | Name of Ambetter Plan Sold in the State |
|---|---|---|---|
| New Jersey | WellCare of New Jersey, Inc. | WellCare of New Jersey, Inc. | Ambetter from WellCare of New Jersey |
| New Mexico | Western Sky Community Care, Inc. | Western Sky Community Care, Inc. | Ambetter from Western Sky Community Care |
| North Carolina | WellCare Health Insurance of North Carolina, Inc.[28] | Ambetter of North Carolina, Inc. | Ambetter of North Carolina, Inc. |
| Ohio | Buckeye Community Health Plan, Inc. | Buckeye Community Health Plan, Inc. | Ambetter from Buckeye Health Plan |
| Oklahoma | Oklahoma Complete Health Inc. | Oklahoma Complete Health Inc. | Ambetter of Oklahoma |
| Pennsylvania | Pennsylvania Health and Wellness, Inc. | Pennsylvania Health and Wellness, Inc. | Ambetter from PA Health & Wellness |
| South Carolina | Absolute Total Care, Inc. | Absolute Total Care, Inc., | Ambetter from Absolute Total Care |
| Tennessee | N/A | Celtic Insurance Company | Ambetter of Tennessee |
| Texas | Superior HealthPlan, Inc. | Celtic Insurance Company | Ambetter from Superior HealthPlan |
| Washington | Coordinated Care of Washington, Inc. | Coordinated Care of Washington, Inc. | Ambetter from Coordinated Care |

---

[28] WellCare Health Insurance of North Carolina, Inc., is a wholly owned subsidiary of WellCare Health Plans, Inc., which is a wholly owned subsidiary of Centene Corp.

122.    The "business strategy" that has enabled the Ambetter Enterprise to successfully defraud the millions of persons who have purchased Ambetter plans rests on three pillars: churn, leverage, and the targeting of low-income consumers.

123.    The Ambetter Enterprise is able to more effectively target low-income consumers because many of those consumers are churning in and out of Medicaid eligibility due to factors like changes in income.

124.    Members of the Enterprise take advantage of this churn by targeting consumers who have lost Medicaid eligibility.

125.    The Ambetter Enterprise does this in several ways, but principally by leveraging both the name recognition and the information in the possession of the Medicaid managed-care organizations that are members of the Enterprise.

126.    When a Medicaid beneficiary whose plan is provided by one of the Enterprise's managed-care organizations becomes ineligible for Medicaid, that organization is notified by the state to cease providing coverage to that person.

127.    That information is then used by the Enterprise to target the low-income consumer who just lost Medicaid coverage by promoting to the consumer the Ambetter plan offered in that state. The Ambetter plans are made more appealing to former Medicaid beneficiaries by "link[ing] [the Ambetter brand] to the local Medicaid brand" offered by a member of the Enterprise, as shown in the table above.[29]

128.    The low-income person targeted by the Ambetter Enterprise purchases an Ambetter plan, only to discover that it does not provide the promised benefits.

---

[29] *Centene Corp at UBS Global Healthcare Conference – Final*, FD (FAIR DISCLOSURE) WIRE (May 22, 2017) (emphasis added) (statement of Ed Kroll, Centene Corp.'s Senior VP of Finance & IR) (LEXISNEXIS).

– 27 –

129. The Ambetter Enterprise currently consists of Defendants Centene Corp., Centene Management, Celtic, and the 26 other Centene Corp. subsidiaries identified in the above table: (1) Health Net of Arizona, Inc. d/b/a Arizona Complete Health, (2) Arkansas Total Care, Inc., (3) Health Net Life Insurance Company, (4) Sunshine State Health Plan, Inc. (5) Peach State Health Plan, Inc., (6) Meridian Health Plan of Illinois, Inc., (7) Coordinated Care Corporation d/b/a/ Managed Health Services ("MHS"), (8) Sunflower State Health Plan, Inc. d/b/a Sunflower Health Plan, (9) WellCare of Kentucky, Inc., (10) Louisiana Healthcare Connections, Inc., (11) Meridian Health Plan of Michigan, Inc., (12) Ambetter of Magnolia, Inc., (13) Magnolia Health Plan, Inc., (14) Home State Health Plan, Inc., (15) Nebraska Total Care, Inc., (16) SilverSummit Healthplan, Inc., (17) WellCare of New Jersey, Inc., (18) Granite State Health Plan, Inc. d/b/a NH Healthy Families, (19) Western Sky Community Care, Inc., (20) Ambetter of North Carolina, Inc., (21) WellCare Health Insurance of North Carolina, Inc., (22) Buckeye Community Health Plan, Inc., (23) Pennsylvania Health and Wellness, Inc., (24) Absolute Total Care, Inc., (25) Superior HealthPlan, Inc., and (26) Coordinated Care of Washington, Inc.

**B. Ambetter plans don't comply with the ACA's requirements.**

130. For a health-insurance plan to be sold on one of the online exchanges created by the ACA, the plan must meet numerous requirements established under the ACA and state laws. Ambetter plans fail to satisfy those requirements.

131. Ambetter plans fail to "[m]aintain[ ] a network that is sufficient in number and types of providers, including providers that specialize in mental health and substance abuse services, *to assure that all services will be accessible without unreasonable delay*" as required by 45 C.F.R. § 156.230(a)(2) (emphasis added).

132.     Likewise, Ambetter plans do not "publish an *up-to-date, accurate, and complete provider directory*, including information on which providers are accepting new patients, the provider's location, contact information, specialty, medical group, and any institutional affiliations, in a manner that is easily accessible to plan enrollees, prospective enrollees, the State, the Exchange, HHS and OPM" as required by 45 C.F.R. § 156.230(b)(2).

133.     Nor do the plans "include in [their] provider *network*[s] *a sufficient number and geographic distribution of essential community providers* (ECPs), where available, to ensure reasonable and timely access to a broad range of such providers for low-income individuals," as required by 45 C.F.R. § 156.235(a)(1).[30]

134.     The Ambetter plans hawked by Defendants fail to satisfy any of these ACA regulations. The provider networks that are represented on Ambetter plans' websites are simply false and often are just copies of physician directories from other sources. Accordingly, plan members have difficulty finding an in-network provider and sometimes cannot find any provider who accepts Ambetter insurance.

135.     The harms caused by this practice include: time spent calling searching for an in network physician, delays in treatment, complete inability to get treatment, injuries resulting from delays or inability to get treatment, travel expenses involved in having to see an in network provider who is hundreds of miles away, and paying out of pocket for out of network providers because no in network provider is available.

136.     In addition, ACA regulations require that plans sold on the exchanges "provide[ ] for essential health benefits" and "limit[ ] cost-sharing [i.e., expenses such as deductibles, coinsurance, and copayments] for such coverage." 42 U.S.C. § 18022(a)(1), (2).

_____

[30] "An essential community provider is a provider that serves predominantly low-income, medically underserved individuals … ." 45 C.F.R. § 156.235(c).

Essential health benefits include (among other things) prescription drugs, laboratory services, and preventive and wellness services and chronic disease management.

137.     But Ambetter plans routinely refuse to pay for medical services and medications that the plan purportedly covers, and Centene Corp. and its subsidiaries have been sued by medical providers over this practice. This leads to many providers refusing to accept Ambetter insurance, which further reduces the number of in-network providers. And when an Ambetter plan refuses to pay for covered medical services or prescriptions, the plan member may be stuck with a bill for the medical service and will certainly have to pay for the prescription out-of-pocket.

**C.  Ambetter plan documents misrepresent the benefits that members will receive.**

138.     Many persons who purchase Ambetter plans do so based on representations about those plans made by Centene Corp. subsidiaries. Indeed, this is supposed to be one of the advantages of the online exchanges: they allow consumers to compare different plans' provider networks, prescription drug coverage, and other benefits fairly easily (or at least more easily than they could do so before the exchanges).

139.     Consumers do not select health plans based on cost alone. Among other things, consumers select a health plan because their preferred doctor is in network, because an expensive prescription drug they regularly take is in the plan's formulary, or because another benefit provided by the plan (e.g., the number of in-network specialists) is important to them. Consumers will review plan documents, including the evidence of coverage, which is the contract between the consumer and the insurer—a contract that is publicly available on the Ambetter sites as well as on the exchanges.

