IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MATTHEW HAVRILLA, CYNTHIA DAWSON, ALDEN HENRIKSEN, MELODY DESCHEPPER, CHRISTOPHER TILTON, and MARK HACKETT, individually and on behalf of all others similarly situated, | Case No. 22 C 4126 <br><br> Judge Nancy L. Maldonado |
| Plaintiffs, | |
| v. | |
| CENTENE CORPORATION, CENTENE MANAGEMENT COMPANY LLC, and CELTIC INSURANCE COMPANY, | |
| Defendants. | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# Table of Contents

Page No.

Introduction ........................................................................................................ 1

Plaintiffs' Allegations ........................................................................................ 2

Legal Standard .................................................................................................... 5

Argument ............................................................................................................. 6

    I.   Plaintiffs' Complaint states a civil RICO claim. ................................... 6

        A.  Plaintiffs' Complaint satisfies Rule 9(b) because it alleges with particularity the circumstances constituting Defendants' fraud. ..................... 6

        B.  Plaintiffs' Complaint passes RICO's distinctiveness test by pleading in detail how the Ambetter Enterprise's decision to operate through subsidiaries facilitated the scheme to defraud................................. 9

        C.  Plaintiffs have adequately alleged intent and knowledge, which may be alleged generally, and the fact that Plaintiffs' allegations may reflect that Defendants *also* breached contracts does not foreclose Plaintiffs' RICO claim................................................................................................ 13

        D.  Plaintiffs state a claim for violation of RICO regardless of their allegations regarding non-compliance with the ACA. ................................. 17

    II.  Plaintiffs have sufficiently pleaded a claim of unjust enrichment........................ 18

    III.  Defendants' challenge to Plaintiffs' "standing" is a challenge to the adequacy of the named Plaintiffs, and should therefore be addressed at the class-certification stage, not on the motion to dismiss....................................... 20

    IV.  Plaintiffs' allegations are sufficient to raise claims under state consumer-protection laws. ............................................................................................. 22

Conclusion............................................................................................................ 25

# Table of Authorities

Page No.

## Cases

*Arnold v. Microsoft Corp.*,
No. 00-CI-00123, 2000 WL 36114007 (Ky. Cir. Ct. July 21, 2000) .................23, 24

*Ayres v. Gen. Motors Corp.*,
234 F.3d 514 (11th Cir. 2000) ................................................................. 17

*Baldwin v. Star Scientific, Inc.*,
78 F. Supp. 3d 724 (N.D. Ill. 2015) .................................................... 20, 21

*Bates v. Nw. Hum. Servs., Inc.*,
466 F. Supp. 2d 69 (D.D.C. 2006) .......................................................... 9

*Bell v. Hood*,
327 U.S. 678 (1946) .............................................................................. 16

*Benson v. Newell Brands, Inc.*,
No. 19 C 6836, 2020 WL 1863296 (N.D. Ill. Apr. 14, 2020)............................20, 21

*Bietsch v. Sergeant's Pet Care Products, Inc.*,
No. 15 C 5432, 2016 WL 1011512 (N.D. Ill. Mar. 15, 2016) ................................ 21

*Boim v. Am. Muslims for Palestine*,
9 F.4th 545 (7th Cir. 2021) ...................................................................... 16

*Bower v. Jones*,
978 F.2d 1004 (7th Cir. 1992).................................................................. 14

*Brown v. Auto-Owners Ins. Co.*,
2022 WL 2442548 (N.D. Ill. June 1, 2022) .......................................................... 21

*Brummett v. Skyline Corp.*,
38 Fed. R. Serv. 2d 1443 (W.D. Ky. 1984)........................................................... 23

*Bucklew v. Hawkins, Ash, Baptie & Co., LLP*,
329 F.3d 923 (7th Cir. 2003)..............................................................9, 10

*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158 (2001) ...........................................................................9, 10

*City of Rockford v. Mallinckrodt ARD, Inc.*,
360 F. Supp. 3d 730 (N.D. Ill. 2019)................................................................. 21

*ClassicStar Mare Lease Litig.*,
  727 F.3d 473 (6th Cir. 2013)................................................................ 10

*Cleary v. Philip Morris, Inc.*,
  656 F.3d 511 (7th Cir. 2011)................................................................ 19

*Connick v. Suzuki Motor Co.*,
  675 N.E.2d 584 (Ill. 1996).................................................................. 22

*Corder v. Ford Motor Co.*,
  297 F.R.D. 572 (W.D. Ky. 2014) ......................................................... 24

*Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*,
  941 F.2d 1220 (D.C. Cir. 1991) ........................................................... 18

*Drager v. Vill. of Bellwood*,
  969 F. Supp. 2d 971 (N.D. Ill. 2013)..................................................... 14

*Falcon v. Nw. Mut. Life Ins. Co.*,
  No. CV 19-404, 2020 WL 7027482 (W.D. Pa. Nov. 30, 2020)............................ 25

*Foster v. Am. Fire & Cas. Co.*,
  219 F. Supp. 3d 590 (E.D. Ky. 2016)..................................................... 25

*Gociman v. Loyola Univ. of Chicago*,
  41 F.4th 873 (7th Cir. 2022) .............................................................. 19

*Goldberg v. Rush Univ. Med. Ctr.*,
  929 F. Supp. 2d 807 (N.D. Ill. 2013)..................................................... 23

*Guidance Endodontics, Ltd. Liab. Co. v. Dentsply Int'l, Inc.*,
  708 F. Supp. 2d 1272 (D.N.M. 2010)..................................................... 25

*H.J. Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989) ....................................................................... 15

*Hefferman v. Bass*,
  467 F.3d 596 (7th Cir. 2006).............................................................. 14

*In re Anthem, Inc. Data Breach Litig.*,
  162 F. Supp. 3d 953 (N.D. Cal. 2016).................................................... 23

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Pracs. Litig.*,
  601 F. Supp. 2d 1201 (S.D. Cal. 2009)................................................... 11

*In re Dairy Farmers of America Inc. Cheese Antitrust Litigation*,
  No. 09 C 3690, 2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) .............................. 20

*In re Herbal Supplements Mktg. & Sales Practices Litig.*,
No. 15 C 5070, 2017 WL 2215025 (N.D. Ill. May 19, 2017)................................. 21

*In re Lincoln Nat'l COI Litig.*,
269 F. Supp. 3d 622 (E.D. Pa. 2017).................................................................... 25

*In re: First Farmers Fin. Litig.*,
No. 14-CV-7581, 2016 WL 5940933 (N.D. Ill. Oct. 13, 2016) .............................. 14

*Jennings v. Auto Meter Prod., Inc.*,
495 F.3d 466 (7th Cir. 2007)................................................................................. 15

*Kempf v. Lumber Liquidators, Inc.*,
No. 3:16-CV-492-DJH, 2017 WL 4288903 (W.D. Ky. Sept. 27, 2017)..............23, 24

*Kostovetsky v. Ambit Energy Holdings, LLC*,
424 F. Supp. 3d 708 (N.D. Ill. 2017).................................................................... 14

*Landmark Am. Ins. Co. v. Deerfield Constr., Inc.*,
933 F.3d 806 (7th Cir. 2019)................................................................................... 5

*Mashallah, Inc. v. W. Bend Mut. Ins. Co.*,
20 F.4th 311 (7th Cir. 2021) ................................................................................. 19

*Mason v. Medline Indus., Inc.*,
731 F. Supp. 2d 730 (N.D. Ill. 2010)...................................................................... 6

*McCulloch v. PNC Bank Inc.*,
298 F.3d 1217 (11th Cir. 2002) ............................................................................ 17

*McDonnell v. Nature's Way Products, LLC*,
No. 16 C 5011, 2017 WL 1149336 (N.D. Ill. Mar. 28, 2017) ................................ 21

*McNeal v. J.P. Morgan Chase Bank, N.A.*,
No. 16 CV 3115, 2016 WL 6804585 (N.D. Ill. Nov. 17, 2016)........................12, 13

*Morrison v. YTB International, Inc.*,
649 F.3d 533 (7th Cir. 2011)................................................................................. 21

