## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Matthew Havrilla, Cynthia Dawson, Alden Henriksen, Melody DeSchepper, Christopher Tilton, and Mark Hackett, individually and on behalf of all others similarly situated, | No. 1:22-cv-4126 Honorable Nancy L. Maldonado |
| Plaintiffs, | |
| v. | |
| Centene Corporation, Centene Management Company, LLC, and Celtic Insurance Company, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Matthew Havrilla, Cynthia Dawson, Alden Henriksen, Melody DeSchepper, Christopher Tilton, and Mark Hackett ("Plaintiffs") bring this putative class action complaint against Defendants Centene Corporation ("Centene Corp."), Centene Management Company, LLC ("Centene Management"), and Celtic Insurance Company ("Celtic") (collectively, "Defendants") alleging that Defendants have engaged in an unlawful scheme to defraud Plaintiffs in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Plaintiffs also bring claims for unjust enrichment and for violation of numerous state consumer protection laws. Defendants have moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) based on lack of subject-matter jurisdiction and Rule 12(b)(6) for failure to state a claim. (Dkt. 18.)[1] For the reasons stated in this Memorandum Opinion and Order, Defendants' Motion to

---

[1] In citations to the docket, page numbers are taken from the CM/ECF headers.

1

Dismiss is granted in part and denied in part. In short, Plaintiffs have pled sufficient facts to allege a RICO conspiracy to commit mail and wire fraud and have adequately established standing to bring claims on behalf of putative class members who reside in states where no named Plaintiff resides. Further, Plaintiffs have stated a claim for relief under each of the state consumer protection acts alleged in the Complaint apart from Nebraska. Plaintiffs' claims under the Nebraska Consumer Protection Act are dismissed. In addition, Plaintiffs' unjust enrichment claim fails as Plaintiffs alleged the existence of an express contract and the Complaint fails to plead unjust enrichment in the alternative. By May 17, 2024, Plaintiffs may file an amended complaint correcting the deficiencies, if possible.

## Background

The Court takes the factual background from the well-pled allegations in the Complaint (Dkt. 1) and assumes the allegations to be true for the purposes of the instant motion. *See, e.g.*, *Anicich v. Home Depot U.S.A., Inc*., 852 F.3d 643, 648 (7th Cir. 2017).

Plaintiffs bring this putative class action alleging that Defendants formed a RICO enterprise with the purpose and intent of defrauding consumers about the coverage available under certain health insurance plans offered by Defendants and their subsidiaries. Plaintiffs allege they were harmed by purchasing the insurance plans offered by Defendants, and they seek to recover the premiums paid by the named Plaintiffs and the putative class for these plans.

### I.    The Ambetter Enterprise

Defendant Centene Corp. is the largest provider of Medicaid managed-care plans and health insurance plans sold on the Affordable Care Act ("ACA") exchanges. (Dkt. 1 ¶¶ 3, 4.) Centene Corp.'s subsidiary companies sell its ACA plans under the brand name "Ambetter." (*Id.* ¶ 4.) Ambetter insurance is sold on ACA exchanges in 26 states, and over two million people

currently have Ambetter insurance. (*Id.* ¶ 5.) In 25 of these states, Centene Corp. subsidiaries have contracts to provide managed-care plans to Medicaid beneficiaries. (*Id.* ¶ 121.) And, in 16 of these states, the subsidiary that contracts with the state for Medicaid coverage is the same subsidiary that sells Ambetter insurance. (*Id.*)

Plaintiffs allege that Defendants, together with at least 26 Centene Corp. subsidiaries, comprise a RICO enterprise, which Plaintiffs refer to as the "Ambetter Enterprise." (*Id.* ¶¶ 19, 122, 129.) Plaintiffs allege that the Ambetter Enterprise shares a common purpose of defrauding consumers in an effort to sell more Ambetter insurance. (*Id.*) As the first step in the alleged scheme, the Ambetter Enterprise targets low-income consumers who "churn" in and out of Medicaid eligibility due to changing income amounts, and who are therefore most likely to purchase insurance on the ACA exchange. (*Id.* ¶¶ 122, 123.) Plaintiffs allege that Centene Corp. exploits its subsidiaries' Medicaid contracts to identify these individuals. (*Id.* ¶ 125.) As the next step in the alleged scheme, the Ambetter Enterprise targets these individuals with misleading marketing and promotional materials for Ambetter insurance—including inaccurate physician directories—to induce these individuals to purchase Ambetter insurance. (*Id.* ¶¶ 23(d), 128.)

Centene Corp.'s subsidiaries are crucial to the scheme, Plaintiffs allege, because these subsidiaries have licenses from their respective states to provide Medicaid managed-care plans and/or to offer insurance plans on the ACA exchange, which are valuable and difficult to obtain. (*Id.* ¶ 160(e), 163.) According to Plaintiffs, Centene Corp. has purposefully acquired subsidiaries with these licenses to obtain information about consumers who lose Medicaid eligibility. (*Id.* ¶ 124.) Centene Corp. then either directs the subsidiary itself to market Ambetter insurance to those individuals or to share the individual's information with another Centene Corp. subsidiary in that state that sells Ambetter insurance on the ACA exchange. (*Id.* ¶ 125–27.) Centene Corp. and its

subsidiaries "link" the branding of Ambetter insurance to the Medicaid brand offered by the subsidiary in that state in an effort to confuse consumers into thinking they will have the same coverage they had while on Medicaid. (*Id.* ¶¶ 127, 128.)

Defendant Celtic is one of these subsidiaries that Plaintiffs allege was intentionally acquired by Centene Corp. and then corrupted in furtherance of the scheme. (*Id.* ¶ 154.) Specifically, Plaintiffs allege Celtic has an "important role" in the scheme because it is licensed to sell insurance in every state except for one, and specifically assists the Ambetter Enterprise by selling Ambetter insurance in eight states. (*Id.*) To further demonstrate Celtic's role in the enterprise, Plaintiffs use the example of Florida. Plaintiffs explain that an individual on Medicaid in Florida would be enrolled in a managed-care plan through Centene's subsidiary in that state, referred to as "Sunshine Health." (*Id.* ¶ 22a.) Once that individual, for some reason, is no longer eligible for Medicaid, Sunshine Health receives notice of this eligibility change. (*Id.* ¶ 22b.) Because both Sunshine Health and Celtic are subsidiaries of Centene, the information about this individual losing Medicaid coverage is then communicated to Celtic, who then sends marketing materials to the individual for Ambetter insurance. (*Id.* ¶ 22d–e.) Additionally, the name of the Ambetter plan in Florida is "Ambetter from Sunshine Health." (*Id.* 22e–f.) Plaintiffs allege this falsely conveys to the individual that they will receive the same coverage under this Ambetter plan as they received through Medicaid, and therefore the individual is more likely to purchase the Ambetter insurance. (*Id.*) After purchasing the Ambetter insurance, however, the individual later learns that the insurance does not provide the benefits that were advertised. (*Id.* 22f.)

Once the consumer purchases Ambetter insurance, Plaintiffs allege they run into difficulty finding healthcare providers who actually accept the insurance—including providers that are listed on the Ambetter plans' websites and provider directories. (*Id.* ¶¶ 131–34.) Plaintiffs allege that

Defendants mislead consumers by publishing provider directories that are not up to date and misrepresent the benefits that members will receive when they purchase the insurance plan. (*Id.* ¶¶ 132, 137, 140.) Plaintiffs further argue that Ambetter insurance does not comply with the requirements of the ACA in that the plans do not maintain a network of a sufficient number of healthcare providers. (*Id.* ¶ 130–31.)

The crux of Plaintiffs' claims are that Defendants intentionally misrepresented to consumers what was covered under Ambetter insurance, and that this misrepresentation deceived consumers into purchasing Ambetter insurance and being overcharged for the coverage.