140. The following is a partial list of misrepresentations that Defendants and other members of the Ambetter Enterprise have made, and continue to make, about Ambetter plans:[31]

    a. "We are committed to … [p]roviding access to covered services and our network providers."[32]

    b. "You have the right to … [r]eceive the benefits for which you have coverage."[33]

    c. "You have the right to … [r]eceive information or make recommendations, including changes, about our organization and services, *our network of physicians and medical practitioners*, and your rights and responsibilities."[34]

    d. "You have the right to … *[b]e kept informed of covered and non-covered services*, program changes, how to access services, *primary care provider assignment, providers*, advance directive information, referrals and authorizations, benefit denials, member rights and responsibilities, and our other rules and guidelines. *We will notify you at least 60 days before the effective date of the modifications.*"[35]

    e. **"You have the right to … [a] current list of network providers**."[36]

    f. "A listing of network providers is available online at Ambetter.IlliniCare.com. We have plan physicians, hospitals, and other medical practitioners who have agreed to provide you with your healthcare services. You may find any of our network

---

[31] These misrepresentations are taken from the evidence of coverage for the 2020 Illinois Ambetter plan (Ambetter from IlliniCare Health), but materially identical misrepresentations are made in the evidence of coverage for each of the 26 states in which Ambetter plans are offered.

[32] Ambetter from IlliniCare Health: 2020 Evidence of Coverage, at 5, *available at* https://api.centene.com/EOC/2020/27833IL014.pdf.

[33] *Id.*

[34] *Id.* (emphasis added).

[35] *Id.* at 5–6.

[36] *Id.*

– 31 –

providers by completing the 'Find a Provider' function on our website and selecting the IlliniCare Health Network. There you will have the ability to narrow your search by provider specialty, zip code, gender, whether or not they are currently accepting new patients, and languages spoken. Your search will produce a list of providers based on your search criteria and will give you other information such as address, phone number, office hours, and qualifications."[37]

g. "*We will pay benefits for covered services* as described in the Schedule of Benefits and the covered services sections of this contract."[38]

h. "Formulary means our list of covered drugs available on our website at Ambetter.IlliniCare.com or by calling our Member Services department. … Our formulary is reviewed and updated on a monthly basis following Pharmacy and Therapeutics Committee meeting."[39]

i. "If a situation arises where a covered service cannot be obtained from a network provider located within a reasonable distance, we may provide a prior authorization for you to obtain the service from a non-network provider at no greater cost to you than if you went to a network provider."[40]

**D. Defendants have been defrauding consumers since 2013.**

141.    Defendants' targeting low-income persons with their Ambetter plans and leveraging their Medicaid contracts to do so is no secret. Centene Corp.'s executives have continually described the strategy to investors since the ACA exchanges went live in 2013:

a. <u>December 2013:</u> "[O]ur value proposition is built around a focus on the subsidized market particularly the Medicaid churn population. We're leveraging a narrow network of our Medicaid

---

[37] *Id.* at 8 (emphasis added).

[38] *Id.* at 33 (emphasis added).

[39] *Id.* at 48–49.

[40] *Id.* at 62.

providers who have experience serving this target market … ."[41]
– Rone Baldwin, Centene's Executive VP of the Insurance Group

b. <u>May 2014:</u> "The exchanges I said I wanted to mention— another very complementary business where we are focused on the low-income level in the exchanges. So **the people that are typically churning out, in and out of Medicaid eligibility**, when they come out, if they have an event that raises the household income, they are no longer qualified for Medicaid, **we can reach out to them with our exchange products**.

"That's our brand, Ambetter. It's in nine states, so we didn't do an all out, all in on the exchanges. But nine states, most of them— virtually all of them we have a Medicaid operation in. So again **focusing on low-income people in the exchanges, those that are going to get subsidies**. It's a very similar population to the Medicaid population, so it's not like we are reinventing the wheel here.

"And just a note on the Ambetter—so that's the common brand across all nine states. But there is a reference point to the Medicaid health plan. Each of our states has a unique Medicaid health plan brand, Peach State Health in Georgia, Sunshine in Florida, Buckeye in Ohio, and et cetera. So the Ambetter brought to you by Buckeye Health Plan in Ohio, for example, to make that connection to the Medicaid player in the same state.

"And again, we are focused on that lower income level, just above Medicaid eligibility. And so far, so good."[42]
– Ed Kroll, Centene's Senior VP of Finance and IR

c. <u>May 2015:</u> "So **we're leveraging Medicaid networks to bring in people who are getting subsidized coverage through the exchanges**. I think a lot of them, a lot of those people have been in Medicaid and have churned out, either through a seasonal job or -- and then maybe they go back to Medicaid eligibility. "So we want to be about to have them in one of our health plans on both sides of that income event. Our brand name is Ambetter across those 11

---

[41] *Centene Corporation Analyst Meeting*, *supra* note 13.

[42] *Centene Corporation at Bank of America Merrill Lynch Health Care Conference*, *supra* note 12 (emphasis added).

states; but we also make the connection to the Medicaid health plan. So in Florida, it's Ambetter by Sunshine Health; or Ambetter by Peach State Health; Buckeye in Ohio. Just so they know that it's the same entity whether they're in a Medicaid plan or the exchange plan."[43]

– Ed Kroll, Centene's Senior VP of Finance and IR

d.  <u>March 2016:</u> "Ambetter is a trademark that we have in every market for the exchange products. So, **in Superior, it's AmBetter brought to you by Superior**.

"So, what we did is we took this, **we're using the same network as we do for Medicaid**. And so, the individuals who lose eligibility in Medicaid[ ]—we coined the word; others are using it now—churn. **People that lose eligibility go into Ambetter, regain eligibility, go back and forth**.

"**So, they're keeping the same network**. They are people that have been managed and taken care of for some period of time.

"And so, it's a matter of staying— 92% of the individuals we've enrolled so far this year have subsidies, which shows it's working, silver subsidies. **And that's where we want to be. We want to be at that socioeconomic level, where we're looking at the bronze and the silver.** We're not trying to be gold-platinum type coverage. And I think that strategy has served us well."[44]

– Michael Neidorff, Centene's Chairman, President, and CEO

e.  <u>May 2017:</u> "Ambetter is our brand name that we use on the exchanges. We do link this brand to the local Medicaid brand, so it would be Ambetter brought to you by Superior Health Care, that's our Medicaid brand in Texas. Because there is movement. When you focus on low-income subsidized people in the exchanges the way we do, there is some movement back-and-forth between Medicaid eligibility and subsidies on the exchange, depending on the household income level. Seasonal workers, for example, would move back and forth.

"You hear a lot of negative things about the exchanges, but not

---

[43] *Centene Corp at Bank of America Merrill Lynch Health Care Conference, supra* note 11.

[44] *Centene Corp at Barclays Global Healthcare Conference – Final* FD (FAIR DISCLOSURE) WIRE (Mar. 15, 2016) (emphasis added) (LEXISNEXIS).

from us. **I think with our focus on low income, where we're leveraging Medicaid infrastructure, where we launched in states where we already had a Medicaid presence, we've done well**. And our—90% of the people we're signing up in exchanges are subsidized. 90% of them are in the silver tier, the so-called silver metal tier because that's where subsidized -- subsidies maximize."[45]
– Ed Kroll, Centene's Senior VP of Finance & IR

f. <u>June 2017:</u> "I think we have our network. We have our population. We're not trying to be -- to move into the general population. We've said that from the beginning, and we're going to stick with our networks, our approach. Medicare, it's a different product. There's a reason for it. And **we coined the word churn, where people lose Medicaid and jump into the exchange and go back and forth, across it and that's really where we want to be, and it's a successful strategy for us**."[46]
– Michael Neidorff, Centene's Chairman of the Board, CEO, and President

g. <u>November 2018:</u> "I mentioned the exchanges before. Ambetter is our brand on the exchanges. So you see that name in the—in all of the states we operate in. **We do connect it to the Medicaid brands that I showed you** on the—a couple of slides ago. **So in Texas, for example, our exchange offering is Ambetter by Superior HealthPlan. Or in Florida, it's Ambetter by Sunshine Health Plan. We want to have that connection to the Medicaid plan because we are focused on subsidized low-income people on the exchanges, and there can be movement or churn back and forth between our 2 different products, right?** If a household has income that goes up, and they previously were covered by Medicaid, we can move them into a subsidized plan on the exchange and vice versa, if someone— if a household is on the exchange, and there's an income event that causes household income to go down, we can pick them up in Medicaid. So that's part of our strategy, part of our growth strategy. And Ambetter's

---

[45] *Centene Corp at UBS Global Healthcare Conference*, *supra* note 29 (emphasis added).

[46] *Centene Corp 15th Annual Investor Day – Final*, FD (FAIR DISCLOSURE) WIRE (June 16, 2017) (emphasis added) (LEXISNEXIS).

#1 in terms of membership in the country. In our 16 states in aggregate, we have 1.5 million lives. So we're the biggest. And we intend to grow next year, as I mentioned, 4 new states, and we'll expand the footprint in 6 of the existing states.