*Muir v. Nature's Bounty (DE), Inc.*,
No. 15 C 9835, 2018 WL 3647115 (N.D. Ill. Aug. 1, 2018) ................................. 21

*Myers v. Provident Life & Accident Ins. Co.*,
564 F. Supp. 3d 1157 (M.D. Fla. 2021)................................................................. 13

*Nat'l Council on Comp. Ins., Inc. v. Am. Int'l Grp., Inc.*,
No. 07 C 2898, 2007 WL 7715086 (N.D. Ill. Dec. 26, 2007)................................. 11

*Natara Multimedia Grp. Inc. v. Carranza,*
  2015 WL 3814653 (N.D. Ill. June 17, 2015) ........................................................ 14

*Pereira v. United States,*
  347 U.S. 1 (1954) ..................................................................................................... 9

*Perlman v. Zell,*
  185 F.3d 850 (7th Cir. 1999) ................................................................................. 14

*Polymer Dynamics, Inc. v. Bayer Corp.,*
  CIV. A. 99-4040, 2000 WL 1146622 (E.D. Pa. Aug. 14, 2000) ............................ 15

*Rawson v. ALDI, Inc.*, No. 21 C 2811, 2022 WL 1556395 (N.D. Ill. May 17, 2022) ....... 20, 21

*Ruebe v. PartnerRe Ireland Ins. DAC,*
  470 F. Supp. 3d 829 (N.D. Ill. 2020) ...................................................................... 2

*Schmuck v. United States,*
  489 U.S. 705 (1989) ............................................................................................... 12

*Sirazi v. Gen. Mediterranean Holding, SA,*
  No. 12 C 0653, 2013 WL 812271 (N.D. Ill. Mar. 5, 2013) .................................... 20

*Smith-Brown v. Ulta Beauty, Inc.,*
  2019 WL 932022 (N.D. Ill. Feb. 26, 2019) ............................................................ 21

*Tallon v. Lloyd & McDaniel,*
  497 F. Supp. 2d 847 (W.D. Ky. 2007) ................................................................... 24

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
  551 U.S. 308 (2007) ............................................................................................... 10

*United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.,*
  No. 12 C 204, 2012 WL 3061859 (N.D. Ill. July 26, 2012) .................................. 17

*United States ex rel. Presser v. Acacia Mental Health Clinic, LLC,*
  836 F.3d 770 (7th Cir. 2016) ................................................................................... 6

*United States ex rel. Upton v. Fam. Health Network, Inc.,*
  900 F. Supp. 2d 821 (N.D. Ill. 2012) ...................................................................... 5

*United States v. Brocksmith,*
  991 F.2d 1363 (7th Cir. 1993) ............................................................................... 12

*United States v. Molina Healthcare of Illinois, Inc.,*
  17 F.4th 732 (7th Cir. 2021) ............................................................................... 5, 6

*United States v. Powell*,
  576 F.3d 482 (7th Cir. 2009) ............................................................. 8

*United States v. Sheneman*,
  682 F.3d 623 (7th Cir. 2012) ............................................................. 9

*Vanzant v. Hill's Pet Nutrition, Inc.*,
  934 F.3d 730 (7th Cir. 2019) ........................................................... 22

*Wiggins v. Daymar Colls. Grp.*,
  317 F.R.D. 42 (W.D. Ky. 2016) ....................................................... 24

*Wyant v. Dude Products, Inc.*,
  21 C 682, 2022 WL 621815 (N.D. Ill. Mar. 3, 2022) ...................... 21, 25

**Statutes**

18 U.S.C. § 1961(1) ............................................................................. 17, 18

18 U.S.C. § 1962(c) ................................................................................. 9

Nebraska Revised Statutes § 59-1602 .................................................. 24

Nebraska Revised Statutes § 59-1617 .................................................. 24

**Other Authorities**

Affordable Care Act ....................................................................... passim

Higher Education Act ......................................................................... 17

Illinois Consumer Fraud and Deceptive Business Practices Act ......... 22

Kentucky Consumer Protection Act .......................................... 23, 24, 25

Nebraska Consumer Protection Act ................................................... 24

Racketeer Influenced and Corrupt Organizations Act .................. passim

Service Contract Act ......................................................................... 18

**Rules**

Federal Rule of Civil Procedure 8(a)(3)(d) ....................................... 24

Federal Rule of Civil Procedure 9(b) ........................................... passim

# INTRODUCTION

Plaintiffs' Class Action Complaint (Dkt. No. 1) alleges that Defendants Centene Corporation ("Centene Corp."), Centene Management Company LLC ("Centene Management"), and Celtic Insurance Company ("Celtic") are engaged in an illegal multi-billion-dollar scheme to defraud consumers through the sale of Ambetter brand health-insurance plans in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and state laws—a scheme that predominantly harms low-income individuals across 26 states. The Ambetter plans are fraudulent because, among other things, the provider networks that are presented to plan members and potential members are false; indeed, they are often just copies of physician directories from other sources. Defendants know that the Ambetter in-network provider lists are a sham—and have been a sham for years—yet Defendants continue to misrepresent and sell Ambetter plans to unwitting consumers. The allegations in Plaintiffs' Complaint are detailed, plausible, and supported by the public record.

Defendants' motion to dismiss should be denied because their challenges to the Complaint ignore the bulk of Plaintiffs' allegations, misapply the legal standards governing motions to dismiss, and mischaracterize legal authority. For example, on the first page of their Memorandum (Dkt. No. 19 ("Defs.' Mem.")), Defendants argue: "[T]he complaint contains no well-pled facts to support the notion that there is anything wrong with a parent company establishing subsidiaries to hold government insurance licenses or to provide coverage to people when they meet income eligibility requirements." This is a straw-man argument, as Plaintiffs do not allege that that there is anything wrong with this conduct standing alone. The wrongful conduct is the subsidiaries' fraudulently obtaining and

maintaining the licenses, and using the licenses to swindle consumers. All of this is alleged in great detail in the Complaint but ignored by Defendants, contrary to the fundamental standard governing motions to dismiss—that the complaint must be read "as a whole" and "in the light most favorable to the non-moving party." *Ruebe v. PartnerRe Ireland Ins. DAC*, 470 F. Supp. 3d 829, 852 (N.D. Ill. 2020) (citations and internal quotation marks omitted).

In short, Plaintiffs have adequately pleaded all elements of their RICO and state-law claims, and Defendants' motion to dismiss should be denied in its entirety.

## PLAINTIFFS' ALLEGATIONS

Plaintiffs are six persons who purchased Ambetter plans through their states' online Affordable Care Act ("ACA") exchanges, only to discover that medical care was unavailable to them when they needed it most because the providers that their Ambetter plans identified as being "in-network" did not accept Ambetter insurance. The Complaint describes how each Plaintiff was harmed by Defendants' fraud, and also provides detailed allegations laying out the who, what, when, where, and how of Defendants' fraudulent scheme.

**Who:** Plaintiffs specify that the perpetrators of the fraud alleged in the Complaint are members of a RICO enterprise ("the Ambetter Enterprise"), which consists of Defendants Centene Corp., Centene Management, Celtic, and "at least 26 other Centene Corp. subsidiaries." Compl. ¶ 16. Plaintiffs identify each of the 26 subsidiaries, specify which subsidiary sells Ambetter plans in which state, and provide the names of the Ambetter plans sold in each state. *Id.* ¶¶ 121, 129. The Complaint also provides representative examples of persons harmed by Defendants' scheme to fraud—the six named Plaintiffs. *Id.* ¶¶ 29–104. Plaintiffs' definition of the Federal-Law Class describes millions of others who were harmed by Defendants' scheme: "All persons who paid premiums for an Ambetter brand

– 2 –

health-insurance plan during the Class Period while residing in" one of the 26 listed states.

*Id.* ¶ 180; *see id.* ¶ 5 ("Over 2 million persons currently pay for Ambetter brand plans.").