## II. Named Plaintiffs' Experiences with Ambetter Insurance

Plaintiffs further illustrate the alleged scheme by providing details of each of the named Plaintiff's experiences with purchasing Ambetter insurance. The six named Plaintiffs each recount their great difficulty finding healthcare providers that accepted Ambetter insurance. Plaintiff Havrilla, who suffers from severe arthritis, specifically chose the Ambetter plan because his healthcare provider was listed as an in-network provider under the Ambetter plan. (*Id.* ¶ 31.) After purchasing the Ambetter insurance, however, Havrilla learned that this medical provider did not accept Ambetter insurance. (*Id.* ¶ 32.) Havrilla continued to have difficulty finding a healthcare provider that was in-network and would accept Ambetter insurance and was ultimately hospitalized after seeing a new provider who prescribed him a medication to which he did not react well. (*Id.* ¶¶ 33–37.) Havrilla continued to have difficulty finding healthcare providers that accepted Ambetter insurance and ultimately switched to a different health insurance plan. (*Id.* ¶¶ 38–42.)

The other five named plaintiffs recount similar frustrations after purchasing Ambetter insurance. Plaintiff Dawson alleges that she purchased the insurance after reviewing the list of in-

network healthcare providers, but ultimately had difficulties finding physicians that accepted Ambetter insurance. (*Id.* ¶¶ 44–52.) Dawson further experienced delays in treatment after being hospitalized for neurological issues because she was unable to find an in-network healthcare provider, and she alleges that Ambetter insurance did not cover necessary testing that she needed. (*Id.* ¶¶ 53–58.) Plaintiff Henriksen similarly experienced difficulties in finding providers who would actually accept the insurance though they were listed on the Ambetter website as in-network. (*Id.* ¶¶ 65–69.)

Plaintiff DeSchepper alleges similar difficulties in finding healthcare providers who accepted the Ambetter insurance. (*Id.* ¶¶ 71–73.) After contacting nearly 30 different providers that were listed on the Ambetter in-network provider list, DeSchepper alleges that she was not able to find one that actually accepted the insurance. (*Id.* ¶ 72.) Plaintiff Tilton specifically confirmed that his current healthcare providers were listed on the ACA marketplace as accepting Ambetter insurance before purchasing the plan. (*Id.* ¶ 78.) After purchasing the plan, however, Tilton learned that some of his providers did not actually accept Ambetter insurance. (*Id.* ¶¶ 80–81.) Finally, Plaintiff Hackett alleges that, after he purchased Ambetter insurance, he was unable to find a number of healthcare providers in his area, despite living in a large metropolitan area. (*Id.* ¶¶ 90–99.)

Overall, each of the named Plaintiffs allege they were damaged because they paid monthly premiums for the Ambetter insurance, but the insurance did not cover physicians or services that Plaintiffs were led to believe would be covered.

### III. Class Allegations

Plaintiffs bring their claims on behalf of themselves and all other similarly situated individuals under Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3). (*Id.* ¶ 179.) Plaintiffs define the putative "Federal law class" as "[a]ll persons who paid premiums for an Ambetter brand

health-insurance plan during the Class Period" in 26 states. (*Id.* ¶ 180.) Plaintiffs also identify 12 state-law subclasses under those state's consumer protection laws. (*Id.*) The state classes are defined in the same manner as the federal class as "[a]ll persons who paid premiums for Ambetter brand health-insurance during the Class Period," except each is limited to persons residing in the respective state.

Before the Court is Defendants' motion to dismiss the Complaint for failure to state a claim pursuant to Rule 12(b)(6) and for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1). (Dkt. 18.)

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). When, as here, a defendant makes a facial challenge to the sufficiency of the allegations regarding subject matter jurisdiction, the Court accepts all allegations of the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Baldwin v. Star*

*Scientific, Inc.*, 78 F. Supp. 3d 724, 731 (N.D. Ill. 2015) (citing *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003)).

### Discussion

Defendants move to dismiss the Complaint in its entirety on a number of grounds. First, Defendants argue that Plaintiffs have failed to state a claim for RICO liability because: (1) Plaintiffs have not established a distinct RICO enterprise, and (2) Plaintiffs do not plead the alleged fraud with particularity. Second, Defendants move to dismiss Plaintiffs' claim for unjust enrichment, arguing that express contracts govern the relationships between the parties and therefore any claim for unjust enrichment is foreclosed. Finally, Defendants challenge Plaintiffs' claims for violations of various state consumer protection acts, arguing that: (1) Plaintiffs do not have standing to allege these claims on behalf of putative class members in states where no named Plaintiff resides; (2) Plaintiffs do not plead violations of the state consumer protection acts with particularity under Rule 9(b); (3) Plaintiffs cannot pursue a putative class action under the Kentucky Consumer Protection Act; (4) Plaintiffs cannot pursue claims under the Nebraska Consumer Protection Act because Defendants' business is regulated by a federal agency; and (5) Plaintiffs allege nothing more than breach of contract claims, which do not state a cause of action for violation of state consumer laws in Illinois, New Jersey, New Mexico, North Carolina, or Pennsylvania.

The Court will address each argument below. Ultimately, the Court concludes that Plaintiffs have adequately alleged a violation of RICO, have failed to state a claim for unjust enrichment, and have stated claims under the various state consumer protection laws except for Nebraska. For these reasons, the Court denies in part and grants in part Defendants' motion to dismiss.

## I.  Plaintiffs' RICO Claim

### a.  Plaintiffs' Alleged RICO Enterprise

Defendants argue that Plaintiffs failed to state a RICO violation because the members of the Ambetter Enterprise include a corporate parent and its subsidiaries, which cannot form a RICO enterprise. (Dkt. 19 at 6–7.)  Defendants further argue that Plaintiffs have not alleged a "person" distinct from the alleged enterprise as required under the RICO statute.[2] (*Id.*)

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To state a claim for a RICO violation, a plaintiff must identify an "enterprise," which is defined by the statute as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4). The Supreme Court has interpreted the definition of "enterprise" broadly, concluding that "'an enterprise includes any union or group of individuals associated in fact' and [] RICO reaches 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 580, 583 (1981)).

Section 1962(c) further requires a plaintiff bringing a RICO action to identify a person "that is distinct from the RICO enterprise." *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853 (7th Cir. 2013). In other words,

---

[2] A "person" for RICO purposes "need not be a natural person," and therefore a corporation is a person within the meaning of the Act. *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226 (7th Cir. 1997) (citing 18 U.S.C. § 1961(3)).

to establish RICO liability, a plaintiff must allege the existence of two distinct entities: "(1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). For this reason, "[a] firm and its employees, or a parent and its subsidiaries, are not an enterprise separate from the firm itself." *Bachman v. Bear, Stearns & Co., Inc.*, 178 F.3d 930, 932 (7th Cir. 1999). An exception to this rule exists, however, where the "enterprise's decision to operate through subsidiaries rather than divisions somehow facilitated its unlawful activity[.]" *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 934 (7th Cir. 2003).

> The Seventh Circuit has described the "prototypical RICO case" as follows:

> [A] person bent on criminal activity seizes control of a previously legitimate firm and uses the firm's resources, contacts, facilities, and appearance of legitimacy to perpetrate more, and less easily discovered, criminal acts than he could do in his own person, that is, without channeling his criminal activities through the enterprise that he has taken over.

*Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir. 1997). The court cautioned, however, that it could not "imagine" applying RICO liability "to a free-standing corporation . . . merely because [the corporation] does business through agents, as virtually every manufacturer does." *Id.*

Defendants argue that Plaintiffs have failed to allege a RICO enterprise because the alleged members of the enterprise are a parent company and its subsidiaries, which the Seventh Circuit has held cannot form an enterprise for purposes of RICO liability. (Dkt. 19 at 7) (citing *Bachman*, 178 F. 3d at 932). Defendants also argue that their structure of functioning through subsidiaries that provide insurance through state-level entities is not improper but is rather "well-accepted and lawful corporate practice." (*Id.* at 8.)