**"And I mentioned that we have a focused strategy. And this has been consistent since the beginning in terms of who we target.** Most of our members on the exchange are in the Silver plans, right? You have Bronze, Gold and -- Bronze, Silver and Gold. And the subsidies are the highest in the Silver level, so that's why we have just under 90% of our 1.5 million lives have Silver-tier health plans."[47]

– Ed Kroll, Centene's Senior VP of Finance & IR

h.  <u>September 2019:</u> "Let me talk about our exchange business. **Ambetter is the brand name we use. You don't see the name Centene on any of our health plans**, whether it's Medicaid, Medicare or exchange.

"But **on the exchange, Ambetter is the brand we use. We do link it to our local Medicaid brands. So in Texas, for example, it's Ambetter by Superior HealthPlan**. And you can see how we've grown. We were—we went live in year 1 of the ACA in 2014. And we've grown to become #1 with almost 2 million members in 20 states. And we've announced that we will be getting the geographic footprint, we'll be bigger next year. In 10 of our 20 states, we'll be expanding into more counties, ZIP Codes, et cetera. **And we've targeted the same people in all of these states, in all of these markets. They're basically working poor people, lower-income, subsidized people.** So 90% of our almost 2 million lives are getting subsidies. And there's some movement back and forth between Medicaid eligibility and getting a subsidy on the exchange. We try to make that a seamless transition for our members."[48]

– Ed Kroll, Centene's Senior VP of Finance & IR

---

[47] *Centene Corp at Credit Suisse Healthcare Conference*, *supra* note 2.

[48] *Centene Corp at Wells Fargo Healthcare Conference*, *supra* note 5 (emphasis added).

**E. Defendants engaged in racketeering by violating the criminal federal mail- and wire-fraud statutes millions of times incident to their scheme to defraud.**

142.    Defendants had a scheme to accomplish the purpose of getting primarily low-income consumers to enroll in Ambetter plans. This was profitable for Defendants, as they received not only premiums from plan members but also various moneys from the federal government for providing Silver plans to low-income persons.

143.    Defendants' scheme was and is intended to deceive consumers into purchasing Ambetter plans by means of materially false or fraudulent pretenses, representations, and promises.

144.    Through the Ambetter Enterprise, Defendants made false representations to consumers about the benefits they would receive under their Ambetter plans, including (among other things) misrepresentations about which providers were in-network, which medical services the plans would reimburse providers for, and which medications were on the plans' formularies. These misrepresentations enabled members of the Ambetter Enterprise to sell the Ambetter plans on the ACA exchanges and to overcharge Plaintiffs and Class Members.

145.    The shortcomings of the Ambetter plans (e.g., an inaccurate list of in network providers) are consistent across the plans offered in 26 states. These shortcomings have been known to Defendants for years as a result of lawsuits and regulatory actions, yet Defendants continue to misrepresent the benefits of Ambetter plans.

146.    The evidence of coverage and various marketing material promulgated by Defendants contain numerous false representations and promises about Ambetter plans. Those falsehoods are capable of influencing a consumer to purchase an Ambetter plan, and have influenced many consumers to do just that.

147.    Defendants caused millions of mailings and electronic communications incident to an essential part of the scheme.

148.    A mailing occurred every time that plan documents were sent to current or potential Ambetter plan members.

149.    A wire communication occurred every time that a member of the Ambetter Enterprise electronically filed Ambetter plan documents with a state's online exchange, every time that an Ambetter plan member paid their premium electronically, and every time that an Ambetter plan sent an email to a plan member or potential customer.

150.    A wire communication also occurred every time that Defendants' executives and employees emailed each other about the Ambetter plans or discussed the plans on their cell phones.

151.    All of these mail and wire communications were foreseeable and incident to an essential part of Defendants' fraudulent scheme. The Ambetter Enterprise defrauded Plaintiffs by selling them Ambetter plans that had neither the full benefits required by law nor the full benefits represented to Plaintiffs in plan documents.

**F. The Ambetter Enterprise's scheme to defraud could not have been executed without Defendant Centene Corp. and its subsidiaries using their separate legal incorporation to facilitate racketeering activity.**

152.    Centene Corp.'s decision to operate through various subsidiaries that it acquires as needed is what makes the Ambetter Enterprise's scheme to defraud possible. Each subsidiary is functionally separate, with different rights and responsibilities, and performs different roles in the Enterprise by using separate legal incorporation to facilitate racketeering activity. The Ambetter Enterprise operated to corrupt Centene Corp. subsidiaries and to use those separate corporate forms to defraud millions of consumers.

153.    In May 2014, Ambetter plans were sold in only nine states. Currently, the plans are sold in just over half of the states. This was accomplished, and could only be accomplished, through the acquisition and use of subsidiaries.

154.    For example, Defendant Celtic—which Centene Corp. acquired in 2008 and then corrupted—performs an important role in the enterprise as it is licensed to sell insurance in every state except New York and has thus far enabled the Ambetter Enterprise to sell Ambetter plans in eight states.

155.    As Centene's Senior VP of Corporate Development Jesse Hunter told investors at the time, the acquisition of Celtic was based on Centene's belief that solutions regarding the uninsured would be implemented at the state (not federal) level:

> [A]t the end of the day our objectives and our mission is to provide solutions for States and we just couldn't do a good job of that without having some solution with respect to individual and uninsured. So that's really what's driving the Celtic strategy. Why Celtic in particular? They have a national presence. **They're in 49 markets.** They've got 20 years of experience in this market.
>
> **There's a lot of credibility that they have both with their existing customers and within the industry.** And their skill sets are very complementary to ours particularly as we look at underwriting, that's something that's unique for us. It's more traditional on a commercial setting so I think when we put their skill set combined with our skill sets we'll be able to provide a wide range of solutions for our State customers.[49]

156.    In 2016 Centene Corp. acquired Health Net of Arizona, Inc.[50] (now operating under the trade name Arizona Complete Health), a company that had a contract to provide

---

[49] *Centene Corporation Annual Investor Day – Final*, FD (FAIR DISCLOSURE) WIRE (Jan. 8, 2008) (emphasis added) (LEXISNEXIS).

[50] Health Net of Arizona Inc. is a wholly owned subsidiary of Health Net LLC, which Centene Corp. purchased in 2016.

managed-care plans to Medicaid beneficiaries in Arizona. This gave the Ambetter Enterprise a foothold in Arizona, which it then used to sell its Ambetter plans to low-income residents of the state.

157.    Consistent with the strategy described above, the Ambetter Enterprise linked the Ambetter plan sold in Arizona to the local Medicaid brand by calling the plan "Ambetter from Arizona Complete Health."

158.    Similarly, in 2020 Centene Corp. completed its acquisition of Wellcare Health Plans, Inc., which owns both the Meridian Health Plan of Illinois, Inc. and Meridian Health Plan of Michigan, Inc. Both Meridian entities had contracts to provide Medicaid managed-care plans in their respective states.

159.    Once again, the Ambetter Enterprise linked the Ambetter plan sold in Michigan to the local Medicaid brand by calling the plan "Ambetter from Meridian."

160.    These three examples are illustrative of how each member of the Ambetter Enterprise performs a different role in the Enterprise and uses its separate legal incorporation to facilitate racketeering activity:

> a.    Defendants Centene Corp. and Centene Management designed the Ambetter plan and originated the scheme to defraud, providing high-level direction to other members of the Enterprise.
>
> b.    Defendant Centene Management coordinates between the various Centene Corp. subsidiaries to ensure that all of the members of the Enterprise work toward a common purpose of defrauding consumers and function as a continuing unit.
>
> c.    Each Centene Corp. subsidiary that has a contract to provide Medicaid plans in a state lends its name/brand to the Ambetter plan in that state so that persons who lose Medicaid coverage are more likely to purchase the Ambetter plan.

d.  Each subsidiary that has a contract to provide Medicaid plans in a state receives notice from the state when a person on their plan is no longer eligible for Medicaid. The subsidiary then uses that information to target that person with promotional materials for the Ambetter plan. (The subsidiary either sells the Ambetter plan itself or provides the consumer's information to the subsidiary that does.)

e.  The subsidiaries that provide Medicaid managed-care plans or Ambetter plans in each state have the necessary licenses to do so, without which the scheme could not work. These licenses are difficult to obtain; Centene Corp. has specifically acquired and corrupted Defendant Celtic and other companies because they are licensed to sell health plans in certain states.

161.    The scheme to defraud millions of people across 26 states could not have been implemented by Defendant Centene Corp.—or any other company—acting alone.

162.    The subsidiary that sells the Ambetter plan in each state must maintain a license to sell health insurance on that state's exchange and often also has a contract with that state to provide Medicaid managed-care plans.