**What:** Nearly every page of the Complaint contains allegations describing the *what* of this case—namely, Defendants' scheme to defraud consumers, as well as federal and state governments. The Complaint summarizes the scheme and its effects as follows:

> The scheme involves materially false representations to consumers about the benefits they would receive under Ambetter plans, including (among other things) misrepresentations about which providers were in-network, which medical services the plan would reimburse providers for, and which medications were on the plan formulary.
>
> . . . .
>
> [These] violations . . . injured Plaintiffs and Class Members in their property by fraudulently overcharging them for Ambetter plans that delivered neither the promised benefits nor the benefits required by law.

Compl. ¶¶ 201–02, 209.

**When:** The Complaint describes how "Defendants have been defrauding consumers since the ACA health-insurance exchanges went online in 2013." Compl. ¶ 24; *see, e.g.*, *id.* ¶¶ 20–23, 141. The Complaint also provides representative examples by specifying the time frames during which each Plaintiff was defrauded. *See, e.g.*, *id.* ¶¶ 29, 39–40 (alleging that Plaintiff Matthew Havrilla paid for an Ambetter policy for the 2021 calendar year and "spent **between two and eight hours per month in 2021** on phone and email correspondence with his insurer attempting to get an accurate list of in-network providers"); *id.* ¶¶ 43, 49–51 (alleging that Plaintiff Cynthia Dawson "paid for an Ambetter policy from Sunshine Health **from January 2018 through December 2020**" and that, when looking for an in-network gynecologist in **early 2018**, nine out of the ten gynecologists on Ambetter's list of in-network providers whom she called did *not* accept Ambetter insurance); *id.* ¶¶ 70, 72 (alleging that

Plaintiff Melody DeSchepper paid for an Ambetter policy **from January 2021 through October 2021**, and that during that time frame, "**[s]he called 29 providers that were on Ambetter's in-network provider list** or were recommended by Ambetter's assistance line" and "**none of them accepted Ambetter insurance**"); *see also id.* ¶¶ 64–68, 76, 87, 89, 97 (describing relevant time frames for other Plaintiffs).

**Where:** Plaintiffs' Complaint identifies 26 states in which Defendants' scheme to defraud currently is in effect, Compl. ¶¶ 121, 180, as well as the state in which each named Plaintiff resided when defrauded. *Id.* ¶¶ 29, 43, 64, 70, 76, 89. The Complaint also identifies several locations in cyberspace where Defendants made fraudulent misrepresentations about Ambetter plans, including on the Ambetter websites that list providers who are purportedly in-network and on the ACA exchanges. *Id.* ¶¶ 10–11, 17, 35, 65, 134, 149, 205.

**How:** As with the *what* of this case, nearly every page of the Complaint describes *how* Defendants operated their fraudulent scheme. This includes describing in detail how Defendants and every other "member of the Ambetter Enterprise performs a different role in the Enterprise and uses its separate legal incorporation to facilitate racketeering activity":

- □ "Defendants **Centene Corp.** and **Centene Management** designed the Ambetter plan and . . . the scheme to defraud, providing high-level direction to other members of the Enterprise." Compl. ¶ 160(a) (emphasis added).

- □ Defendant **Centene Corp.** continually acquires companies—including (among others) Defendant **Celtic**, Health Net of Arizona, and Wellcare Health Plans—because they are reputable companies that "are licensed to sell health plans in certain states." *Id.* ¶¶ 160(e), 168–69. Each state requires a license to sell health insurance on that state's ACA marketplace, and the license is unique for each state. *Id.* ¶¶ 160(e), 163. These licenses are necessary to the Ambetter Enterprise's scheme to defraud, and the Enterprise could not have obtained these licenses in each one of the 26 states in which the defective Ambetter plans are sold *without the use of subsidiaries. Id.* ¶ 163.

□ **Centene Corp.** and **Centene Management** corrupt the acquired companies, making possible the rapid expansion of the Enterprise's scheme to defraud. *See id.* ¶ 155 ("Why [acquire] Celtic in particular? They have a national presence. They're in 49 markets. They've got 20 years of experience in this market. There's a lot of credibility that they have both with their existing customers and within the industry." (statement by Centene's Senior VP of Corporate Development Jesse Hunt)); *see also id.* ¶¶ 141(g)–(h), 152, 154, 163.

□ Defendant **Celtic**—and other corrupted subsidiaries—sells the defective Ambetter policies to consumers on the ACA online exchanges. *Id.* ¶ 160(e). **Celtic** and other **Centene Corp.** subsidiaries "provide[ ] the resources, contacts, and facilities that [are] then used as instruments of the Ambetter Enterprise and ensured the functioning and success of the Enterprise." *Id.* ¶ 171.

□ "Defendant **Centene Management** coordinates between the various Centene Corp. subsidiaries to ensure that all of the members of the Enterprise work toward a common purpose of defrauding consumers . . . ." *Id.* ¶ 160(b) (emphasis added).

Allegations specific to each Plaintiff provide representative examples of how Defendants' scheme to defraud operates. Compl. ¶¶ 29–104.

## LEGAL STANDARD

In deciding a motion to dismiss, the Court views a complaint as a whole, accepting the factual allegations as true and viewing the facts in the light most favorable to Plaintiffs. *See Landmark Am. Ins. Co. v. Deerfield Constr., Inc.*, 933 F.3d 806, 809 (7th Cir. 2019); *United States ex rel. Upton v. Fam. Health Network, Inc.*, 900 F. Supp. 2d 821, 829 (N.D. Ill. 2012) (St. Eve, J.).

Federal Rule of Civil Procedure 9(b) requires that a party who, like Plaintiffs here, alleges fraud, "must state with particularity the circumstances constituting fraud . . . ." This means that the "[t]he complaint must describe the 'who, what, when, where, and how' of the fraud to survive a motion to dismiss." *United States v. Molina Healthcare of Illinois, Inc.*, 17 F.4th 732, 739 (7th Cir. 2021) (citation omitted). This pleading standard is flexible, as the

– 5 –

Seventh Circuit has made clear by warning that "courts and litigants often erroneously take an overly rigid view of the ['who, what, when, where, and how'] formulation." *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (citation and internal quotation marks omitted). Thus, far from being carved in stone, "the specific details that are needed to support a plausible claim of fraud will depend on the facts of the case." *Molina Healthcare,* 17 F.4th at 739 (citations and internal quotation marks omitted).

## ARGUMENT

I. **Plaintiffs' Complaint states a civil RICO claim.**

   A. **Plaintiffs' Complaint satisfies Rule 9(b) because it alleges with particularity the circumstances constituting Defendants' fraud.**

The allegations in Plaintiffs' Complaint more than satisfy Rule 9(b)'s requirements. Because Plaintiffs "plead[ ] a fraudulent scheme involving numerous transactions over a period of years," they "need not plead specifics with respect to every instance of fraud"; rather, they must only "provide representative examples." *Mason v. Medline Indus., Inc.*, 731 F. Supp. 2d 730, 735 (N.D. Ill. 2010) (emphasis added). Plaintiffs not only provide representative examples of the fraud, their 75-page Complaint teems with detailed and plausible allegations describing Defendants' fraudulent scheme.

Defendants first challenge the sufficiency of the Complaint by focusing on a *single allegation* in the Complaint—"that 'the provider networks for Ambetter plans that are presented to plan members and potential members' are inaccurate and that 'plan members have difficulty finding an in-network provider' as a result." Defs.' Mem. 10 (quoting Compl. ¶ 12). From there, Defendants proceed to argue that the claims of three Plaintiffs fail because the Complaint "do[es] not allege that they consulted a provider directory before

purchasing Ambetter plans, much less that they purchased Ambetter plans because they saw certain providers listed in a directory." *Id.*

This argument fails because, by cherry-picking statements from a single paragraph of the Complaint, Defendants mischaracterize Plaintiffs' allegations. Contrary to Defendants' representations, Plaintiffs do not allege that Defendants defraud only those who purchase an Ambetter policy because they saw certain providers in a directory *before* purchasing the policy. Rather, Plaintiffs' Complaint makes clear that Defendants also defraud consumers by, among other things, falsely representing through advertising materials that their lists of network providers are current. *See, e.g.*, Compl. ¶ 140(e).