In response, Plaintiffs argue that they have sufficiently pled a RICO enterprise because they have alleged the distinct role each Defendant plays in the RICO enterprise, and because

Defendants operated through subsidiaries in furtherance of the scheme. (Dkt. 33 at 10.) Specifically, Plaintiffs allege the following regarding each Defendants' role in the Ambetter Enterprise:

- Defendant Celtic is licensed to sell insurance in every state except New York, and "enable[s] the Ambetter Enterprise to sell Ambetter plans in eight states" where Celtic is licensed (Dkt. 1. ¶ 154);

- Defendants Centene Corp. and Centene Management "designed the Ambetter plan and originated the scheme to defraud, providing high-level direction to other members of the Enterprise." (*Id*. ¶ 160(a));

- Defendant Centene Management "coordinates between the various Centene Corp. subsidiaries to ensure that all of the members of the Enterprise work toward a common purpose of defrauding consumers and function as a continuing unit." (*Id*. ¶ 160(b));

- Each subsidiary of Centene Corp. alleged to be a member of the Ambetter Enterprise "has a contract to provide Medicaid plans in a state" and lend their names and branding "to the Ambetter plan in that state so that persons who lose Medicaid coverage are more likely to purchase the Ambetter plan." (*Id*. ¶ 160(c));

- Each subsidiary of Centene Corp. alleged to be a member of the Ambetter Enterprise uses information it receives as a state-contracted Medicaid provider to target individuals who recently lost Medicaid eligibility and to market Ambetter insurance to them. (*Id*. ¶ 160(d)); and

- Centene Corp. has specifically acquired and corrupted companies with difficult to obtain licenses that allow those companies to provide Medicaid managed-care plans. (*Id*. ¶ 152.)

Plaintiffs further allege that the "Ambetter Enterprise's decision to operate through subsidiaries facilitates its unlawful activity" and that "Centene Corp.'s decision to operate through various subsidiaries that it acquires as needed is what makes the Ambetter Enterprise's scheme to defraud possible." (*Id*. ¶ 20.)

The Court finds that the above allegations are sufficient to identify each alleged member's role in the Ambetter Enterprise. Plaintiffs' allegations are close to the "prototypical RICO case" outlined by the Seventh Circuit in *Fitzgerald*. Plaintiffs allege that Defendant Centene Corp.

intentionally takes control of companies already licensed to provide Medicaid managed-care plans and those licensed to sell insurance policies on the ACA exchange in an effort to mislead consumers as to the coverage offered by Ambetter insurance. In other words, Plaintiffs have alleged that Centene Corp. has used the "resources, contacts, facilities, and appearance of legitimacy" of its subsidiaries to perpetrate a fraud in a manner it could not have done without channeling its activities through the enterprise. *See Fitzgerald*, 116 F. 3d at 227.

Defendants direct the Court to its decision in *McNeal* in support of their argument that Plaintiffs have not alleged facts that rise to the level of a viable RICO claim. (Dkt. 19 at 9 (citing *McNeal v. J.P. Morgan Chase Bank, N.A.*, 2016 WL 6804585, at *1 (N.D. Ill. Nov. 17, 2016)). In *McNeal*, the plaintiff alleged that the defendant corporations engaged in a RICO enterprise to effect fraudulent mortgage assignments and collect improper fees. 2016 WL 6804585 at *3. The plaintiff in that case sued multiple banks, alleging that those banks and their employees formed the RICO enterprise. *Id.* Ultimately, the district court dismissed the plaintiff's RICO claim, determining that plaintiff's allegations were merely that affiliates within the defendant's corporate family "unlawfully carried out their mortgage-related business." *Id.* at *4. The court found this was insufficient to state a RICO claim because the complaint did not allege unlawful conduct on behalf of a distinct RICO enterprise. *Id.* The court further noted that the plaintiff failed to allege the structure, duration, or organization of the alleged enterprise and only "vaguely allud[ed] to the corporate affiliation between the [] defendants and alleged predicate acts." *Id.* Accordingly, the court dismissed the plaintiff's RICO claims. *Id.*

In response, Plaintiffs rely on *National Council on Compensation*, among other cases, to argue that Plaintiffs sufficiently pleaded a RICO enterprise by alleging that Defendants used their separate corporate forms to facilitate the unlawful activity. (Dkt. 33 at 11 (citing *Nat'l Council on*

12

*Compensation Ins., Inc. v. American Int'l Grp., Inc.*, No 07 C 2898, 2007 WL 7715086, at *3 (N.D. Ill. Dec. 26, 2007)). In *National Council*, the plaintiff alleged that defendant American International Group, Inc. ("AIG"), along with its affiliates and subsidiary corporations, filed reports which contained false information regarding the defendants' workers' compensation premiums. *Id.* The plaintiff alleged that the defendant AIG, along with several of its executives, engaged in a pattern of racketeering activity and formed a RICO enterprise to commit mail fraud by filing the inaccurate reports. *Id.* The plaintiff further alleged that AIG and its affiliates and subsidiaries used their separate corporate forms to defraud the plaintiff. *Id.* The district court held that plaintiff's allegations were sufficient to state a claim under RICO because the plaintiff "adequately, though minimally, pled that the use of subsidiaries . . . furthered defendants' allegedly unlawful activity, which is sufficient to establish an 'enterprise' separate from defendant AIG itself." *Id.*

Like the Court in *National Council*, and unlike in *McNeal*, the Court finds that Plaintiffs' allegations here are sufficient. Defendants are correct, as the court in *McNeal* recognized, that Plaintiffs must allege that the members of the Ambetter Enterprise were carrying out the affairs of the enterprise—and not merely the affairs of their insurance businesses. The Court finds they have done so, although barely, and have alleged adequate facts at this stage regarding each Defendants' role in the alleged enterprise. Drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs have also established an enterprise distinct from the Defendants themselves by adequately alleging that Defendants used their subsidiaries to further facilitate the allegedly fraudulent scheme. Accordingly, Plaintiffs have alleged a RICO enterprise.

### b. Whether Plaintiffs Plead Mail and Wire Fraud with Particularity

Having found that Plaintiffs have adequately alleged a RICO enterprise, the Court next turns to whether Plaintiffs have pled mail and wire fraud with particularity. To state a claim for mail or wire fraud, a plaintiff must allege (1) participation in a scheme to defraud, (2) intent to defraud, and (3) use of interstate wires in furtherance of the fraud. *United States v. Sheneman*, 682 F. 3d 623, 628 (7th Cir. 2012). "The use of the wires need not be an essential element of the scheme; it is enough if the use is 'incident to an essential part of the scheme' or 'a step in the plot.'" *Id.* (quoting *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989)). In fact, the use of the wires need not contain any false or fraudulent information, the use must only be part of the alleged scheme. *Id.*

Additionally, to meet the heightened pleading standard of Rule 9(b), "a RICO plaintiff 'must, at a minimum, describe the predicate acts [of fraud] with some specificity and state the time, place, and content of the alleged communications perpetrating the fraud." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 726 (7th Cir. 1998) (quoting *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992)). "Although Rule 9(b) requires that a RICO plaintiff provide only a general outline of the alleged fraud scheme—one sufficient to reasonably notify the defendants of their purported role in the scheme—the complaint must, at minimum, describe the predicate acts with some specificity[.]" *Midwest Grinding*, 976 F.2d at 1020. At the same time, Rule 9(b) sets forth that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Further, "[a] plaintiff who pleads a fraudulent scheme involving numerous transactions over a period of years need not plead specifics with respect to every instance of fraud, but he must at least provide representative examples." *Mason v. Medline Indust., Inc.*, 731 F. Supp. 2d 730, 735 (N.D. Ill. 2010).