163.    If, for example, Centene Corp. wanted to sell Ambetter plans without its subsidiaries, it would need to obtain a license to do so in each of the 26 states where the plan is now offered. But it is extremely difficult for any single corporate entity to obtain the licenses and state Medicaid contracts in 26 states, as evidenced by Centene Corp.'s statement in its 10-K for the fiscal year ended on December 31, 2020:

> The process for obtaining authorization to operate as a managed care organization, health insurance plan, prescription drug plan, pharmacy or provider organization is complex . . . . [U]nder both state managed care organization statutes and insurance laws, our health plan subsidiaries, as well as our applicable specialty companies, must comply with minimum statutory capital and other financial solvency requirements, such as deposit and surplus requirements. Insurance regulations may also require prior state approval of acquisitions of

– 41 –

other managed care organization businesses and the payment of dividends, as well as notice for loans or the transfer of funds. Our subsidiaries are also subject to periodic state and federal reporting requirements. In addition, each health plan and individual healthcare provider must meet criteria to secure the approval of state regulatory authorities before implementing certain operational changes, including without limitation changes to existing offerings, the development of new product offerings, certain organizational restructurings and, in some states, the expansion of service areas.[51]

**G. Centene Corp. and Centene Management obtain their subsidiaries by acquiring companies that previously offered legitimate health insurance services and then use the subsidiaries to further the Ambetter Enterprise.**

164.     It is not just a matter of Defendants using preexisting subsidiaries to facilitate the fraudulent scheme, although, as set forth above, Defendants did so. Defendants actively sought out and acquired companies—including those companies' resources, facilities, contacts, and brand names—that had previously offered legitimate health-insurance services to become part of the Ambetter Enterprise.

165.     Defendants specifically target the low-income market. As stated by Rone Baldwin, Centene's Executive VP of the Insurance Group, Defendants seek to leverage "a narrow network of . . . Medicaid providers who have experience serving this target market." Accordingly, Defendants seek out and acquire as subsidiaries companies that have experience providing managed-care plans to Medicaid beneficiaries. Prior to being acquired and incorporated into the Ambetter Enterprise, these companies generally provided established managed-care plans to beneficiaries.

---

[51] SEC Form 10-K Filed by Centene Corp. for Fiscal Year Ended Dec. 31, 2020, at 15, *available at* https://investors.centene.com/sec-filings/all-sec-filings/content/0001071739-21-000039/0001071739-21-000039.pdf.

166.    The reason for Defendants' strategy is not just the difficulty of obtaining

licensing state-by-state, although that alone is a substantial motive. The strategy also allows

Defendants to leverage the existing structure of facilities and resources, including

information in the possession of the Medicaid managed-care organizations, and brand names

that become subsidiaries in the Ambetter Enterprise so that the acquired companies can then

play the requisite role in ensuring the Enterprise's growth and success.

167.    Once acquired, Defendants subsume the beneficiaries that were already on the

plans offered by the subsidiary prior to acquisition. Those beneficiaries are familiar with the

quality and level of managed care provided, which lends an air of credibility to the Ambetter

Enterprise. The Ambetter Enterprise relies on "churning" between Medicaid coverage and

private coverage and, accordingly, is dependent upon current and new beneficiaries believing

that the Ambetter plan will provide them with the same coverage they or others previously

received through Medicaid.

168.    For example, in 2016 Centene acquired Health Net of Arizona, Inc., a

company that had a contract to provide managed-care plans to Medicaid beneficiaries in

Arizona. Health Net of Arizona, Inc. now operates under the trade name Arizona Complete

Health as part of the Ambetter Enterprise and offers "Ambetter from Arizona Complete

Health."

169.    Likewise, in 2020 Centene Corp. acquired Wellcare Health Plans, Inc., which

owns both the Meridian Health Plan of Illinois, Inc. and Meridian Health Plan of Michigan,

Inc., both of which had contracts to provide Medicaid managed-care plans in their respective

states.

170.    Once again, the Ambetter Enterprise linked the Ambetter plan sold in

Michigan to the local Medicaid brand by calling the plan "Ambetter from Meridian."

– 43 –

171.     Through these acquisitions of subsidiaries—including not just the licensing and other attributes discussed above—Defendants obtained control of companies that were offering legitimate health-insurance services and had established names and brand recognition. These acquisitions provided the resources, contacts, and facilities that were then used as instruments of the Ambetter Enterprise and ensured the functioning and success of the Enterprise

## H. The Ambetter Enterprise defrauded not only consumers, but also the federal government.

172.     In addition to defrauding consumers, the Ambetter Enterprise also defrauds the federal government of hundreds of millions of dollars a year.

173.     This is no coincidence, as the Enterprise's strategy from the beginning has been that Ambetter plans would target low-income persons who are eligible for a government subsidy for plans purchased through the ACA exchanges.

174.     As Ed Kroll, Centene's Senior VP of Finance, said about the strategy underlying the sale of Ambetter plans: "I think it's a very complementary strategy to our core Medicaid strategy that we are doing in the exchanges. We're focused on low-income people. **90% of our exchange lives are getting a subsidy**."[52]

175.     Michael Neidorff, Centene Corp.'s Chairman, president, and CEO, has emphasized the same strategy: "You can see the gold, bronze, platinum, gold. There's essentially nothing there. **We're in the silver, which has the highest subsidy. We have 92% subsidies on them right now -- over 90% in subsidies**, which tells you we continue to attract the population we are looking for."[53]

---

[52] *Centene Corp at Wells Fargo Healthcare Conference*, *supra* note 5 (emphasis added).

[53] *Centene Corp 2017 Financial Guidance and Investor Day – Final*, FD (Fair Disclosure) Wire (Dec. 16, 2016) (emphasis added) (LexisNexis).

176.    Again, the Ambetter plans could not be sold on the ACA exchanges but for the Ambetter Enterprise's misrepresentations to federal and state governments about those plans—including misrepresentations about the plans' provider networks.

177.    The Enterprise's misrepresentations to governmental authorities enable the Enterprise to sell to consumers Ambetter plans that fail to satisfy federal and state laws.

178.    And because the federal government is paying up to 90% of the premiums for Ambetter plans, the Ambetter Enterprise is defrauding the federal government of hundreds of millions—potentially billions—of dollars every year.

## V.    CLASS ACTION ALLEGATIONS

179.    Plaintiffs bring this action on behalf of themselves and under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), on behalf of themselves and all other similarly situated.

180.    Subject to confirmation, clarification, or modification based on discovery to be conducted in this action, the Classes that Plaintiffs seek to represent are defined as follows:

**The Federal-Law Class:**

All persons who paid premiums for an Ambetter brand health-insurance plan during the Class Period while residing in Arizona, Arkansas, California, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, or Washington.

**The State-Law Subclasses:**

**The Arizona Class:** All persons who paid premiums for an Ambetter brand health-insurance plan during the Class Period while residing in the state of Arizona.

**The California Class:** All persons who paid premiums for an Ambetter brand health-insurance plan during the Class Period while residing in the state of California.

**The Florida Class:** All persons who paid premiums for an Ambetter brand health-insurance plan during the Class Period while residing in the state of Florida.

**The Illinois Class:** All persons who paid premiums for an Ambetter brand health-insurance plan during the Class Period while residing in the state of Illinois.

**The Kentucky Class:** All persons who paid premiums for an Ambetter brand health-insurance plan during the Class Period while residing in the state of Kentucky.

**The Nebraska Class:** All persons who paid premiums for an Ambetter brand health-insurance plan during the Class Period while residing in the state of Nebraska.

**The Nevada Class:** All persons who paid premiums for an Ambetter brand health-insurance plan during the Class Period while residing in the state of Nevada.

**The New Jersey Class:** All persons who paid premiums for an Ambetter brand health-insurance plan during the Class Period while residing in the state of New Jersey.

**The New Mexico Class:** All persons who paid premiums for an Ambetter brand health-insurance plan during the Class Period while residing in the state of New Mexico.

**The North Carolina Class:** All persons who paid premiums for an Ambetter brand health-insurance plan during the Class Period while residing in the state of North Carolina.

**The Pennsylvania Class:** All persons who paid premiums for an Ambetter brand health-insurance plan during the Class Period while residing in the Commonwealth of Pennsylvania.

**The Washington Class:** All persons who paid premiums for an Ambetter brand health-insurance plan during the Class Period while residing in the state of Washington.

181.    For purposes of this action, the Class Period is defined as August 5, 2018 through the present.

182.    Excluded from the Class are Defendants and any entity in which any Defendant has a controlling interest, as well as any Defendant's legal representatives, officers, directors, assignees, and successors.