Defendants concede that Ambetter advertising materials like the Evidence of Coverage represent to consumers that they will receive "[a] ***current list*** of network providers."[1] Defs.' Mem. 4 (emphasis in original) (quoting Dkt. No. 19-1, Defs.' Ex. A – Ambetter of Illinois 2022 Evidence of Coverage at 6). But they attempt to evade this concession by pointing out that the Evidence of Coverage states "that the list of network providers is '***subject to change***,'" and contending that this is somehow "fatal" to Plaintiffs' Complaint. *Id.* at 11 (emphasis in original) (quoting Dkt. No. 19-1, Defs.' Ex. A at 6, 38).

But Plaintiffs' allegations—which at this stage must be accepted as true—reflect that Ambetter provider lists are grossly and inexcusably inaccurate. The "subject to change"

---

[1] Although Defendants refer to the Evidence of Coverage as a contract, the document becomes a contract only after the customer signs up for an Ambetter plan through the ACA exchanges. Before that, the Evidence of Coverage is a marketing document used to advertise the policy to consumers and persuade them to purchase it. *See, e.g.*, *Marketing Models, Standard Documents, and Educational Material*, Centers for Medicare & Medicaid Services (last modified Oct. 19, 2022) (listing Evidence of Coverage as one kind of "marketing material[ ]"), https://www.cms.gov/medicare/health-plans/managedcaremarketing/marketngmodelsstandarddocumentsandeducationalmaterial.

language does not invalidate Plaintiffs' allegations that "[a]t least 50% of the providers on Ambetter's in-network list [contacted by Plaintiff Havrilla] did not accept Ambetter insurance," Compl. ¶ 39; that Ambetter insurance was accepted by **none** of the "29 providers [called by Plaintiff DeSchepper] that were on Ambetter's in-network provider list or were recommended by Ambetter's assistance line," *id.* ¶ 72; and that a physical therapist and an orthopedic surgeon in Nevada who "ha[d] not been in-network **since 2017**" were still on Ambetter's list of in-network providers **four years later**, in May 2021, *id.* ¶¶ 76–81.

Defendants' remaining arguments regarding Rule 9(b) are that it is overreach to allege wire fraud "every time 'a member of the Ambetter Enterprise electronically filed Ambetter plan documents with a state's online exchange' or 'sent an email to a plan member or potential customer,'" and that Plaintiffs' Complaint "do[es] not connect actual violations of the mail- and wire-fraud statutes to individual Defendants." Defs.' Mem. 12. Defendants' contentions, however, are based on fundamental misunderstandings of the elements of mail and wire fraud.[2] "The use of the mail or wires need not be an indispensable part of the fraud . . . ; it need only be incident to an essential part of the scheme . . . or a step in [the] plot." *United States v. Powell*, 576 F.3d 482, 493 (7th Cir. 2009) (citation and internal quotation marks omitted). Here, there is no question that submitting plan documents to ACA exchanges, plan members, and potential customers all were incident to an essential part of

---

[2] The elements of mail and wire fraud are nearly identical: (1) that the defendant knowingly devised or participated in a scheme to defraud; (2) that the defendant did so with the intent to defraud; (3) that the scheme to defraud involved a materially false or fraudulent pretense, representation, or promise; and (4) that for the purpose of carrying out the scheme or attempting to do so, the defendant (a) used or caused the use of the United States Mails or a private or commercial interstate carrier (mail fraud), or (b) caused interstate wire communications (wire fraud). The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit, at 538 (2020 ed.).

Defendants' scheme. Without their submissions, Defendants would not have been able to "sell[ ] fraudulent health-insurance policies under the brand name 'Ambetter' to millions of consumers across 26 states." Compl. ¶ 1; *see, e.g., id.* ¶¶ 17, 142–51.

Moreover, the Complaint connects violations of the mail- and wire-fraud statutes to individual Defendants by describing each Defendants' role in the Ambetter Enterprise, Compl. ¶ 207, and alleging that "Defendants caused millions of mailings and electronic communications incident to an essential part of the scheme," *id.* ¶ 149–50. These allegations are more than sufficient because "there is no requirement that a defendant personally cause the use of the wire. Rather, it will suffice if the use of the wire 'will follow in the ordinary course of business, or where such use can be reasonably foreseen, even though not actually intended.'" *United States v. Sheneman*, 682 F.3d 623, 630 (7th Cir. 2012) (citation omitted); *see also Pereira v. United States*, 347 U.S. 1, 8–9 (1954).

**B. Plaintiffs' Complaint passes RICO's distinctiveness test by pleading in detail how the Ambetter Enterprise's decision to operate through subsidiaries facilitated the scheme to defraud.**

"[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). As Defendants concede, the Seventh Circuit has recognized that a parent corporation and its subsidiaries can form a RICO enterprise when "the enterprise's decision to operate through subsidiaries . . . somehow facilitated its unlawful activity." Defs.' Mem. 7 (quoting *Bucklew v. Hawkins, Ash, Baptie & Co., LLP.*, 329 F.3d 923, 934 (7th Cir. 2003)); *see also Bates v. Nw. Hum. Servs., Inc.*, 466 F. Supp. 2d 69, 83 (D.D.C. 2006) ("It is nonsensical to suppose that a parent corporation and its wholly owned subsidiary, each duly and separately

incorporated, may be considered distinct legal entities from one another in the ordinary course of events, but *not,* as a categorical matter, in the context of Section 1962(c) . . . ." (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001))).

Defendants contend that Plaintiffs "fail to meet the heightened pleading standards for a RICO claim" by "[m]erely alleging that '[e]ach subsidiary is functionally separate, with different rights and responsibilities, and performs different roles in the Enterprise.'" Defs.' Mem. 7 (quoting Compl. ¶ 152). This contention relies on "an individual allegation, scrutinized in isolation," rather than a consideration of "whether *all* of the facts alleged, taken collectively," meet the pleading standard. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007) (citation omitted). Read as a whole, Plaintiffs' Complaint satisfies both the federal pleading standards generally and the requirements articulated by the Seventh Circuit in *Bucklew*. The Complaint describes in detail the distinct role of each Defendant—Centene Corp., Centene Management, and Celtic—in the Ambetter Enterprise and how the Enterprise's decision to operate through subsidiaries facilitates its scheme to defraud. Compl. ¶¶ 141(g)–(h), 152, 154–55, 160, 163, 168–69, 171; *see supra* pp. 4–5. These allegations sufficiently plead that Defendants and other corporate affiliates are distinct entities that are members of the Ambetter Enterprise. *See, e.g.*, *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 493 (6th Cir. 2013) (ruling at summary judgment that "the [RICO] enterprise was sufficiently distinct from [parent company] itself" because parent company "and each of its subsidiaries performed distinct roles that helped facilitate the fraudulent scheme": (1) parent company's "role was that of an external, financially stable guarantor that stood behind the various conversion opportunities" (2) one subsidiary's "role was to provide a funding source for [the parent company] that was attractive to investors," (3) the parent company "brought to the

table its traditional expertise in oil and gas mining," while one of the subsidiaries "contributed its expertise in horse breeding," (4) the parent company "needed the reputation, know how, experience, and legitimacy of [its subsidiaries] in order to entice investors," and (5) another subsidiary's "role was to provide a mechanism for concealing the shortage of horses in the Mare Lease Program by offering investors an alternative investment in the form of publicly traded stock"); *Nat'l Council on Comp. Ins., Inc. v. Am. Int'l Grp., Inc.*, No. 07 C 2898, 2007 WL 7715086, at *3 (N.D. Ill. Dec. 26, 2007) (concluding that plaintiff sufficiently pleaded "an 'enterprise' separate from defendant AIG [the parent company] itself" by "alleg[ing] that defendants used 'the separate corporate forms to defraud [other companies]' and made a 'conscious decision to abuse AIG corporate subsidiary forms . . . in order to . . . widely disperse the wrongful and unlawful conduct, make the fraudulent scheme harder to detect and better conceal the nature and extent of the lies and wrongdoing'"); *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Pracs. Litig.*, 601 F. Supp. 2d 1201, 1214–15 (S.D. Cal. 2009) (deciding that plaintiffs' "allegations satisf[ied] the distinctiveness requirement, and [were] sufficient to withstand Defendants' motion to dismiss" where plaintiffs alleged each of the affiliate companies in the RICO enterprise "had a distinct role"—"CHL was in the business of originating loans, CT provided tax services in connection with the loans, LandSafe Inc. provided a variety of products during the closing process, LandSafe Appraisal Services, Inc. provided appraisal services, etc." (citation omitted)).