14

Plaintiffs' RICO claims allege that Defendants' pattern of racketeering activity "consists of millions of violations of the federal mail- and wire-fraud statutes." (Dkt. 1 ¶ 198 (citing 18 U.S.C. §§ 1341, 1343.)) Accordingly, the heightened pleading requirement of Rule 9(b) applies to Plaintiffs' RICO claim, which requires Plaintiffs to allege the "who, what, when, where, and how of the fraud." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014). "While the precise level of particularity required under Rule 9(b) depends upon the facts of the case . . . [o]ne of the purposes of the particularity and specificity required under Rule 9(b) is 'to force the plaintiff to do more than the usual investigation before filing his complaint.'" *Id.* (quoting *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999)).

Defendants argue that Plaintiffs' RICO claims should be dismissed because the Complaint does not plead with particularity as required by Rule 9(b), and because the Complaint does not adequately allege how each Defendant committed a RICO predicate act. Defendants contend that Plaintiffs fail to allege the "what, when, and how of Defendants' purported fraud," because Plaintiffs do not specify the "predicate acts of fraud" nor the "time, place, and content of the alleged communications perpetrating the fraud." (Dkt. 19 at 10, 11) (citing *Del. Motel Assocs., Inc. v. Cap. Crossing Servicing Co.*, No. 17 C 1715, 2017 WL 4224618, at *4 (N.D. Ill. Sept. 22, 2017)). Defendants further argue that Plaintiffs improperly "lump" the Defendants together, and do not specify with particularity which Defendant engaged in the fraud and how. (*Id.*)

In their opposition briefing, Plaintiffs outline the who, what, when, where, and how of their claim for mail and wire fraud as alleged in the Complaint. (Dkt. 33 at 2–5.) The Court need not restate each and every allegation here verbatim; it suffices to say that the Court ultimately finds, upon review of the Complaint and Plaintiffs' briefing, that Plaintiffs have pled fraud with the requisite particularity required by Rule 9(b). Plaintiffs identify the "who" of the alleged fraud—

Defendants and at least 26 other Centene Corp. subsidiaries—and outline each Defendant's role in the Ambetter Enterprise. (Dkt. 33 at 2) (citing Dkt. 1 ¶ 121 (identifying which subsidiary sells Ambetter insurance in each state); ¶ 160(a) (alleging Defendants Centene Corp. and Centene Management designed the Ambetter plan and provide high-level direction to other members of the Enterprise); ¶ 160(d) (alleging Centene Corp. subsidiaries share information with the enterprise about individuals no longer eligible for Medicaid). Plaintiffs further identify the "what" as alleged in the Complaint, namely Defendants' alleged scheme to make fraudulent misrepresentations to consumers about the benefits they would receive with Ambetter insurance. (Dkt. 33 at 3; Dkt. 1 ¶¶ 201–02.) Plaintiffs allege the "when," specifically when ACA health-insurance exchanges went online in 2013 and identify the specific dates during which each named Plaintiff was allegedly deceived. (Dkt. 33 at 3.) Plaintiffs further allege "where" the alleged fraud took place, including the locations of the alleged misrepresentations. (*Id.* at 4) (citing Dkt. 1 ¶ 10 (providing alleged misrepresentations about Ambetter insurance on Centene Corp.'s website); ¶ 65 (Ambetter's list of in-network providers available to members); ¶ 149 (Ambetter plan documents filed electronically with the state's online exchange). Finally, Plaintiffs adequately allege "how" Defendants perpetrated the scheme by setting forth each Defendant's role in the scheme. (*Id.* at 4–5.) The Court finds these allegations sufficient to plead a claim for mail and wire fraud with specificity as required by Rule 9(b).

As for the specific allegations of the named Plaintiffs, Defendants argue that three of the named Plaintiffs did not allege they purchased Ambetter insurance in reliance on the representations made in the provider networks. (Dkt. 19 at 10.) The Complaint, however, alleges that Defendants committed mail and wire fraud "every time that plan documents were sent to *current* or potential Ambetter plan members[.]" (Dkt. 1 ¶ 205) (emphasis added). The three named

Plaintiffs that Defendants identify in their briefing—Henriksen, DeSchepper, and Hackett—were current plan members who allege that Defendants made misrepresentations to them regarding what physicians and services were covered by Ambetter insurance. (*See* Dkt. 1 ¶¶ 65–67, 72, 92–99.) Drawing all reasonable inferences in favor of Plaintiffs, the Court can reasonably infer that these individual Plaintiffs' reliance on Defendants' alleged misrepresentations was continuing and resulted in the individual Plaintiff's continued payment of monthly premiums to Defendants for the time they were enrolled in Ambetter insurance. The Court finds that these Plaintiffs have thus adequately alleged the elements of a claim for mail or wire fraud. *See Sheneman*, 682 F. 3d at 628.

Defendants further argue that Plaintiffs have not adequately alleged the element of intent, specifically that Defendants intended to deceive consumers. (Dkt. 19 at 13.) Defendants argue that, at most, Plaintiffs alleged that Defendants breached their contractual obligations, but that such allegations are insufficient to state a claim for mail or wire fraud. (*Id.*) Plaintiffs argue that Rule 9(b) does not require Plaintiffs to plead intent and knowledge with particularity, and Plaintiffs have therefore pled adequate facts that Defendants intended to defraud consumers. (Dkt. 33 at 14.) The Court agrees with Plaintiffs.

Defendants cite *Kostovetsky* as support for the proposition that, to state a claim for mail or wire fraud, "there must be evidence of intent to defraud." (Dkt. 19 at 14 (citing *Kostovetsky v. Ambit Energy Holdings, LLC*, 242 F. Supp. 3d 708, 724 (N.D. Ill. 2017).) But as Plaintiffs note in their briefing, *Kostovetsky* was decided at the summary judgment stage. (Dkt. 33 at 14 n.6.) At the pleading stage, the Court is not concerned with whether Plaintiffs have propounded "evidence" of Defendants' intent to defraud. Rather, Plaintiffs need only state facts alleging the intent to defraud, and they may do so "generally," as set forth by Rule 9(b). *See* Fed. R. Civ. P. 9(b); *Hefferman v. Bass*, 467 F.3d 596, 602 (7th Cir. 2006) (holding plaintiff sufficiently pled intent to defraud by

17

alleging defendant's "fraud and breach of fiduciary duty was knowing and intentional."). Taking all the allegations in the Complaint as true and drawing all reasonable inferences in favor of Plaintiffs, the Court finds that Plaintiffs have adequately alleged intent.

Finally, Defendants argue that Plaintiffs' fraud claims are merely breach of contract claims, and such claims cannot support a cause of action for fraud. (Dkt. 19 at 13.) While it is "difficult to recast a dispute about broken promises into a claim of racketeering under RICO . . . [d]ifficult is not impossible. Sometimes the evidence shows outright lies and a plan not to keep one's promises—enough of them to meet RICO's continuity-plus-relationship formula for a 'pattern.'" *Perlman v. Zell*, 185 F.3d 850, 853 (7th Cir. 1999). Because the Court has found that Plaintiffs adequately alleged Defendants' intent to deceive, the Court finds that Plaintiffs have pled a claim for mail and wire fraud, and therefore rejects Defendants' argument that Plaintiffs' claims are merely ones for breach of contract. *See Kostovetsky*, 242 F. Supp. 3d at 724 (noting that "intent to defraud" is what distinguishes "run-of-the-mill broken promises and breached contracts from RICO fraud").