183.    Members of the Class are so numerous that joinder of all Class Members is impractical. Currently, over 2 million persons are paying for Ambetter health-insurance plans. Thus, Class Members number in the millions. Class Members are readily identifiable from information and records in Defendants' possession.

184.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and Class Members were aggrieved by the same wrongful conduct of Defendants acting through the Ambetter Enterprise: all Plaintiffs and Class Members were sold Ambetter plans, which failed to provide (1) benefits required by state and federal laws and regulations, and (2) benefits represented in the marketing materials and the insurance documents themselves. Thus, all Plaintiffs and Class Members were fraudulently overcharged for their Ambetter plans.

185.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the other members of the Class.

186.    Plaintiffs are represented by counsel with experience in the prosecution of class actions and in particular with class actions raising claims under RICO.

187.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the entire Class, thereby making damages with respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful actions.

188.     Questions of law and fact common to the Class include:

a.   Whether the Ambetter Enterprise exists and is a RICO enterprise as alleged.

b.   Whether each Defendant was associated with the Ambetter Enterprise.

c.   Whether Ambetter plans provide the full benefits required by state and federal laws and regulations.

d.   Whether Ambetter plans provide the full benefits represented in the marketing materials and the insurance documents themselves.

e.   Whether Defendants engaged in a pattern of racketeering activity by committing two or more instances of mail or wire fraud.

f.   Whether Defendants conducted, or participated in, the conduct of the Ambetter Enterprise through a pattern of racketeering activity.

g.   Whether Defendants knowingly devised or participated in a scheme to defraud person who purchased Ambetter plans.

h.   Whether Defendants intended to defraud persons who purchased Ambetter plans.

i.   Whether Defendants' scheme to defraud involved materially false or fraudulent pretenses, representations, or promises.

j.   Whether, for the purpose of carrying out the scheme to defraud or attempting to do so, Defendants (i) used or caused the use of the United States Mails or a private or commercial interstate carrier, or (ii) caused interstate wire communications.

k.  Whether persons who purchased Ambetter plans were overcharged.

l.  The proper measure of damages for the fraudulent overcharges incurred by persons who purchased Ambetter plans.

m.  Whether the Ambetter Enterprise affected interstate commerce.

189.  Class-action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class-action mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

190.  Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VI.  CLAIMS FOR RELIEF

### Claim 1: Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)

191.  Plaintiffs repeat and incorporate by reference all preceding paragraphs and allegations.

192.  This claim is brought against all Defendants on behalf of members of the putative Federal-Law Class ("Class Members" for purposes of Plaintiffs' claims under federal law).

193.    Defendants' sale of Ambetter plans is a violation of RICO, 18 U.S.C.

§ 1962(c), that has injured Plaintiffs and Class Members in their property, thereby entitling

Plaintiffs and Class Members to recover treble damages, *id.* § 1964(c).

194.    Each Defendant is a "person" for purposes of the RICO statute, 18 U.S.C.

§ 1962(c).

195.    Each Defendant is associated with the Ambetter Enterprise, which consists of

Defendants and at least 26 other corporate entities.

196.    The Ambetter Enterprise engages in and affects interstate commerce.

197.    Each Defendant conducts or participates in the conduct of the Ambetter

Enterprise's affairs through a pattern of racketeering activity.

198.    Defendants' pattern of racketeering activity consists of millions of violations of

the federal mail- and wire-fraud statutes, 18 U.S.C. §§ 1341, 1343.

199.    Defendants formed a scheme to accomplish the purpose of getting low-income

consumers to purchase Ambetter health-insurance plans. The scheme was profitable, as it

involved not only premiums paid by plan members but also various moneys from the federal

government in the form of subsidies for the Ambetter Silver plans purchased by low-income

persons.

200.    Defendants' scheme to defraud was and is intended to deceive low-income

consumers into purchasing Ambetter plans by means of materially false or fraudulent

pretenses, representations, and promises.

201.    The scheme involves materially false representations to consumers about the

benefits they would receive under Ambetter plans, including (among other things)

misrepresentations about which providers were in-network, which medical services the plan

would reimburse providers for, and which medications were on the plan formulary.

202. The scheme also involves materially false representations to federal and state governments, as the Ambetter plans could not have been sold on the online exchanges created by the ACA if Defendants and other members of the Ambetter Enterprise had not falsely represented to government officials that Ambetter plans comply with federal and state laws and regulations.

203. Defendants' intent to defraud is evidenced by their conduct. Among other things, the defects in the Ambetter plans (e.g., fake lists of in-network providers) are consistent across the plans offered in 26 states. Moreover, the shortcomings in the Ambetter plans have been known to Defendants for years as a result of lawsuits and regulatory actions (e.g., in the State of Washington), and yet Defendants and the other members of the Ambetter Enterprise continue to misrepresent the features of Ambetter plans.

204. The evidence of coverage, marketing materials, and other Ambetter plan documents that consumers can access to decide whether to purchase an Ambetter plan contain numerous false representations and promises, and those falsehoods are capable of influencing consumers to purchase Ambetter plans.

205. Defendants caused millions of mailings and wire communications incident to an essential part of their scheme to defraud consumers. Such mailings and wire communications occurred every time that plan documents were sent to current or potential Ambetter plan members; every time that a member of the Ambetter Enterprise electronically filed Ambetter plan documents with a state's online exchange; every time that an Ambetter member paid their premium electronically; every time that an Ambetter plan sent an email to a plan member or potential customer; and every time that members of the Ambetter Enterprise emailed each other about Ambetter plans or discussed the plans over the phone.

206. All of these mailings and wire communications were both foreseeable and incident to an essential part of Defendants' fraudulent scheme.

207. Each Defendant and other member of the Ambetter Enterprise performs distinct roles that facilitate the fraudulent scheme:

    a. Defendants Centene Corp. and Centene Management designed the Ambetter plan and originated the scheme to defraud.

    b. Defendant Centene Management coordinates between the various Centene Corp. subsidiaries who are members of the Ambetter Enterprise to ensure that all of the members of the Enterprise work toward a common purpose and function as a continuing unit.

    c. Each member of the Ambetter Enterprise that has a contract to provide Medicaid plans in a state lends its name/brand to the Ambetter plan in that state so that persons who lose Medicaid coverage are more likely to purchase the Ambetter plan.

    d. Each member of the Ambetter Enterprise that has a contract to provide Medicaid plans in a state receives notice from the state when a person on their plan is no longer eligible for Medicaid. The subsidiary then uses that information to target that person with promotional materials for the Ambetter plan.

    e. The members of the Ambetter Enterprise that provide Medicaid managed-care plans or Ambetter plans in each state have the necessary licenses to do so, without which the scheme could not work. The licenses are difficult to obtain; Centene Corp. has specifically acquired Health Net LLC, Wellcare Health Plans, Inc., Defendant Celtic, and other companies because they are licensed to sell health plans in certain states.

208. It is exceedingly difficult—if not impossible—for a single corporate entity to perform all of these distinct roles. Thus, Defendant Centene Corp.'s decision to operate through subsidiaries facilitates Defendants' fraudulent scheme.

209. Defendants' violations of RICO injured Plaintiffs and Class Members in their property by fraudulently overcharging them for Ambetter plans that delivered neither the promised benefits nor the benefits required by law.

210. Defendants' violations of RICO are the but-for cause of Plaintiffs' and Class Members' injuries, as the fraudulent sale of Ambetter plans wrongfully deprived Plaintiffs and Class Members of money.

211. Defendants' violations also are the proximate cause of Plaintiffs' and Class Members' injuries, as federal and state governments would not have permitted Ambetter plans to be sold to consumers had Defendants not misrepresented the benefits available through the plans.

## Claim 2: Unjust Enrichment

212. Plaintiffs repeat and incorporate by reference all preceding paragraphs and allegations.

213. This claim is brought against all Defendants on behalf of members of all of the putative State-Law Subclasses ("Class Members" for purposes of this claim of unjust enrichment).

214. Defendants appreciated, accepted, and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from Defendants' conduct toward Plaintiffs and Class Members as described herein.

215. Plaintiffs and Class Members have no adequate remedy at law.

216. Under the circumstances, it would be unjust and unfair for Defendants to be permitted to retain any of the benefits obtained from the overcharges imposed on Plaintiffs and Class Members

217.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received as a result of their pattern of racketeering activity and scheme to defraud Plaintiffs and Class Members.

### Claim 3: Violations of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521 through 44-1534

218.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

219.    This claim is brought against all Defendants on behalf of members of the putative Arizona Class ("Class Members" for purposes of all claims under Arizona law).

220.    Defendants, Plaintiffs, and Class Members all are persons within the meaning of the Arizona Consumer Fraud Act.

221.    At all relevant times, Defendants engaged in trade and commerce, and the sale and advertisement of merchandise, within the meaning of the Arizona Consumer Fraud Act.