Defendants also argue that the Complaint does not allege a RICO enterprise because "the activities described"— "[t]he separate legal incorporation of each subsidiary," the "acqui[sition] of companies with state licenses that are otherwise difficult to obtain," and

"tying the name of a statute subsidiary to the ACA plan offered to residents of that state"—
"are all routine and perfectly legal." Defs.' Mem. 7–9.

Contrary to Defendants' representations, Plaintiffs do not allege that owning corporate subsidiaries or using the same brand name for multiple products is unlawful. Rather, Plaintiffs allege that (1) Defendants and other members of the Ambetter Enterprise operate a scheme to defraud by "deceiv[ing] consumers into purchasing Ambetter plans" through "false representations to consumers about the benefits they would receive under their Ambetter plans, including (among other things) misrepresentations about which providers were in-network," Compl. ¶¶ 143–44; and (2) the scheme is carried out and expanded in part by the acquisition of corporate subsidies and the employment of branding strategies, *id.* ¶¶ 21–23, 122–28, 141, 152–71.[3]

Defendants next rely on *McNeal v. J.P. Morgan Chase Bank, N.A.*, No. 16 CV 3115, 2016 WL 6804585 (N.D. Ill. Nov. 17, 2016), for the proposition that, at best, Plaintiffs *do* allege that Centene subsidiaries violated the law, just not RICO specifically. Defs.' Mem. 9. This reliance on *McNeal* is misplaced because the *McNeal* complaint "provide[d] no allegations concerning [the] structure, duration, or organization" of the alleged RICO enterprise, *McNeal*, 2016 WL 6804585, at *4, whereas Plaintiffs' Complaint specifies all three. Compl. ¶¶ 141, 152–71. For example, the *McNeal* complaint "allege[d] that members of a

---

[3] Defendants' argument verges on the nonsensical because it suggests that unlawful conduct cannot be carried out using lawful tools. This is equivalent to asserting that a bank robber committed no crime because he legally possessed the gun used in the robbery. Courts applying the mail- and wire-fraud statutes consistently reject this kind of reasoning. *See, e.g.*, *Schmuck v. United States*, 489 U.S. 705, 715 (1989) (explaining that "'innocent' mailings—ones that contain no false information—may supply the mailing element" and that "the elements of mail fraud [may even] be satisfied where the mailings [are] routine" (citations omitted)); *United States v. Brocksmith*, 991 F.2d 1363, 1368 (7th Cir. 1993) (same).

corporate family were both the persons and the [RICO] enterprise." *McNeal*, 2016 WL 6804585, at *4. In contrast, Plaintiffs' Complaint here specifies that each Defendant is a "person" under RICO who is associated with the Ambetter Enterprise—which is not any individual Defendant, but the combination of "Defendants and at least 26 other corporate entities." Compl. ¶¶ 194–95.

In sum, Plaintiffs have adequately alleged a RICO enterprise separate from Defendants for purposes of surviving a motion to dismiss. The ultimate resolution of this issue will involve a "fact-intensive inquiry [that] is best left for a summary judgment motion." *Myers v. Provident Life & Accident Ins. Co.*, 564 F. Supp. 3d 1157, 1173 (M.D. Fla. 2021).

### C. Plaintiffs have adequately alleged intent and knowledge, which may be alleged generally, and the fact that Plaintiffs' allegations may reflect that Defendants *also* breached contracts does not foreclose Plaintiffs' RICO claim.

Defendants' contention that Plaintiffs have not adequately pleaded "an intent to defraud" or knowledge for purposes of the mail- and wire-fraud statutes is at odds with Federal Rule of Procedure 9(b), which provides that "[m]alice, **intent**, **knowledge**, and other **conditions of a person's mind may be alleged generally**" (emphasis added).[4] Plaintiffs have adequately pleaded intent and knowledge by alleging, among other things, that "Defendants' scheme was and is intended to deceive consumers into purchasing Ambetter plans by means of materially false or fraudulent pretenses, representations, and promises," Compl. ¶ 142, and that "Defendants' intent to defraud is evidenced by their conduct," such as "continu[ing] to misrepresent the features of Ambetter plans" despite knowing for years that the plans are

---

[4] Defendants' disregard of Rule 9(b)'s liberal requirements for alleging intent is puzzling given that the preceding section of Defendants' brief (§ I.B), consists of three pages arguing that "Plaintiffs' fraud allegations do not satisfy Rule 9(b)."

defective, *id.* ¶ 203.[5] *See, e.g.*, *Hefferman v. Bass*, 467 F.3d 596, 602 (7th Cir. 2006) (concluding

that plaintiff adequately pleaded "knowledge" and "condition of mind" by alleging that

"[defendant's] participation in [the] fraud and breach of fiduciary duty was knowing and

intentional"); *In re: First Farmers Fin. Litig.*, No. 14-CV-7581, 2016 WL 5940933, at *4

(N.D. Ill. Oct. 13, 2016) (St. Eve, J.) (explaining that allegation that defendant, "at the time

he executed the loan documents, did not intend to pay back the loan and knew his business

would not have the money to do so" was sufficient "to plead the requisite fraudulent intent").

None of Defendants' cited cases supports applying a heightened pleading standard to

Plaintiffs' allegations of intent to defraud. Three of the cases address whether the plaintiffs

had presented evidence of fraudulent intent at summary judgment or trial,[6] which is irrelevant

here because "Plaintiff[s] need not 'prove,' 'substantiate' or 'establish' any allegations" at the

pleading stage. *Drager v. Vill. of Bellwood*, 969 F. Supp. 2d 971, 984 (N.D. Ill. 2013).[7]

---

[5] For the same reasons, Plaintiffs have sufficiently alleged that Defendants knew that the Ambetter plans they were promoting and selling were deficient. *See* Defs.' Mem. 15–16.

[6] *See Perlman v. Zell*, 185 F.3d 850, 853 (7th Cir. 1999) (cited at Defs.' Mem. 13) ("[L]ike the district court we conclude that Perlman did not adduce evidence from which a trier of fact properly could find a pattern of predicate acts."); *Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992) (cited at Defs.' Mem. 13) ("[T]he district court granted summary judgment to the defendants on this claim, finding that Bower had not presented evidence sufficient to establish that the defendants acted with fraudulent intent."); *Kostovetsky v. Ambit Energy Holdings, LLC*, 424 F. Supp. 3d 708, 724 (N.D. Ill. 2017) (cited at Defs.' Mem. 14) (entering summary judgment for defendant because plaintiff had submitted no direct or circumstantial evidence of intent to defraud).

[7] The other cases cited by Defendants likewise do not support a heightened standard for alleging intent because they simply set forth general statements of law that are not in dispute. *See, e.g.*, Defs.' Mem. 13 (quoting *Natara Multimedia Grp. Inc. v. Carranza*, 2015 WL 3814653, at *6 (N.D. Ill. June 17, 2015), for proposition that "RICO 'was not designed to permit plaintiffs to cast run-of-the-mill, state-law breach of contract and fraud claims as federal RICO actions'").