Accordingly, the Court concludes that Plaintiffs have adequately alleged that Defendants participated in a scheme to defraud consumers, intended to defraud consumers, and used interstate mail and wires in furtherance of this scheme. For these reasons, the Court denies Defendants' motion to dismiss Plaintiffs' RICO claims.[3]

---

[3] Defendants also move to dismiss Plaintiffs' RICO claims on the grounds that Plaintiffs characterize Defendants' alleged violations of the ACA as mail and wire fraud when the ACA does not provide a private cause of action. (Dkt. 19 at 6.) In response, Plaintiffs concede that a RICO claim cannot stand if it is "solely" predicated on unlawful conduct that is not enumerated as a "racketeering activity" under RICO. (Dkt. 33 at 17.) Plaintiffs argue, however, that because they have otherwise stated a RICO claim, they do not need to establish an ACA violation to prevail. (*Id.* at 18.) The Court agrees that alleged violations of the ACA cannot support a claim for RICO violations on their own, because the ACA does not provide a private right of action. *See United Food & Comm. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, No. 12 C 204, 2012 WL 3061859, at *3 (N.D. Ill. July 26, 2012). At the same time, because the Court found above that Plaintiffs have otherwise stated a RICO claim against Defendants and have adequately alleged the predicate of mail and wire fraud, this conclusion does not alter the Court's decision with respect to Plaintiffs' RICO claims.

## II.    Plaintiffs' Unjust Enrichment Claim

Defendants next argue that Plaintiffs' claim for unjust enrichment must be dismissed because Plaintiffs have alleged that they entered into contracts with Defendants. (Dkt. 19 at 17.) Defendants also argue that Plaintiffs' unjust enrichment claim fails because it is based on a deficient RICO claim. (*Id.* at 18.) But the Court has concluded above that Plaintiffs adequately plead a RICO cause of action, and therefore will not dismiss the unjust enrichment claim on this ground. *See Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) ("[W]here the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent *claim* of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well.") (emphasis in original).

Therefore, the Court turns to Defendants' argument that Plaintiffs have pled themselves out of court on their unjust enrichment claim. Defendants argue that Plaintiffs allege they entered into contracts with Defendants, thus dooming their unjust enrichment claim. (Dkt. 19 at 17.) Plaintiffs argue, on the other hand, that the Complaint does not allege Plaintiffs entered into contracts with Defendants Centene Corp. or Centene Management, and that only four of the six Plaintiffs "may" have entered into contracts with Defendant Celtic. (Dkt. 33 at 18.) In their briefing, Plaintiffs also dispute the validity of the contracts with Celtic and, regardless, argue that Plaintiffs are entitled to pursue both legal and equitable theories of relief at the pleading stage. (*Id.* at 18–19.)

Defendants specifically point to Plaintiffs' allegations that they entered into contracts with Defendants for ACA health insurance and Plaintiffs' allegations regarding the representations made in the Illinois Ambetter evidence of coverage. (Dkt. 1 ¶ 140.) Plaintiffs cited to this evidence of coverage as a sample list of alleged misrepresentations made by Defendants and explain that

the evidence of coverage for each Ambetter plan is "the contract between the consumer and the insurer[.]" (*Id.* ¶ 139.) That is, Plaintiffs themselves define the evidence of coverage as a "contract." In their briefing in opposition to the motion to dismiss, however, Plaintiffs dispute both the existence and the validity of the contracts. (Dkt. 33 at 18–19.) Plaintiffs also argue that pursuant to Rule 8, they are permitted to plead breach of contract and unjust enrichment claims in the alternative. (*Id.*)

Unjust enrichment is an equitable remedy. A claim for unjust enrichment "does not seek to compensate a plaintiff for loss or damages suffered but seeks to disgorge a benefit that the defendant unjustly retains." *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 658 (7th Cir. 2014). For this reason, generally, "where there is a specific contract that governs the relationship of the parties, the doctrine has no application." *Id.* (further clarifying that under Illinois law "a plaintiff may not state a claim for unjust enrichment when a contract governs the relationship between the parties.").

While a plaintiff is permitted to plead inconsistent theories in the alternative, this option is "limited." *Mashallah, Inc. v. West Bend Mut. Ins. Co.*, 20 F.4th 311, 325 (7th Cir. 2021) (quoting *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013). If the parties do not dispute the existence of a contract, an unjust enrichment claim "will seldom survive a motion to dismiss." *Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873, 887 (7th Cir. 2022). A plaintiff may plead in the alternative that if there is an express contract, defendant is liable for breach, or that if there is *not* an express contract, defendant is liable for unjust enrichment. *Cohen*, 735 F.3d at 615. A plaintiff, however, "may not include allegations of an express contract which governs the relationship of the parties, in the counts for unjust enrichment[.]" *Id.*

Here, Plaintiffs have pled the existence of an express contract, namely the evidence of coverage Plaintiffs allege existed for Ambetter insurance in each of the 26 states where it is offered. (Dkt. 1 ¶ 140 n.31.) While Plaintiffs' opposition brief disputes the validity and existence of such contracts, the Complaint itself fails to plead unjust enrichment in the alternative and fails to allege that there was no express contract between the parties. Plaintiffs may not amend their complaint in their responsive briefing. *Pirelli Armstrong Tire Corp. Retiree Med. Bens. Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011). Further, Plaintiffs incorporated all of the previous allegations in the Complaint in their unjust enrichment claim—including the allegations of the evidence of coverage—which *Cohen* specifically prohibits in order to plead unjust enrichment in the alternative. *See also Gociman*, 41 F.4th at 887 (affirming dismissal of plaintiffs' unjust enrichment claim where the plaintiffs "incorporate[d] by reference the allegations of the existence of a contract between the parties."). Accordingly, the Court finds that Plaintiffs have alleged the existence of an express contract with Defendants and failed to adequately plead their unjust enrichment claim in the alternative. Plaintiffs may, however, amend their Complaint to re-plead their unjust enrichment claim, if appropriate.

### III. Plaintiffs' State Consumer Protection Claims

#### a. Whether the Named Plaintiffs Lack Standing to Bring Claims under State Consumer Protection Acts on behalf of the Putative Class Members Residing in Those States

Defendants move pursuant to Rule 12(b)(1) to dismiss Plaintiffs' consumer protection act claims from states where no named plaintiff resides or suffered an injury, arguing that Plaintiffs do not have standing to bring claims under these state laws. In other words, Defendants argue that the named Plaintiffs cannot bring claims on behalf of putative class members for violations of state law in states that the Plaintiffs do not themselves reside in. Plaintiffs allege violations of the

consumer protection laws of Arizona, California, Illinois, Kentucky, Nebraska, Nevada, New Jersey, New Mexico, North Carolina, Pennsylvania, and Washington. (*See* Dkt. 1 at Counts 4–14.) But the named Plaintiffs are only citizens of Arizona, Florida, Illinois, Nevada, and Texas (*Id.* ¶¶ 29, 43, 64, 70, 76, 89.)

Defendants acknowledge that whether Plaintiffs must establish standing at the pleading stage to pursue these claims, or whether the class certification stage is more appropriate, remains an open question in the Seventh Circuit. (Dkt. 19 at 20) (citing *Baldwin v. Star Scientific, Inc.*, 78 F. Supp. 3d 724, 733–34 (N.D. Ill. 2015)). Defendants argue that the Court should nevertheless dismiss these claims in an effort to conserve judicial and party resources.

"Standing is an essential component of Article III's case-or-controversy requirement." *Baldwin*, 78 F. Supp. 3d at 731. Generally, courts should ensure Article III standing exists prior to reaching the merits of the case. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999). The Supreme Court has held that issues relating to class certification may be resolved prior to addressing Article III standing where resolution of class certification is dispositive, and therefore is "logically antecedent" to Article III standing. *Id.* (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997)). In other words, where a challenge to standing "would not exist but for the [class-action] certification[,]" the Court found that it makes more sense to address whether class certification is appropriate prior to addressing whether the plaintiff has standing. *Amchem*, 521 U.S. at 612 (citing *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 623 (3d Cir. 1996)). At the same time, courts should be "mindful that Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right.'" *Id.* (citing 27 U.S.C. § 2072(b)).