222.    The Arizona Act makes unlawful "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. Ann. § 44-1522(A).

223.    As alleged in this Complaint, Defendants' conduct constitutes unfair and deceptive acts or practices in violation of the Arizona Consumer Fraud Act.

224.    Defendants violated the Act by, among other things, (i) falsely representing to Class Members that medical providers who do not accept Ambetter insurance are in the

Ambetter provider network, and (ii) falsely promising Class Members that Ambetter health plans cover certain medical services and medications, and then denying claims for those medical services and medications.

225.    Defendants intentionally and knowingly employed deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, and suppression and omission of material facts in connection with the advertising and sale of Ambetter insurance plans.

226.    Defendants intended that Class Members would rely on their deceptions, false promises, and misrepresentations in deciding to purchase an Ambetter health plan.

227.    The foregoing deceptive and unfair acts and practices, false promises, and misrepresentations of material fact proximately caused Class Members to suffer an ascertainable loss in the form of, among other things, overcharges incurred by paying for Ambetter health plans that did not deliver the promised benefits.

228.    Plaintiffs seek to recover for Class Members the overcharges they incurred as a result of Defendants' deceptive practices, as well as any other legal or equitable relief that the Court deems just and appropriate.

### Claim 4: Violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 through 17594

229.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

230.    This claim is brought against all Defendants on behalf of members of the putative California Class ("Class Members" for purposes of all claims under California law).

231.    Defendants, Plaintiffs, and Class Members all are persons within the meaning of the California Unfair Competition Law.

232.    The statute makes unlawful "unfair competition," which is defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

233.    As alleged in this Complaint, Defendants' conduct constitutes unfair competition in violation of the California Unfair Competition Law.

234.    Defendants violated the Law by, among other things, (i) falsely representing to Class Members that medical providers who do not accept Ambetter insurance are in the Ambetter provider network, and (ii) falsely promising Class Members that Ambetter health plans cover certain medical services and medications, and then denying claims for those medical services and medications.

235.    Defendants intentionally and knowingly mislead, deceived, and defrauded Class Members in connection with the sale of Ambetter insurance plans.

236.    Defendants intended that Class Members would rely on their deceptions, false promises, and misrepresentations in deciding to purchase an Ambetter health plan.

237.    The foregoing misleading, deceiving, and fraudulent acts by Defendants proximately caused Class Members to suffer an ascertainable loss in the form of, among other things, overcharges incurred by paying for Ambetter health plans that did not deliver the promised benefits.

238.    Plaintiffs seek to recover for Class Members the overcharges they incurred as a result of Defendants' deceptive practices, as well as any other legal or equitable relief that the Court deems just and appropriate.

## Claim 5: Violations of the Illinois Consumer Fraud and
## Deceptive Business Practices Act, 815 ILCS 505/1 through 505/12

239.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

240.    This claim is brought against all Defendants on behalf of members of the putative Illinois Class ("Class Members" for purposes of all claims under Illinois law).

241.    Defendants, Plaintiffs, and Class Members all are persons within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act.

242.    Plaintiffs and Class Members also are consumers within the meaning of the Act.

243.    At all relevant times, Defendants engaged in trade and commerce, and the sale and advertisement of merchandise, within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act.

244.    The Illinois Act makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' [815 ILCS 510/2] … in the conduct of any trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

245.    As alleged in this Complaint, Defendants' conduct constitutes unfair and deceptive acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

246. Defendants violated the Act by, among other things, (i) falsely representing to Class Members that medical providers who do not accept Ambetter insurance are in the Ambetter provider network, and (ii) falsely promising Class Members that Ambetter health plans cover certain medical services and medications, and then denying claims for those medical services and medications.

247. Defendants intentionally and knowingly misrepresented material facts regarding Ambetter health plans with the intent to mislead Class Members.

248. Defendants intended that Class Members would rely on their deceptions, false promises, and misrepresentations in deciding to purchase an Ambetter health plan.

249. The foregoing deceptive and unfair acts and practices, false promises, and misrepresentations of material fact proximately caused Class Members to suffer an ascertainable loss in the form of, among other things, overcharges incurred by paying for Ambetter health plans that did not deliver the promised benefits.

250. Plaintiffs seek to recover for Class Members the overcharges they incurred as a result of Defendants' unfair and deceptive practices, as well as any other legal or equitable relief that the Court deems just and appropriate.

### Claim 6: Violations of the Kentucky Consumer Protection Act,<br>Ky. Rev. Stat. Ann. §§ 367.110 through 367.990

251. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

252. This claim is brought against all Defendants on behalf of members of the putative Kentucky Class ("Class Members" for purposes of all claims under Kentucky law).

253. Defendants, Plaintiffs, and Class Members all are persons within the meaning of the Kentucky Consumer Protection Act.

254.   At all relevant times, Defendants engaged in trade and commerce within the meaning of the Kentucky Consumer Protection Act.

255.   The Kentucky Act makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct off any trade or commerce." Ky. Rev. Stat. Ann. § 367.170.

256.   As alleged in this Complaint, Defendants committed unfair, false, misleading, and deceptive acts and practices in the conduct of trade and commerce in violation of the Kentucky Consumer Protection Act.

257.   Defendants violated the Act by, among other things, (i) falsely representing to Class Members that medical providers who do not accept Ambetter insurance are in the Ambetter provider network, and (ii) falsely promising Class Members that Ambetter health plans cover certain medical services and medications, and then denying claims for those medical services and medications.

258.   Defendants intentionally and knowingly misrepresented or lied about material facts regarding Ambetter health plans with the intent to mislead Class Members.

259.   Defendants intended that Class Members would rely on their unfair, false, misleading, and deceptive acts and practices in deciding to purchase an Ambetter health plan.

260.   Defendants' unfair, false, misleading, and deceptive acts and practices proximately caused Class Members to suffer an ascertainable loss in the form of, among other things, overcharges incurred by paying for Ambetter health plans that did not deliver the promised benefits.

261.   Plaintiffs seek to recover for Class Members the overcharges they incurred as a result of Defendants' unfair, false, misleading, and deceptive acts and practices, as well as any other legal or equitable relief that the Court deems just and appropriate.

– 59 –

## Claim 7: Violations of the Nebraska Consumer Protection Act,
## Neb. Rev. Stat. §§ 59-1601 through 59-1623

262.     Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs of this Complaint.

263.     This claim is brought against all Defendants on behalf of members of the

putative Nebraska Class ("Class Members" for purposes of all claims under Nebraska law).

264.     Defendants, Plaintiffs, and Class Members all are persons within the meaning

of the Nebraska Consumer Protection Act.

265.     At all relevant times, Defendants engaged in trade and commerce within the

meaning of the Nebraska Consumer Protection Act.

266.     The Nebraska Act makes unlawful "[u]nfair methods of competition and

unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev.

Stat. Ann. § 59-1602.

267.     As alleged in this Complaint, Defendants committed unfair and deceptive acts

and practices in the conduct of trade and commerce in violation of the Nebraska Consumer

Protection Act.

268.     Defendants violated the Act by, among other things, (i) falsely representing to

Class Members that medical providers who do not accept Ambetter insurance are in the

Ambetter provider network, and (ii) falsely promising Class Members that Ambetter health

plans cover certain medical services and medications, and then denying claims for those

medical services and medications.

269.     Defendants intentionally and knowingly misrepresented or lied about material

facts regarding Ambetter health plans with the intent to deceive Class Members.

270.     Defendants intended that Class Members would rely on their unfair and

deceptive acts and practices in deciding to purchase an Ambetter health plan.

271.    Defendants' unfair and deceptive acts and practices caused Class Members to suffer an ascertainable loss in the form of, among other things, overcharges incurred by paying for Ambetter health plans that did not deliver the promised benefits.

272.    Plaintiffs seek to recover for Class Members the overcharges they incurred as a result of Defendants' unfair and deceptive acts and practices, as well as any other legal or equitable relief that the Court deems just and appropriate.

### Claim 8: Violations of the Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 41.600, 589.0903 through 598.0999

273.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

274.    This claim is brought by Plaintiffs against all Defendants on behalf of members of the putative Nevada Class ("Class Members" for purposes of all claims under Nevada law).

275.    Defendants, Plaintiffs, and Class Members all are persons within the meaning of the Nevada Trade Regulation and Practices Act.