Defendants' related argument—that Plaintiffs' RICO claim is foreclosed because "Plaintiffs' allegations amount, at most, to claims for breach of contract," Defs.' Mem. 13— fails for at least three reasons. First, it ignores the established standard for evaluating whether an action is properly brought under RICO. Courts make this determination by "carefully scrutiniz[ing] the pattern requirement [of RICO]." *Jennings v. Auto Meter Prod., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007). A suit is properly brought as a RICO action—as opposed to a "garden-variety action" for fraud or breach of contract under state law—when plaintiffs "satisfy the so-called 'continuity-plus-relationship test': the predicate acts must be related to one another (the relationship prong) and pose a threat of continued criminal activity (the continuity prong)." *Id.* at 473 (citation and some internal quotation marks omitted). Here, Plaintiffs have adequately pleaded a relationship among Defendants' criminal acts by alleging in detail how Defendants' acts of mail and wire fraud "ha[d] the same or similar purposes, results, participants, victims, [and] methods of commission." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989); *see* Compl. ¶¶ 142–51. Likewise, Plaintiffs have adequately pleaded the continuity of Defendants' criminal acts by alleging "that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'" *H.J.*, 492 U.S. at 243; *see, e.g.*, Compl. ¶ 23.

Second, RICO claims and breach-of-contract claims are not mutually exclusive. *See, e.g.*, *Polymer Dynamics, Inc. v. Bayer Corp.*, CIV. A. 99-4040, 2000 WL 1146622, *6–7 (E.D. Pa. Aug. 14, 2000) (denying motion to dismiss as to both civil RICO claim and breach-of-contract claims). And as masters of the Complaint, Plaintiffs are entitled to bring a RICO claim and refrain from raising breach-of-contract claims. *Bell v. Hood*, 327 U.S. 678,

681 (1946) ("[T]he party who brings a suit is master to decide what law he will rely upon . . . ." (citation and internal quotation mark omitted)). *Boim v. Am. Muslims for Palestine*, 9 F.4th 545, 557 (7th Cir. 2021) ("[P]laintiffs are the master of their complaint." (citation omitted)).

Finally, Defendants attempt to cabin this case as a contractual dispute by stating that "an express contract governs the relationship between Plaintiffs and Defendants." Defs.' Mem. 2. But that statement is both partly false and partly disputed. Neither Defendant Centene Corp. nor Defendant Centene Management is a party to any contract with Plaintiffs. Rather, Centene Corp.'s subsidiaries are parties to the contracts with Plaintiffs and other consumers, as evidenced by Defendants' own Exhibit 1 (an insurance contract for a 2022 Ambetter of Illinois policy), which states that the contract is between the plan member and a single Defendant—Celtic Insurance Company. Dkt. No. 19-1, Defs.' Ex. A, at 4 ("This *contract*, the *Schedule of Benefits*, and application shall constitute the entire *contract* under which *covered services* and supplies are provided or paid for by *us*."); *id.* at 1 (providing that "[t]he terms '*we*,' '*our*,' or 'us' will refer to Ambetter of Illinois insured by Celtic Insurance Company"); *id.* at 4 ("Ambetter of Illinois operates under its legal entity, Celtic Insurance Company.").

Thus, the only Defendant who *may* have had a contractual relationship with any Plaintiff is Celtic, which seemingly operated the Ambetter plans purchased by Plaintiffs Cynthia Dawson (Florida), Alden Henriksen (Illinois), Melody DeSchepper (Illinois), and Mark Hackett (Texas). Compl., Table following ¶ 121. As Defendants implicitly recognize, however, the validity of those contracts cannot be determined at the pleading stage. *See* Defs.' Mem. 11 ("Plaintiffs claim to have been fraudulently induced to purchase

– 16 –

Ambetter insurance."); *id.* at 13 (reading Plaintiffs' Complaint as "assert[ing] fraudulent inducement"). Even if the contracts are valid, however, that does not dispose of these four Plaintiffs' RICO claims because, as explained above, the existence of a potential breach-of-contract claim does not foreclose a RICO claim.

Thus, at this stage of the litigation, there is no basis for concluding that any of Plaintiffs' claims are foreclosed by a contractual agreement.

### D. Plaintiffs state a claim for violation of RICO regardless of their allegations regarding non-compliance with the ACA.

Defendants argue that Plaintiffs' RICO claim "must be dismissed" because it "is premised on alleged ACA violations," which cannot serve as a RICO predicate. Defs.' Mem. at 16–17. This argument is a red herring. The cases cited by Defendants stand for the limited proposition that a RICO claim cannot be predicated *solely* on unlawful conduct that is not an enumerated "racketeering activity" under RICO, 18 U.S.C. § 1961(1). *See United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.,* No. 12 C 204, 2012 WL 3061859, at *4 (N.D. Ill. July 26, 2012) (cited at Defs.' Mem. 16) ("In the instant action, if there is no violation of the laws referenced in the complaint [the federal and state Food, Drug, and Cosmetic Acts], the Fund cannot sustain its RICO claims against Defendants."); *Ayres v. Gen. Motors Corp.*, 234 F.3d 514, 525 (11th Cir. 2000) (cited at Defs.' Mem. 16) (concluding that defendants were entitled to summary judgment on RICO claim because breach of "duty to notify found in the Safety Act" did not "constitute[ ] mail [or] wire fraud" and "*Plaintiffs ha[d] not **otherwise established** that Defendants violated the mail or wire fraud statutes*" (emphasis added)); *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1225 (11th Cir. 2002) (cited at Defs.' Mem. 17) ("Plaintiffs' RICO claim is only viable if (1) Defendants have a duty under the HEA [Higher Education Act] or common law to provide alternative financial

aid information to parents turned down for Plus Loans, and (2) a breach of that duty constitutes mail or wire fraud."); *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1229 (D.C. Cir. 1991) (cited at Defs.' Mem. 17) ("RICO, in fact, does recite a list of statutes the breach of which will constitute racketeering. Conspicuously, however, the SCA [Service Contract Act] is not one of those statutes. Thus, we conclude that the District Court was correct in holding that the private civil action, even couched in RICO terms, will not lie for an alleged breach of the SCA." (citing 18 U.S.C. § 1961(1))).

Here, Plaintiffs have adequately pleaded a RICO claim because—although they do allege that Ambetter plans do not comply with the ACA—Plaintiffs need not establish an ACA violation to prevail. Rather, Plaintiffs can prevail on their RICO claim if they prove that Defendants engaged in a scheme to defraud that "involve[d] materially false representations to consumers about the benefits they would receive under Ambetter plans, including . . . misrepresentations about which providers were in-network, which medical services the plan would reimburse providers for, and which medications were on the plan formulary"—even if the evidence ultimately shows that Ambetter plans complied with the ACA. Compl. ¶ 201.

## II. Plaintiffs have sufficiently pleaded a claim of unjust enrichment.

Defendants state that Plaintiffs' unjust enrichment claims are "doom[ed]" because Plaintiffs "entered into contract with Defendants for ACA health insurance" and therefore that contract governs the parties' relationships. Defs.' Memo. 17. But none of the Plaintiffs had contracts with either Defendants Centene Corp. or Centene Management. *See supra* pp. 16–17. And only four of the six Plaintiffs *may* have had a contractual relationship with Defendant Celtic. *Id.* Regardless, given that the validity of the contracts with Celtic is at issue, *see id.*, Plaintiffs' claim of unjust enrichment should not be dismissed.

*See, e.g.*, *Gociman v. Loyola Univ. of Chicago,* 41 F.4th 873, 887 (7th Cir. 2022) ("An unjust enrichment claim may survive a motion to dismiss when the validity or the scope of the contract is difficult to determine, or if the claim at issue falls outside the contract."); *Mashallah, Inc. v. W. Bend Mut. Ins. Co.,* 20 F.4th 311, 325 (7th Cir. 2021) ("[I]f there is not a contract, then the defendant is liable for unjustly enriching himself at the plaintiff's expense." (internal quotations and citations omitted)).

Because the validity of the contracts with Celtic cannot be determined at the pleading stage, the Court also should reject Defendants' contention that the claim of unjust enrichment should be dismissed on the ground that "breach of contract would be an adequate legal remedy." Defs.' Mem. 18. This argument fails because it ignores the Federal Rules of Civil Procedure, which permit pleading in the alternative. Fed. R. Civ. P. 8(a)(3)(d). And given that "a party may plead breach of contract *and* unjust enrichment claims in the alternative," it is senseless for Defendants to argue that Plaintiffs—who have not even raised a breach-of-contract claim—are barred from pleading a claim of unjust enrichment. *Gociman*, 41 F.4th at 886 (emphasis added) (citations omitted).