Since the Supreme Court's decisions in *Amchem* and *Ortiz*, district courts have come to different conclusions as to whether courts should address class certification before Article III standing. *See Baldwin*, 78 F. Supp. 3d at 734 (collecting cases). One school of thought is that defendants should not be able to use the "guise of standing" to raise issues "more appropriately addressed at the class certification stage." *Id.* (citing *In re Bayer Corp.*, 701 F. Supp. 2d 356, 377 (E.D.N.Y. 2010)). Other courts have taken the view that the Supreme Court "did *not* intend for district courts to delay determining whether an actual case or controversy is before them." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09 CV 3690, 2013 WL 4506000, at *6 (N.D. Ill. Aug. 23, 2013) (emphasis in original). Courts falling in this latter school of thought have also recognized the discovery cost concerns with addressing class certification before standing. *Baldwin*, 78 F. Supp. 3d at 734–35 (citing *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 155 (E.D. Pa. 2009)).

While both sides present important considerations, this Court adopts the prevailing viewpoint of courts in the Seventh Circuit that any challenge to the named plaintiffs' standing to pursue claims on behalf of putative class members is best resolved at the class certification stage, rather than at the pleading stage. *See Rawson v. ALDI, Inc.*, No. 21-cv-2811, 2022 WL 1556395, at *6 (N.D. Ill. May 17, 2022) (collecting cases). The plaintiff in *Rawson*, for example, brought a putative multi-state class action suit including claims under 33 state consumer protection statutes. *Id.* at *5. Defendant in that case similarly argued that the plaintiff could not maintain a claim under a state statute if the plaintiff did not allege she was injured in that state. *Id.* The *Rawson* court adopted the prevailing view in this Circuit that "standing only requires that the plaintiff allege a concrete and particularized injury based on the defendant's conduct, which, in cases like this one, is usually met for the named-plaintiff in consumer protection class-action cases." *Id.* The court

thus concluded that "whether a plaintiff must have a valid claim under every legal theory he seeks to assert on behalf of a class goes to the propriety of class certification." *Id.*

Further, the Court finds that the class certification issue is "logically antecedent" to the standing issues raised here. *See Lesorgen v. Mondelēz Global, LLC*, 674 F. Supp. 3d 459, 464 (N.D. Ill. 2023). The plaintiff in *Lesorgen* brought state law claims on behalf of putative class members residing in those states. *Id.* The court thus reasoned that "any standing issues arise from plaintiff's attempts to represent the proposed class" and therefore the "class certification issue is 'logically antecedent' to the standing concerns." *Id.* (citing *Aftermarket Filters Antitrust Litig.*, No. 08 C 4883, 2009 WL 3754041, at *5 (N.D. Ill. Nov. 5, 2009)). Therefore, the court deferred judgment on standing to the class certification stage. *Id.*; *see also In re Beyond Meat, Inc., Protein Content Marketing & Sales Prac. Litig.*, No. 23 C 669, 2024 WL 726838, at *6 (N.D. Ill. Feb. 21, 2024) (holding because the "standing issue would not exist but for [plaintiffs'] assertion of state law claims on behalf of class members in those states" the class certification issues were "logically antecedent" to standing concerns).

Similarly, here, the class certification issues are "logically antecedent" to the standing concerns because they arise from the named Plaintiffs' attempts to represent putative class members in states in which they do not reside. But for Plaintiffs' assertion of claims on behalf of these putative class members, there would be no challenge to Plaintiffs' standing. The Court therefore will defer consideration of these issues until the class certification stage. Defendants' motion to dismiss counts 4, 6, 7, 9, 10, 11, 12, 13, and 14 for lack of standing is denied.

### b. Whether Plaintiffs are Required to Plead with Particularity under State Consumer Protection Laws

Defendants next argue that Plaintiffs' state consumer protection law claims should be dismissed because Plaintiffs failed to plead those violations with particularity under Rule 9(b).

Defendants argue that all of Plaintiffs' state consumer protection claims "use the quintessential language of fraud" and are therefore subject to Rule 9(b)'s heightened pleading standard. (Dkt. 19 at 22.) Defendants further argue that Plaintiffs failed to allege that they relied on Defendants' fraudulent misrepresentations. (*Id.*)

The Court is not convinced. Defendants do not set forth the elements required to state a claim under each separate state consumer protection law alleged in the Complaint. Defendants bear the burden of persuasion on their motion to dismiss, and they cannot meet that burden with generalized arguments that are disconnected from the specific standards under each statutory claim they seek to dismiss. Indeed, Plaintiffs note in their briefing that reliance is not an element of each state consumer protection act claim alleged. (Dkt. 33 at 22.) Defendants therefore have failed to meet their burden to show dismissal is appropriate as to every state law claim.

To the extent that certain statutory claims do include an element of reliance, the Court finds that Plaintiffs have adequately alleged reliance on Defendants' alleged misrepresentations. For example, each named Plaintiff alleges they either purchased Ambetter insurance or continued to pay their monthly premium for Ambetter insurance in reliance on Defendants' representations as to which services and providers were covered by Ambetter insurance. (Dkt. 1 ¶¶ 30–31; 44–45; 65–66, 68; 74; 77–80; 89, 95–100). Plaintiffs also make similar allegations of reliance on Defendants' misrepresentations on behalf of the putative class members. (*Id.* ¶¶ 22, 127–28; 200–01.) Accordingly, Defendants' motion to dismiss is denied on this ground.

As to Defendants' argument that Plaintiffs' state law claims are subject to the same heightened pleading standard under Rule 9(b), Defendants argue that because Plaintiffs' state consumer protection act claims use the "quintessential language of fraud," those claims implicate the heightened pleading standard of Rule 9(b). (Dkt. 19 at 22.) The Court agrees.

A claim that "'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (holding that where the theory of fraud "pervade[d]" plaintiffs' entire case, plaintiffs' claims were subject to Rule 9(b)). Where this is the case, Rule 9(b) applies to the factual allegations in a complaint. *Id.* Plaintiffs' claims under the various state consumer protection acts each sound in fraud, as they each incorporate the allegations in the Complaint that Defendants "falsely represent[ed] to Class Members that medical providers who do not accept Ambetter insurance are in the Ambetter provider network, and (ii) falsely promis[ed] Class Members that Ambetter health plans cover certain medical services and medications, and then den[ied] claims for those medical services and medications[.]" (Dkt. 1 ¶¶ 224, 234, 246, 257, 268, 278, 289, 301, 310, 319, 328, 337.) Accordingly, similar to *Borsellino*, Plaintiffs' theory of fraud "pervades" their state consumer protection act claims, and therefore those claims are subject to Rule 9(b)'s particularity requirement.

Here, Plaintiffs allege that Defendants knowingly misrepresented the services and providers covered by Ambetter insurance to prospective customers and insureds. The individual Plaintiffs each allege the dates on which they received the alleged misrepresentations and the means by which they received those communications. (*See, e.g.*, Dkt. 1 ¶¶29, 39–40, 43, 49–51, 70, 72, 10–11, 17, 35, 65, 134, 149, 205.) Plaintiffs also allege that they either purchased or continued paying premiums for Ambetter insurance relying on these misrepresentations. Further, as the Court concluded above, Plaintiffs have pled fraud with particularity as it relates to their RICO claim. (*See* supra pp. 14–19.) Because Plaintiffs' state consumer protection act claims are premised on the same alleged conduct, and because Plaintiff has alleged its fraud claims with particularity, the Court finds that Plaintiffs have pled their state consumer protection act claims

with particularity under Rule 9(b). *See Sloan v. Anker Innovations Ltd.*, No. 22 C 7174, 2024 WL 935426, at *10 (N.D. Ill. Jan. 9, 2024) (holding plaintiffs adequately pled causes of action under state consumer protection laws with particularity under Rule 9(b)). Accordingly, Defendants' motion to dismiss is denied on this ground.