276.    The Nevada Act makes unlawful "deceptive trade practices," including: (i) "[k]nowingly mak[ing] a false representation as to the characteristics, … uses, [or] benefits, … of goods or services for sale," Nev. Rev. Stat. § 598.0915(5); (ii)"[r]epresent[ing[ that goods or services for sale or lease are of a particular standard, quality or grade" if the person making the representation "knows or should know that they are of another standard, quality, grade, style or model," *id.* § 598.0915(7); (iii) "[f]ail[ing] to disclose a material fact in connection with the sale or lease of goods or services," *id.* § 598.0923(1)(b); and (iv) "[u]sing an unconscionable practice in a transaction," *id.* § 598.0923(1)(e).

277.    As alleged in this Complaint, Defendants' conduct constitutes deceptive trade practices in violation of the Nevada Trade Regulation and Practices Act.

278.     Defendants violated the Act by, among other things, (i) falsely representing to Class Members that medical providers who do not accept Ambetter insurance are in the Ambetter provider network, and (ii) falsely promising Class Members that Ambetter health plans cover certain medical services and medications, and then denying claims for those medical services and medications.

279.     Defendants intentionally and knowingly misrepresented material facts regarding Ambetter health plans with the intent to mislead Class Members.

280.     Defendants intended that Class Members would rely on their deceptions, false promises, and misrepresentations in deciding to purchase an Ambetter health plan.

281.     The foregoing deceptive trade practices proximately caused Class Members to suffer an ascertainable loss in the form of, among other things, overcharges incurred by paying for Ambetter health plans that did not deliver the promised benefits.

282.     Plaintiffs seek to recover for Class Members the overcharges they incurred as a result of Defendants' deceptive practices, as well as any other legal or equitable relief that the Court deems just and appropriate.

### Claim 9: Violations of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1 through 56:8-91

283.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

284.     This claim is brought against all Defendants on behalf of members of the putative New Jersey Class ("Class Members" for purposes of all claims under New Jersey law).

285.     Defendants, Plaintiffs, and Class Members all are persons within the meaning of the New Jersey Consumer Fraud Act.

286.    At all relevant times, Defendants engaged in the sale and advertising of merchandise within the meaning of the New Jersey Consumer Fraud Act.

287.    The New Jersey Act makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . or with the subsequent performance of such person as aforesaid." N.J. Stat. Ann. § 56:8-2.

288.    As alleged in this Complaint, Defendants used and employed unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, and omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale and advertisement of Ambetter health insurance plans.

289.    Defendants violated the Act by, among other things, (i) falsely representing to Class Members that medical providers who do not accept Ambetter insurance are in the Ambetter provider network, and (ii) falsely promising Class Members that Ambetter health plans cover certain medical services and medications, and then denying claims for those medical services and medications.

290.    Defendants' unlawful acts and practices caused Class Members to suffer an ascertainable loss in the form of, among other things, overcharges incurred by paying for Ambetter health plans that did not deliver the promised benefits.

291.    Plaintiffs seek to recover for Class Members the overcharges they incurred as a result of Defendants' unfair and deceptive acts and practices, as well as any other legal or equitable relief that the Court deems just and appropriate.

## Claim 10: Violations of New Mexico Unfair Practices Act,
## N.M. Stat. §§ 57-12-1 through 57-12-22

292.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

293.    This claim is brought by Plaintiffs against all Defendants on behalf of members of the putative New Mexico Class ("Class Members" for purposes of all claims under New Mexico law).

294.    Defendants, Plaintiffs, and Class Members all are persons within the meaning of the New Mexico Unfair Practices Act.

295.    At all relevant times, Defendants engaged in trade and commerce within the meaning of the New Mexico Unfair Practices Act.

296.    The New Mexico Act makes unlawful "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce." N.M. Stat. Ann. § 57-12-3.

297.    Unfair or deceptive trade practices are defined as "false or misleading oral or written statement[s], visual description[s], or other representation[s] of any kind knowingly made in connection with the sale . . . of goods or services . . . in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including: "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that the person does not have" and "failing to deliver the quality or quantity of goods or services contracted for." *Id.* § 57-12-2(D).

298.    An unconscionable trade practice "means an act or practice in connection with the sale, lease, rental or loan, or in connection with the offering for sale, lease, rental or loan,

of any goods or services, including services provided by licensed professionals, . . . that to a person's detriment: (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) results in a gross disparity between the value received by a person and the price paid." *Id.* § 57-12-2(E).

299.     As alleged in this Complaint, Defendants' conduct constitutes unfair and deceptive trade practices in violation of the New Mexico Unfair Practices Act.

300.     As alleged in this Complaint, Defendants' conduct also constitutes an unconscionable trade practice in violation of the Act.

301.     Defendants violated the Act by, among other things, (i) falsely representing to Class Members that medical providers who do not accept Ambetter insurance are in the Ambetter provider network, and (ii) falsely promising Class Members that Ambetter health plans cover certain medical services and medications, and then denying claims for those medical services and medications.

302.     Defendants intended that their unfair, deceptive, and unconscionable trade practices would take advantage of Class Members by persuading them to purchase Ambetter plans that don't provide the advertised benefits, thereby resulting in a gross disparity between the value received by Class Members and the price paid by Class Members.

303.     The foregoing deceptive trade practices proximately caused Class Members to suffer an ascertainable loss in the form of, among other things, overcharges incurred by paying for Ambetter health plans that did not deliver the promised benefits.

304.     Plaintiffs seek to recover for Class Members the overcharges they incurred as a result of Defendants' deceptive practices, as well as any other legal or equitable relief that the Court deems just and appropriate.

## Claim 11: Violations of the New Mexico Unfair Insurance Practices Act, N.M. Stat. §§ 59A-16-1 through 59A-16-30

305.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

306.    This claim is brought by Plaintiffs against all Defendants on behalf of members of the putative New Mexico Class ("Class Members" for purposes of all claims under New Mexico law).

307.    Defendants, Plaintiffs, and Class Members all are persons within the meaning of the New Mexico Unfair Insurance Act.

308.    Defendants are insurers within the meaning of the New Mexico Unfair Insurance Practices Act.

309.    The Act prohibits persons from "engag[ing] in . . . any practice which in [the Act] is defined or prohibited as, or determined to be, an unfair method of competition, or unfair or deceptive act or practice, or fraudulent," N.M. Stat. Ann. § 59A-16-3, including:

> ▫ "mak[ing], publish[ing], issu[ing] or circulat[ing] any estimate, illustration, circular, statement, sales presentation or comparison which . . . misrepresents the benefits, advantages, conditions or terms of any policy; [or] fails to disclose material facts reasonably necessary to prevent other statements made from being misleading," *id.* § 59A-16-4(A), (G);

> ▫ "mak[ing], publish[ing], disseminat[ing], circulat[ing] or plac[ing] before the public, or caus[ing], directly or indirectly, to be made, published, disseminated, circulated or placed before the public, in a newspaper, magazine or other publication, or in the form of a notice, circular, pamphlet, letter or poster, or over any radio or television station, or in any other way, any advertisement, announcement or statement containing any assertion, representation or statement with respect to any business subject to the superintendent's supervision under the Insurance Code, or with

respect to any person in the conduct of such business, which is untrue, deceptive or misleading," *id.* § 59A-16-5;

◦ "wilfully collect[ing] any sum as premium or charge for insurance or other coverage, which insurance or coverage is not then provided or in due course to be provided . . . by a policy issued by an insurer," *id.* § 59A-16-24.

310.    Defendants violated the Act by, among other things, misrepresenting the benefits, advantages, conditions, and terms of Ambetter policies; failing to disclose material facts reasonably necessary to prevent other statements by Defendants from being misleading; providing to the public advertisements, announcements, and statements containing assertions, representations, and statements about Ambetter health insurance plans that were untrue, deceptive, and misleading; and willfully collecting premiums for coverage that was not provided by the Ambetter policies issues by Defendants.

311.    Defendants' officers, directors, and department heads authorized or knowingly permitted Defendants' agents, solicitors, and employees to commit the above unlawful acts and had prior knowledge thereof.

312.    The foregoing unlawful conduct caused Class Members to suffer an ascertainable loss in the form of, among other things, overcharges incurred by paying for Ambetter health plans that did not deliver the promised benefits.

313.    Plaintiffs seek to recover for Class Members the overcharges they incurred as a result of Defendants' deceptive practices, as well as any other legal or equitable relief that the Court deems just and appropriate.

## Claim 12: Violations of the North Carolina Unfair and Deceptive
### Practices Statute, N.C. Gen. Stat. §§ 75-1.1 through 75-35

314.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

315.    This claim is brought against all Defendants on behalf of members of the putative North Carolina Class ("Class Members" for purposes of all claims under North Carolina law).

316.    At all relevant times, Defendants engaged in commerce within the meaning of the North Carolina Unfair and Deceptive Practices Statute.

317.    The North Carolina Statute makes unlawful "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. Ann. § 75-1.1(a).