Defendants also argue that Plaintiffs' unjust enrichment claim fails because the underlying RICO claim is deficient. Defs.' Mem. 19. Plaintiffs acknowledge that their unjust enrichment claim rises or falls with their RICO claim. Compl. ¶¶ 212, 217; *see also Cleary v. Philip Morris, Inc.,* 656 F.3d 511, 517 (7th Cir. 2011) ("If an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment . . . will stand or fall with the related claim." (citation omitted)). As explained above, however, Plaintiffs have stated a claim under RICO. *See supra* § I. Therefore, Plaintiffs can proceed with both their RICO and unjust-enrichment claims. *Sirazi v. Gen. Mediterranean Holding, SA,*

– 19 –

No. 12 C 0653, 2013 WL 812271, at *9 (N.D. Ill. Mar. 5, 2013) (concluding there was "no basis to dismiss [plaintiffs'] unjust enrichment claim" where court denied motion to dismiss underlying fraud claim).

### III. Defendants' challenge to Plaintiffs' "standing" is a challenge to the adequacy of the named Plaintiffs, and should therefore be addressed at the class-certification stage, not on the motion to dismiss.

Defendants move to dismiss eight of Plaintiffs' state consumer-protection claims—Claims 4, 6, 7, 9, 10, 12, 13, and 14—on the ground that Plaintiffs lack standing to raise claims under the laws of states where they do not reside and where they have not received services. Defs.' Mem. 19–20. Defendants' argument should be rejected because "this type of challenge is really to the adequacy of the named plaintiffs to represent the putative class members' state-law claims and thus is better addressed at the class-certification stage." *Benson v. Newell Brands, Inc.*, No. 19 C 6836, 2020 WL 1863296, at *4 (N.D. Ill. Apr. 14, 2020).

Defendants note that it is an "open question" whether Plaintiffs must now—before the class-certification stage—establish standing to pursue the eight state consumer-protection claims in question, and cite two decisions from this district that are in their favor: *Baldwin v. Star Scientific, Inc.*, 78 F. Supp. 3d 724 (N.D. Ill. 2015), and *In re Dairy Farmers of America Inc. Cheese Antitrust Litigation*, No. 09 C 3690, 2013 WL 4506000 (N.D. Ill. Aug. 23, 2013). Defs.' Mem. 20–21. Defendants neglect to mention, however, that the vast majority of judges in this district who have considered this question since the 2015 decision in *Baldwin* have concluded that the challenge raised by Defendants is best reserved for the class-certification stage. *See, e.g., Rawson v. ALDI, Inc.*, No. 21 C 2811, 2022 WL 1556395, at *5–6 (N.D. Ill. May 17, 2022) (adopting "prevailing view" that "the issue is best framed through the class-certification lens, not standing"); *Wyant v. Dude Products, Inc.*, No. 21 C 682, 2022 WL

621815, at *3 (N.D. Ill. Mar. 3, 2022) (same); *Benson v. Newell Brands, Inc.*, 19 C 6836, 2020 WL 1863296, at *3 (N.D. Ill. Apr. 14, 2020) (same); *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 758–759 (N.D. Ill. 2019) (same); *Muir v. Nature's Bounty (DE), Inc.*, No. 15 C 9835, 2018 WL 3647115, at *6–8 (N.D. Ill. Aug. 1, 2018) (same); *In re Herbal Supplements Mktg. & Sales Practices Litig.*, No. 15 C 5070, 2017 WL 2215025, at *6 (N.D. Ill. May 19, 2017) (St. Eve, J.) (same); *McDonnell v. Nature's Way Products, LLC*, No. 16 C 5011, 2017 WL 1149336, at *4–5 (N.D. Ill. Mar. 28, 2017) (same); *Bietsch v. Sergeant's Pet Care Products, Inc.*, No. 15 C 5432, 2016 WL 1011512, at *9 (N.D. Ill. Mar. 15, 2016).[8]

As Judge St. Eve recognized when ruling on this question, Plaintiffs' position that "Defendants' concerns are better left for the class-certification stage" also is supported by the Seventh Circuit's decision in *Morrison v. YTB International, Inc.*, 649 F.3d 533 (7th Cir. 2011):

> In *Morrison*, the plaintiffs brought suit under an Illinois statute on behalf of a nationwide class. The defendant challenged the standing of class members from states other than Illinois, and the district court agreed with the defendant. The Seventh Circuit explained that there was "no problem with standing" because "[p]laintiffs have standing if they have been injured, the defendants cause that injury, and the injury can be redressed by a judicial decision." Because the plaintiffs demonstrated those elements of standing, "[n]othing more [was] required."

*In re Herbal Supplements*, 2017 WL 2215025, at *7.

Defendants contend that addressing this issue now "conserves judicial and party resources, if any part of this case is to go forward." Defs.' Mem. 21. But the opposite is true.

---

[8] Although not cited by Defendants, there have been a couple of decisions since *Baldwin* taking the position Defendants advocate—that it is not premature to address standing at the pleading stage. *See, e.g., Brown v. Auto-Owners Ins. Co.*, 2022 WL 2442548, at *2–3 (N.D. Ill. June 1, 2022); *Smith-Brown v. Ulta Beauty, Inc.*, 2019 WL 932022, at *5–6 (N.D. Ill. Feb. 26, 2019). Nonetheless, the overwhelming weight of authority in this district remains in favor of the approach favored by Plaintiffs and articulated in *Rawson, Wyant, City of Rockford,* and the other cases cited here.

Even if the Court were to hold that Plaintiffs do not have standing to assert the eight state-law claims at issue, Plaintiffs would still seek largely (if not entirely) the same discovery to prosecute the remainder of their claims—for example, documents and deposition testimony from Defendants relating to the creation of their Ambetter plans, documents reflecting Defendants' knowledge that the lists of Ambetter in-network providers were fraudulent, and representations made to consumers and state and federal governments about the plans. Although some of this information is state-specific, all of it relates to Plaintiffs' RICO claim, which covers all states in which the Ambetter plans are sold. Compl. ¶¶ 180, 192. Thus, no conservation of resources would result.

## IV. Plaintiffs' allegations are sufficient to raise claims under state consumer-protection laws.

Defendants argue that, "[f]or the same reasons that Plaintiffs' RICO claim fails under Rule 9(b), Plaintiffs' vague and generalized state-law claims do not satisfy Rule 9(b)." Defs.' Mem. 22. This argument fails for the reasons already addressed above. *See supra* § I.A.

Defendants attempt to bolster their argument by contending that Plaintiffs "do not adequately plead that they relied on Defendants' allegedly fraudulent misrepresentations." Defs.' Mem. 22–23. But reliance is not an element of all of the state consumer-protection claims. Most relevant here, reliance is not an element of the claim under the Illinois Consumer Fraud and Deceptive Business Practices Act raised by Plaintiffs Alden and DeSchepper. *Vanzant v. Hill's Pet Nutrition, Inc.,* 934 F.3d 730, 739 (7th Cir. 2019) ("'[R]eliance is not an element of statutory consumer fraud [the Illinois Consumer Fraud and Deceptive Business Practices Act].'" (quoting *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996)).

Regardless, the Complaint is replete with allegations that Plaintiffs relied upon Defendants' representations: Cynthia Dawson "checked to see whether Ambetter had a good list of in-network providers" and purchased based upon that list, Compl. ¶¶ 44–45; Christopher Tilton "reviewed plans . . . [and] chose the Ambetter plan after confirming that all of his medical providers . . . were listed as being in-network," *id.* ¶¶ 77–80; Mark Hackett, who suffers from a serious health issue, was careful to select a plan that he thought would provide him access to the healthcare he needed, *id.* ¶¶ 89–99; and Matthew Havrilla carefully reviewed all available plans and "one of the decisive factors in his choosing to purchase the Ambetter plan was that his rheumatologist was listed on the prescriber list," *id.* ¶¶ 30–40. These allegations sufficiently notify Defendants of Plaintiffs' claims and thus are not "conclusory." *See, e.g., Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 815 (N.D. Ill. 2013) ("Fair notice is perhaps the most basic consideration' underlying Rule 9(b)").