### c. Individual State Consumer Protection Laws

Defendants further challenge Plaintiffs' claims under some of the specific state consumer protection acts where Defendants contend those laws do not permit a claim under these circumstances. The Court will address Defendants' arguments with respect to the particular state laws in turn below.

### i. Kentucky

Defendants argue Plaintiffs cannot maintain a putative class action under the Kentucky Consumer Protection Act ("KCPA"). (Dkt. 19 at 23.) In support of this argument, Defendants cite a Northern District of California opinion citing to an unpublished Kentucky Court of Appeals decision, which reasoned that the court "[did] not believe that [the KCPA] was meant to be a vehicle for Class Action suits." *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 1001 (N.D. Cal. 2016) (citing *Arnold v. Microsoft Corp.*, No. 00-CI-00123, 2000 WL 36114007, at *6 (Ky. Cir. Ct. July 21, 2000)). Plaintiffs contend, on the other hand, that class actions under the KCPA have previously been certified, and they cite to two Western District of Kentucky cases for support. (Dkt. 33 at 23) (citing *Kempf v. Lumber Liquidators*, No. 3:16-cv-492-DJH, 2017 WL 4288903, at *3 (W.D. Ky. Sept. 27, 2017); *Brummett v. Skyline Corp.*, No. C 81-0103-L(B), 1984 WL 262559, at *1, *5 (W.D. Ky. 1984)).

The Court finds that *Kempf*, cited by the Plaintiffs, is instructive here. There, the court recognized the conclusion of the Kentucky Court of Appeals in its *Arnold* decision, but noted that

the *Arnold* court "provided little support for its conclusion, merely referencing the 'venue requirements and other language of [the KCPA]." *Kempf*, 2017 WL 4288903, at *3 (citing *Arnold*, 2000 WL 36114007, at *6). The *Kempf* court reasoned that there is no "explicit prohibition of class actions" anywhere in the language of the KCPA. *Id.* The court also recognized other cases where a class action was permitted to proceed under the KCPA, notably one opinion from the Kentucky Supreme Court which affirmed the lower court's certification of a class alleging KCPA claims. *Id.* (citing *Merck & Co. v. Combs*, No. 2010-SC-000529-MR, 2011 WL 1104133, at *1–2 (Ky. Mar. 24, 2011)). The *Kempf* court ultimately concluded that class actions are not prohibited by the KCPA. *Id.* The Court finds the reasoning of *Kempf* persuasive and, absent any controlling authority to the contrary, similarly concludes that class actions are not prohibited under the KCPA. The Court therefore denies Defendants' motion to dismiss Plaintiffs' claims under the KCPA.

### ii. Nebraska

Defendants next argue that Plaintiffs' claims under the Nebraska Consumer Protection Act ("NCPA") must be dismissed because the statute exempts "certain activities of heavily regulated businesses." (Dkt. 19 at 24) (citing *Hage v. Gen. Servs. Bureau*, 306 F. Supp. 2d 883, 889 (D. Neb. 2003)). Because the Complaint acknowledges that Defendants' business activity is subject to regulation by the Department of Health and Human Services, Defendants argue the conduct complained of in the Complaint is exempt from liability under the NCPA. (*Id.*)

The NCPA "expressly exempts certain activities of heavily regulated businesses." *Hage*, 306 F. Supp. 2d at 889. The NCPA does not apply "to actions or transactions otherwise permitted, prohibited, or regulated under laws administered by . . . any [] regulatory body or officer acting under statutory authority of this state or the United States." Neb. Rev. Stat. § 59-1617(1). "However, particular conduct is not immunized from the operation of the [NCPA] merely because

28

the actor comes within the jurisdiction of some regulatory body, the immunity arises if the conduct itself is also regulated." *Hage*, 306 F. Supp. 2d at 889.

The mere fact that Defendants are engaged in a business that is regulated by the Department of Health and Human Services does not mean Defendants are exempt from all liability under the NCPA. Instead, the Court must look to the unlawful conduct Plaintiffs allege in the Complaint to determine if that conduct is specifically regulated. As Defendants point out, Plaintiffs allege certain conduct by Defendants related to the provider network and directory that is regulated by the Department of Health and Human Services. (*See* Dkt. 1 ¶¶ 131) (alleging Defendants fail to maintain a sufficient network as required by 45 C.F.R. § 156.230(a)(2)); (Dkt. 1 ¶ 132) (alleging Defendants fail to publish an accurate and complete provider directory, as required by 45 C.F.R. § 156.230(b)(2)); (Dkt. 1 ¶ 133) (alleging Defendants do not maintain a sufficient number of providers in the proper geographic distribution as required by 45 C.F.R. § 156.235(a)(1)). In fact, the crux of Plaintiffs' Complaint is that Defendants formed a RICO enterprise with the purpose of defrauding consumers, in part by misrepresenting the providers that were in network with Ambetter insurance. As the Complaint shows, this conduct is directly regulated by the Department of Health and Human Services, and the Complaint cites to the governing regulations. (Dkt. 1 ¶¶ 131–33.) Accordingly, the Court finds that Defendants' alleged conduct falls within the "broad sweep" of Nebraska's statutory exemption. *See In re Cattle Antitrust Litig.*, No. 19-1222, 2021 WL 7757881, at *13 (D. Minn. Sept. 14, 2021).

Plaintiffs attempt to escape Nebraska's statutory exemption for regulated practices by arguing that a carve out for "[a]ctions and transactions prohibited under the laws administered by the Director of Insurance" applies. Neb. Rev. Stat. § 1617(2). Plaintiffs, however, do not allege that the Director of Insurance regulates Defendants' conduct. While the Court acknowledges that

a plaintiff's burden in defending a motion to dismiss is "low" and accepts all well-pled allegations as true at the motion to dismiss stage, the Complaint contains no allegations that the Nebraska Department of Insurance regulates Defendants' relevant conduct, nor do Plaintiffs attempt to develop this argument in their opposition brief. (*See* Dkt. 33 at 24.); *Deb v. SIRVA, Inc.*, 832 F.3d 800, 810 (7th Cir. 2016). Accordingly, the Court cannot conclude that the limiting language of § 59-1617(2) applies here. For these reasons, Defendants motion to dismiss Plaintiffs' claims under the NCPA is granted.

### iii. Whether Plaintiffs' Claims are Foreclosed under Illinois, New Jersey, New Mexico, North Carolina and Pennsylvania Consumer Protection Laws because Plaintiffs only State a Claim for Breach of Contract

Defendants finally argue that Plaintiffs' claims under certain states' consumer protection laws should be dismissed because Plaintiffs allege nothing more than "garden-variety breach of contract" claims, which cannot form the basis of a consumer protection claim. (Dkt. 19 at 24.) Defendants argue this precludes Plaintiffs from bringing claims under the consumer protection laws of Illinois, Kentucky, Nebraska, New Jersey, New Mexico, North Carolina, and Pennsylvania because those statutes require more than an allegation of breach of contract to state a claim. (*Id.*)

As explained above, *supra* at 13–18, this Court has found that Plaintiffs stated a RICO claim for mail and wire fraud. Accordingly, the Court has already rejected Defendants' argument that Plaintiffs' claims are no more than garden variety breach of contract claims. Plaintiffs therefore have alleged conduct sufficient to state a claim for violation of the relevant consumer protection law in each of these states as follows[4]:

**Illinois.** Defendants cite to *Avery v. State Farm Mut. Auto. Ins. Co.*, for the proposition that "[a] breach of contractual promise, without more, is not actionable under the [Illinois] Consumer

---

[4] The Court declines to address the additional grounds for dismissal under the Nebraska consumer protection act, having already dismissed that claim. *Supra* at 29–30.