318.    As alleged in this Complaint, Defendants engaged in unfair and deceptive acts in the sale and advertisement of Ambetter health insurance plans.

319.    Defendants violated the North Carolina Statute by, among other things, (i) falsely representing to Class Members that medical providers who do not accept Ambetter insurance are in the Ambetter provider network, and (ii) falsely promising Class Members that Ambetter health plans cover certain medical services and medications, and then denying claims for those medical services and medications.

320.    Defendants' unlawful acts and practices caused Class Members to suffer an ascertainable loss in the form of, among other things, overcharges incurred by paying for Ambetter health plans that did not deliver the promised benefits.

321.    Plaintiffs seek to recover for Class Members the overcharges they incurred as a result of Defendants' unfair and deceptive acts and practices, as well as any other legal or equitable relief that the Court deems just and appropriate.

### Claim 13: Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. §§ 201-1 through 201-9.3

322.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

323.     This claim is brought against all Defendants on behalf of members of the putative Pennsylvania Class ("Class Members" for purposes of all claims under Pennsylvania law).

324.     Defendants, Plaintiffs, and Class Members all are persons within the meaning of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

325.     At all relevant times, Defendants engaged in trade and commerce within the meaning of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

326.     The Pennsylvania Law makes unlawful certain enumerated "unfair or deceptive acts or practices in the conduct of any trade or commerce," 73 Pa. Stat. Ann. § 201-3, including: "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality or grade, . . . if they are of another"; and "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." *Id.* § 201-2.

327.     As alleged in this Complaint, Defendants' actions constitute unfair and deceptive acts and practices in the conduct of any trade or commerce in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

328.     Defendants violated the Law by, among other things, (i) falsely representing to Class Members that medical providers who do not accept Ambetter insurance are in the Ambetter provider network, and (ii) falsely promising Class Members that Ambetter health

plans cover certain medical services and medications, and then denying claims for those medical services and medications.

329. Defendants intended that their unfair and deceptive acts and practices would take advantage of Class Members by persuading them to purchase Ambetter plans that don't provide the advertised benefits.

330. The foregoing deceptive trade practices proximately caused Class Members to suffer an ascertainable loss in the form of, among other things, overcharges incurred by paying for Ambetter health plans that did not deliver the promised benefits.

303. Plaintiffs seek to recover for Class Members the overcharges they incurred as a result of Defendants' deceptive practices, as well as any other legal or equitable relief that the Court deems just and appropriate.

### Claim 14: Violations of the Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.010 through 19.86.920

331. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

332. This claim is brought against all Defendants on behalf of members of the putative Washington Class ("Class Members" for purposes of all claims under Washington law).

333. Defendants, Plaintiffs, and Class Members all are persons within the meaning of the Washington Consumer Protection Act.

334. At all relevant times, Defendants engaged in trade and commerce within the meaning of the Washington Consumer Protection Act.

335. The Washington Act makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code Ann. § 19.86.020.

336. As alleged in this Complaint, Defendants' actions constitute unfair and deceptive acts and practices in the conduct of any trade or commerce in violation of the Washington Act.

337. Defendants violated the Act by, among other things, (i) falsely representing to Class Members that medical providers who do not accept Ambetter insurance are in the Ambetter provider network, and (ii) falsely promising Class Members that Ambetter health plans cover certain medical services and medications, and then denying claims for those medical services and medications.

338. Defendants intended that their unfair and deceptive acts and practices would take advantage of Class Members by persuading them to purchase Ambetter plans that don't provide the advertised benefits.

339. The foregoing deceptive trade practices proximately caused Class Members to suffer an ascertainable loss in the form of, among other things, overcharges incurred by paying for Ambetter health plans that did not deliver the promised benefits.

340. Moreover, Defendants' unfair and deceptive acts and practices are injurious to the public interest because the acts and practices have the capacity to injure other persons, had the capacity to injure other persons during the Class Period, and did injure other persons during the Class Period.

341. Plaintiffs seek to recover for Class Members the overcharges they incurred as a result of Defendants' deceptive practices, as well as treble damages and any other legal or equitable relief that the Court deems just and appropriate.

## VII.   PRAYER FOR RELIEF

342.    WHEREFORE, on behalf of themselves and the Class, Plaintiffs respectfully request that this Court enter an Order:

a. Certifying this case as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of the Class defined above, appointing Plaintiffs Matthew Havrilla, Cynthia Dawson, Alden Henriksen, Melody DeSchepper, Christopher Tilton, and Mark Hackett as representatives of the Class, and appointing their counsel as Class Counsel;

b. Declaring that Defendants' actions, as set out above, violate RICO, 18 U.S.C. § 1962(c);

c. Awarding treble damages based on the overcharges incurred by Plaintiffs and Class Members as a result of Defendants' pattern of racketeering activity and scheme to defraud, 18 U.S.C. § 1964(c);

d. Declaring that Defendants' actions, as set out above, violate the Arizona Consumer Fraud Act, the California Unfair Competition Law, Illinois Consumer Fraud and Deceptive Business Practices Act, the Kentucky Consumer Protection Act, the Nebraska Consumer Protection Act, the Nevada Trade Regulation and Practices Act, the New Jersey Consumer Fraud Act, the New Mexico Unfair Practices Act, the New Mexico Unfair Insurance Practices Act, the North Carolina Unfair and Deceptive Practices Statute, the Pennsylvania Unfair Trade Practices and Consumer Protection Law, and the Washington Consumer Protection Act;

e. Awarding any and all damages based on overcharges incurred by Plaintiffs and Class Members as a result of Defendants' violations of the Arizona Consumer Fraud Act, the California Unfair Competition Law, Illinois Consumer Fraud and Deceptive Business Practices Act, the Kentucky Consumer Protection Act, the Nebraska Consumer Protection Act, the Nevada Trade Regulation and Practices Act, the New Jersey Consumer Fraud Act, the New Mexico Unfair Practices Act, the New Mexico Unfair Insurance Practices Act, the North Carolina Unfair and

Deceptive Practices Statute, the Pennsylvania Unfair Trade Practices and Consumer Protection Law, and the Washington Consumer Protection Act;

f. Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including, among other things, an order requiring Defendants to cease their pattern of racketeering activity and scheme to defraud through the sale of Ambetter plans that provide neither the full benefits required by state and federal laws and regulations, nor the full benefits represented in the marketing materials and the insurance documents;

g. Awarding Plaintiffs and the Class their reasonable litigation expenses and attorneys' fees;

h. Awarding Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable; and

i. Awarding such other and further relief as equity and justice may require.

## VIII. Jury Demand

343. Plaintiffs demand a trial by jury on all issues so triable.

Dated: August 5, 2022

*/s/ Kenneth A. Wexler*

Kenneth A. Wexler
Justin N. Boley
Zoran Tasić
Wexler Boley & Elgersma LLP
311 S. Wacker Drive, Suite 5450
Chicago, IL 60606
Tel: (312) 346-2222
Fax: (312) 346-0022
kaw@wbe-llp.com
jnb@wbe-llp.com
zt@wbe-llp.com

Daniel E. Gustafson
   (*pro hac vice* forthcoming)
Daniel C. Hedlund
   (*pro hac vice* forthcoming)
Michelle J. Looby
   (*pro hac vice* forthcoming)
Anthony J. Stauber
   (*pro hac vice* forthcoming)
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
tstauber@gustafsongluek.com


Beth E. Terrell
   (*pro hac vice* forthcoming)
Jennifer Rust Murray
   (*pro hac vice* forthcoming)
Amanda M. Steiner
   (*pro hac vice* forthcoming)
TERRELL MARSHALL LAW GROUP
936 North 34th Street, Suite 300
Seattle, Washington 98103
Tel: (206) 816-6603
Fax: (206) 319-5450
bterrell@terrellmarshall.com
jmurray@terrellmarshall.com
asteiner@terrellmarshall.com


Seth R. Lesser
   (*pro hac vice* forthcoming)
Sarah Sears
   (*pro hac vice* forthcoming)
KLAFTER LESSER LLP
Two International Drive, Suite 350
Rye Brook, NY 10573
Telephone: (914) 934-9200
seth@klafterlesser.com
sarah.sears@klafterlesser.com

Adam J. Zapala
  (*pro hac vice* forthcoming)
COTCHETT, PITRE & MCCARTHY, LLP
840 Malcolm Road
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577
azapala@cpmlegal.com

Alexander Barnett
  (*pro hac vice* forthcoming)
COTCHETT, PITRE & MCCARTHY, LLP
40 Worth Street, Suite 602
New York, NY 10013
Tel: (212) 201-6820
Fax: (917) 398-7753
abarnett@cpmlegal.com

*Attorneys for Plaintiffs and
Proposed Classes*