Defendants also contend that the Kentucky Consumer Protection Act ("KCPA") bars class actions, despite the fact that class actions under the Act have often been certified. *See, e.g., Kempf v. Lumber Liquidators, Inc.*, No. 3:16-CV-492-DJH, 2017 WL 4288903, at *4 (W.D. Ky. Sept. 27, 2017) ("[C]lass actions are not prohibited by the KCPA." (citations omitted)); *Brummett v. Skyline Corp.*, 38 Fed. R. Serv. 2d 1443, at *1, *5 (W.D. Ky. 1984) (certifying class action brought under KCPA and other statutes).[9]

---

[9] Defendants rely on *Arnold v. Microsoft Corp.*, No. 00-CI-00123, 2000 WL 36114007 (Ky. Cir. Ct. July 21, 2000), for the proposition that the KCPA does not "encompass class action litigants." Defs.' Mem. 23–24 (internal quotation marks omitted). (Defendants also cite *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 1001 (N.D. Cal. 2016), which essentially follows *Arnold*.) But *Arnold* was a decision on a motion to dismiss and class certification was not at issue. *Arnold*, 2000 WL 36114007, at *1 ("This matter is before the Court on Defendant['s] . . . Motion to Dismiss Plaintiffs' Complaint . . . for failure to state a claim upon which relief can be granted."). The judge's statements in *Arnold* regarding class actions are non-precedential dicta offered without any analysis or supporting authority, and

Moving on to the claim under Nebraska law, Defendants cite subsection 1 of Nebraska Revised Statutes § 59-1617 for the proposition that "the very conduct about which Plaintiffs complain" is exempt from the protections of the Nebraska Consumer Protection Act ("NCPA"). Defs.' Mem. 24. This is incorrect. The very next paragraph of the statute, § 59-1617(2), limits subsection 1 by providing that "[a]ctions and transactions prohibited or regulated under the laws administered by the Director of Insurance ***shall*** be subject to section 59-1602 and all statutes which provide for the implementation and enforcement of section 59-1602" (emphasis added). In turn, § 59-1602 prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Because that is precisely the conduct about which Plaintiffs complain—that "Defendants committed unfair and deceptive acts and practices in the conduct of trade and commerce," Compl. ¶¶ 267–28—Section 2 definitively undercuts Defendants' argument.

Finally, Defendants repeat their earlier argument that Plaintiffs allege nothing more than "garden-variety breach of contract," thus foreclosing their claims under the consumer protection statutes of Illinois, Kentucky, Nebraska, New Jersey, New Mexico, North Carolina, and Pennsylvania. Defs.' Mem. 24–25. Even setting aside that neither Defendant Centene Corp. nor Defendant Centene Management is a party to any contracts with

---

are presented not as rulings but as the judge's "beliefs" and "feelings." *Id.* at *6 ("The Court . . . does not believe that [the KCPA] was meant to be a vehicle for Class Action suits . . . ."); *id.* at *8 ("[T]his Court also feels that [the KCPA] was never meant to encompass class action litigants . . . ."). This dicta from *Arnold* has subsequently been rejected because the *Arnold* court's "analysis of the statute is, at best, thin." *Kempf*, 2017 WL 4288903, at *3–4 (noting, among other things, that "courts have addressed class claims" under the KCPA "in numerous other cases (citing *Wiggins v. Daymar Colls. Grp.*, 317 F.R.D. 42, 43–44, 46 (W.D. Ky. 2016); *Corder v. Ford Motor Co.*, 297 F.R.D. 572, 577, 579 (W.D. Ky. 2014); *Tallon v. Lloyd & McDaniel*, 497 F. Supp. 2d 847, 849, 854–55 (W.D. Ky. 2007)).

Plaintiffs, *see supra* § I.D, Plaintiffs allege far more than run-of-the-mill failure to perform. Among other things, Plaintiffs allege that Defendants intentionally and knowingly falsely represented that medical providers who do not accept Ambetter insurance were in the Ambetter provider network and falsely represented that Ambetter health plans covered certain medical services and medications. Compl. ¶¶ 246, 257, 268, 289, 301, 319, 328. These allegations go beyond breach of contract; as alleged, these "unfair, false, misleading or deceptive acts" are "intentional . . . conduct" that is prohibited by the state consumer-protection statutes invoked by Plaintiffs. *Foster v. Am. Fire & Cas. Co.*, 219 F. Supp. 3d 590, 598 (E.D. Ky. 2016) ("To succeed on a KCPA claim, an insured must demonstrate "some evidence of unfair, false, misleading or deceptive acts . . . ." (citation and quotation mark omitted)).[10]

## CONCLUSION

The allegations in Plaintiffs' Complaint are sufficient to state claims under RICO and the relevant state laws, and Defendants' challenge to "standing" is premature, as it should not be addressed until the class-certification stage. Defendants fail to raise a single legitimate reason for dismissing any portion of Plaintiffs' Complaint. Accordingly, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss in its entirety.

---

[10] Other consumer-protection laws relevant here employ a substantively identical standard. *See, e.g.*, *Wyant v. Dude Prod., Inc.*, No. 21-CV-00682, 2022 WL 621815, at *3–4 (N.D. Ill. Mar. 3, 2022) (Illinois); *In re Lincoln Nat'l COI Litig.*, 269 F. Supp. 3d 622, 640–44 (E.D. Pa. 2017) (New Jersey and North Carolina); *Guidance Endodontics, Ltd. Liab. Co. v. Dentsply Int'l, Inc.*, 708 F. Supp. 2d 1272, 1279 (D.N.M. 2010) (New Mexico); *Falcon v. Nw. Mut. Life Ins. Co.*, No. CV 19-404, 2020 WL 7027482, at *13–14 (W.D. Pa. Nov. 30, 2020) (Pennsylvania).

Dated: November 11, 2022

/s/ *Kenneth A. Wexler*

Kenneth A. Wexler
Justin N. Boley
Zoran Tasić
WEXLER BOLEY & ELGERSMA LLP
311 S. Wacker Drive, Suite 5450
Chicago, IL 60606
Tel: (312) 346-2222
Fax: (312) 346-0022
kaw@wbe-llp.com
jnb@wbe-llp.com
zt@wbe-llp.com

Daniel E. Gustafson
  (*pro hac vice* forthcoming)
Daniel C. Hedlund
  (*pro hac vice*)
Michelle J. Looby
  (*pro hac vice*)
Anthony J. Stauber
  (*pro hac vice* forthcoming)
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
tstauber@gustafsongluek.com

Beth E. Terrell
  (*pro hac vice*)
Jennifer Rust Murray
  (*pro hac vice*)
Amanda M. Steiner
  (*pro hac vice*)
TERRELL MARSHALL LAW GROUP
936 North 34th Street, Suite 300
Seattle, Washington 98103
Tel: (206) 816-6603
Fax: (206) 319-5450
bterrell@terrellmarshall.com
jmurray@terrellmarshall.com
asteiner@terrellmarshall.com

Seth R. Lesser
  (*pro hac vice* forthcoming)
Sarah Sears
  (*pro hac vice* forthcoming)
KLAFTER LESSER LLP
Two International Drive, Suite 350
Rye Brook, NY 10573
Telephone: (914) 934-9200
seth@klafterlesser.com
sarah.sears@klafterlesser.com

Adam J. Zapala
  (*pro hac vice*)
COTCHETT, PITRE & MCCARTHY, LLP
840 Malcolm Road
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577
azapala@cpmlegal.com

Alexander Barnett
  (*pro hac vice*)
COTCHETT, PITRE & MCCARTHY, LLP
40 Worth Street, Suite 602
New York, NY 10013
Tel: (212) 201-6820
Fax: (917) 398-7753
abarnett@cpmlegal.com

*Attorneys for Plaintiffs and
Proposed Classes*