Fraud Act." 835 N.E.2d 801, 844 (Ill. 2005). Here, Plaintiffs allege that Defendants intentionally misrepresented the services and physicians covered by Ambetter insurance in order to induce consumers to purchase Ambetter insurance. (*See* supra pp. 13–18.) This alleged conduct goes beyond a mere breach of a contractual promise, and therefore states a claim under the Illinois Consumer Fraud Act.

*Dyson, Inc. v. Syncreon Tech. (Am.), Inc.*, is informative. 2019 WL 3037075, at *5 (N.D. Ill. July 11, 2019). In that case, the court refused to dismiss the plaintiff's claims under the Illinois Consumer Fraud Act because the plaintiff contended the defendant "induced [plaintiff] to enter the contract by misrepresenting its experience in retail logistics and its existing technological capacity." *Id.* Accordingly, the court held that the plaintiff's claims of fraudulent misrepresentations "extend beyond an unfulfilled promise to perform its contractual obligations" and denied the defendant's motion to dismiss the plaintiff's Consumer Fraud Act claims. Similarly, here, Plaintiffs have alleged more than mere contractual breaches, and therefore Defendants' motion to dismiss Plaintiffs' Illinois Consumer Fraud Act claim is denied.

**Kentucky.** Defendants cite to *M.T. v. Saum* to argue that the "mere failure to perform a contract will not trigger application of the KCPA." 7 F. Supp. 3d 701, 705 (W.D. Ky. 2014). Rather, "[t]o succeed on a KCPA claim, an insured must demonstrate 'some evidence of unfair, false, misleading or deceptive acts[.]'" *Foster v. Am. Fire & Cas. Co.*, 219 F. Supp. 3d 590, 598. Because the Court determined above that Plaintiffs have stated a claim for mail and wire fraud, the Complaint therefore alleges "false, misleading or deceptive acts" sufficient to state a claim under the KCPA. *See Ali v. Allstate Northbrook Indem., Co.*, 2024 WL 1199023, at *4 (W.D. Ky. March 20, 2024) (holding that where plaintiff alleged facts rising to the level of gross negligence, plaintiff sufficiently pleaded a claim under the KCPA).

**New Jersey.** Defendants argue that Plaintiffs failed to state a claim under the New Jersey Consumer Fraud Act ("NJCFA") because to state a claim under the NJCFA that is premised on a breach of contract claim, a plaintiff must allege a "substantial aggravating circumstance" which demonstrates the defendant's conduct "stands outside the norm of reasonable business practice in that it will victimize the average consumer." *Coda v. Constellation Energy Power Choice, LLC*, 409 F. Supp. 3d 296, 301–02 (D.N.J. 2019). A claim under the NJCFA, however, "is not barred by the economic loss doctrine and can be asserted alongside a breach of contract claim when a plaintiff alleges fraud in the inducement of the contract." *Lukacs v. Purvi Padia Design LLC*, No. 21-19599, 2022 WL 2116868 (D.N.J. June 13, 2022).

Here, Plaintiffs' claim under the NJCFA is premised on Plaintiffs' fraud claim. (Dkt. 1 ¶¶ 299–89.) Claims under the NJCFA are required to meet the particularity requirement of Rule 9(b) and a plaintiff must allege the "date, time and place of the alleged fraud[.]" *Coda*, 409 F. Supp. at 301. Because the Court concluded above that Plaintiffs' fraud claims meet the particularity requirement of Rule 9(b), Plaintiffs have stated a claim under the NJCFA. Even if the Court were to accept Defendants' argument that Plaintiffs' NJCFA claim is premised on a breach of contract claim, Plaintiffs sufficiently alleged aggravating factors by alleging that Defendants made misrepresentations about the services and providers covered under Ambetter insurance. *See Lukacs*, 2022 WL 2116868 at *6 (holding plaintiff alleged substantially aggravating factors to state a claim under the NJCFA by alleging specific misrepresentations directly connected to the alleged losses). Accordingly, Defendants' motion to dismiss Plaintiffs' NJCFA claim is denied.

**New Mexico.** To support their argument that Plaintiffs' claim under the New Mexico Unfair Practices Act ("NMUPA") must be dismissed, Defendants cite *Carl Kelley Const. LLC v. Danco Tech.* for the proposition that "a [NM]UPA claim is more like a tort claim than a contract claim."

656 F. Supp. 2d 1323, 1339 (D.N.M. 2009). However, this citation does not support Defendants' argument that Plaintiffs' NMUPA claim must be dismissed. Rather, the Court in *Carl Kelley* was analyzing the impact of a choice-of-law provision in a contract on the plaintiff's NMUPA claim. Such analysis is irrelevant here, and Defendants provide no discussion otherwise. Accordingly, Defendants have failed to carry their burden to show why Plaintiffs' NMUPA claim should be dismissed. Defendants' motion to dismiss is denied as to Plaintiffs' NMUPA claim.

**North Carolina.** Defendants cite *Broussard v. Meineke Discount Muffler Shops, Inc.* for the proposition that "North Carolina courts have repeatedly held that 'a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under" the North Carolina Unfair Trade Practices Act ("NCUTPA"). 155 F.3d 331, 347 (4th Cir. 1998) (citing *Branch Banking & Tr. Co. v. Thompson*, 418 S.E.2d 694, 700 (N.C. App. 1992)). Rather, "North Carolina law requires a showing of 'substantial aggravating circumstances' to support a claim under the [NC]UTPA." *Id.* The Fourth Circuit has since held various misrepresentations made by a party that had the "tendency to deceive" and which the plaintiff relied on constituted such "substantial aggravating circumstances." *Edmonson v. Am. Motorcycle Ass'n, Inc.*, 7 F. App'x 136, 152 (4th Cir. 2001).

Similarly, here, Plaintiffs alleged that Defendants made misrepresentations regarding the coverage provided under the Ambetter plan sufficient to state a claim for fraud. Accordingly, even accepting Defendants' argument that Plaintiffs' NCUTPA claim is premised on a breach of contract claim, Plaintiffs have adequately stated such aggravating circumstances to sufficiently state a claim under the NCUTPA. *See Id.* (affirming jury verdict in favor of plaintiff on NCUTPA claim finding defendants made fraudulent misrepresentations regarding their intention to contract with the

plaintiff, such conduct the court found was "unethical" and had the "capacity and tendency to deceive."). Defendants' motion to dismiss Plaintiffs' NCUTPA claim is denied.

**Pennsylvania.** Defendants cite *Pansini v. Trane Co.* to argue that Plaintiffs have failed to state a claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("PUTP"). No. 17-3948, 2018 WL 1172461, at *6 (E.D. Pa. March 6, 2018). However, the portion of this opinion Defendants cite relates to the court's analysis of the economic loss doctrine, where the court explains that "[i]f the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract . . . then the claim is to be viewed as one for breach of contract." *Id.* However, in analyzing the plaintiff's claim under the PUTP, the court explained that the alleged violation "is predicated on the count for fraudulent misrepresentation." *Id.* at *4. Accordingly, the court explained "the two counts rise and fall together." *Id.* As such, because the court held the plaintiff stated a claim for fraudulent misrepresentation, the court held the plaintiff sufficiently pled a PUTP violation as well.

The Court reaches the same conclusion here. Because the Court concluded above that Plaintiffs have stated a claim for fraud, and because Plaintiffs' PUTP claim is premised on the fraud claim, Plaintiffs have therefore stated a claim under the PUTP. Defendants' motion to dismiss this claim is denied.

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part.

Dated: May 2, 2024

_____

Honorable Nancy L. Maldonado
U.S. District Judge